UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL D. BIKUNDI, SR., | : | Criminal No. 14-CR-00030-BAH-2 |
| | : | |
| Defendant. | : | |
| _____ | : | |

## GOVERNMENT'S MOTION FOR PRELIMINARY ORDER OF FORFEITURE

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully moves the Court, pursuant to Federal Rule of Criminal

Procedure 32.2(b), to enter the attached Preliminary Order of Forfeiture.  In support of its

Motion, the government states as follows.

## I.  BACKGROUND

On December 18, 2014, a grand jury issued a superseding Indictment ("Indictment")

charging defendants Florence Bikundi and Michael D. Bikundi, Sr. ("Michael Bikundi"), with

Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349 (Count One), Health

Care Fraud, in violation of 18 U.S.C. § 1347 (Count Two), Money Laundering Conspiracy, in

violation of 18 U.S.C. § 1956(h) (Count Fifteen), Laundering of Monetary Instruments, in

violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts Sixteen through Twenty-Two), and Engaging

in Monetary Transactions in Property Derived from  Specified  Unlawful Activity,  in  violation

of 18 U.S.C. § 1957 (Counts Twenty-Three through Twenty-Five).   Indictment, ECF No. 44.

The Indictment separately charged Florence Bikundi with an additional count of Health Care

Fraud (Count Thirteen) and one count of Federal Health Benefit Program Fraud, in violation of

42 U.S.C. § 1320a-7b(a)(3)  (Count Fourteen).  Id.

The Indictment included a Forfeiture Allegation.[1]  The Forfeiture Allegation informed the defendant that (1) upon conviction of an offense alleged in Counts One, Two, Thirteen, or Fourteen, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense; and (2) upon conviction of an offense alleged in Counts Fifteen through Twenty-Five, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in the offense, or any property traceable to such property.[2]  Id.

The Forfeiture Allegation identified eighty-seven specific properties as subject to forfeiture upon conviction of an offense alleged in Counts One, Two, Thirteen, or Fourteen.  Id. On April 24, 2015, the United States filed a Bill of Particulars for Forfeiture ("Bill of Particulars") listing (a) five additional properties subject to forfeiture upon conviction for each of the offenses alleged in Counts One, Two, Thirteen, or Fourteen; (b) ninety-two specific properties subject to forfeiture upon conviction of the offense alleged in Count Fifteen; and (c) separate specific property subject to forfeiture upon conviction for the offenses alleged in Count Twenty-Three through Twenty-Five.[3]  Bill of Particulars, ECF No. 119.

The Forfeiture Allegation notified the defendant that the government will seek a

---

[1] Federal Rule of Criminal Procedure 32.2(a) requires the government to provide notice to the defendant in an indictment that it will seek forfeiture of property upon conviction.  Fed. R. Crim. P. 32.2(a).  "The indictment . . . need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks."  Id.

[2] Due to the guilty verdict for the money laundering conspiracy, the government no longer seeks forfeiture for Counts Sixteen through Twenty-Two.

[3] The Indictment and Bill of Particulars identified six pieces of jewelry and three accounts with less than a dollar balance as subject to forfeiture for Counts One, Two, Thirteen, Fourteen, and Fifteen.  The government now seeks to forfeit the jewelry as substitute assets and does not intend to forfeit the three accounts.  See United States v. Candelaria-Silva, 166 F.3d 19, 43-44 (1st Cir. 1999) ("proper" for government to switch theory of forfeiture from direct forfeiture to substitute assets based on "prosecutor's conclusion that there was insufficient evidence to support direct forfeiture").

forfeiture money judgment in the amount of at least $75,000,000 upon conviction of an offense alleged in Counts One, Two, Thirteen, Fourteen, or Fifteen.  The Forfeiture Allegation also informed the defendant that the United States will seek the forfeiture of substitute property if any of the criteria in 21 U.S.C. § 853(p) are satisfied.  Id.

On November 12, 2015, a jury returned a verdict finding both defendants guilty of Counts One, Two, Fifteen, and Sixteen through Twenty-Two.  Florence Bikundi was also found guilty of Counts Thirteen and Fourteen.

## II.  FORFEITURE DETERMINATIONS

"Forfeiture is an element of the sentence imposed *following* conviction."  Libretti v. United States, 516 U.S. 29, 38-39 (1995) (emphasis in original).  The standard of proof for a forfeiture determination is preponderance of the evidence.  See United States v. DeFries, 129 F.3d 1293, 1312 (D.C. Cir. 1997).

The Court must determine: (1) what property is subject to forfeiture under the applicable statute; (2) whether the government has established the requisite nexus between the specific property it seeks to forfeit and the offense; (3) the forfeiture money judgment amount; and (4) if the government has met the statutory criteria to forfeit substitute property.  Fed. R. Crim. P. 32.2(b)(1)(A), (b)(2)(A).  If the Court determines that property is subject to forfeiture, it must then enter a preliminary order of forfeiture.  Id. (b)(2)(A).  "Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant."  Id. 32.2(b)(2)(B).  A preliminary order becomes final as to a defendant at sentencing unless the defendant consents to an earlier time.  Id. 32.2 (b)(4)(A).

The Court's forfeiture determinations "may be based on evidence already in the record,"

3

including evidence during the guilt phase, "and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Id. 32.2(b)(1)(B). The Federal Rules of Evidence do not apply for the forfeiture phase. See Fed. R. Evid. 1101(d)(3); United States v. Emor, No. CRIM. 10-0298 PLF, 2012 WL 988024, at *1 (D.D.C. Mar. 23, 2012). "It is appropriate" for a court to consider an affidavit when making its forfeiture determination. United States v. Ivanchukov, 405 F. Supp. 2d 708, 709 n.1 (E.D. Va. 2005). "[R]eliable hearsay is admissible." United States v. Gaskin, No. 00-CR-6148, 2002 WL 459005, at *9 (W.D.N.Y. Jan. 8, 2002), aff'd, 364 F.3d 438 (2d Cir. 2004).

## III. HEALTH CARE FRAUD OFFENSES

### A. Property Subject to Forfeiture Under the Applicable Statute

Counts One, Two, Thirteen, and Fourteen are Federal health care offenses as defined in 18 U.S.C. § 24. 18 U.S.C. § 24. The applicable forfeiture statute for Federal health care offenses is 18 U.S.C. § 982(a)(7). It provides that "[t]he court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7).

"[I]n § 982(a)(7), 'gross proceeds' is properly interpreted to include the total amount of money brought in through the fraudulent activity, with no costs deducted or set-offs applied." United States v. Poulin, 461 F. App'x 272, 288 (4th Cir. 2012) (per curiam); see also United States v. Hoffman-Vaile, 568 F.3d 1335, 1344 (11th Cir. 2009) (holding that payments defendant received from private insurance companies and patients are forfeitable under § 982(a)(7) "because, but for her Medicare fraud, she would not have been entitled to collect these sums from the companies and patients."); United States v. Jafari, 85 F. Supp. 3d 679, 687 (W.D.N.Y.

2015) (holding that § 982(a)(7) "plainly requires forfeiture of 'gross proceeds,' not profits" and that there is no right to a set-off "for services actually rendered"); United States v. Boesen, 473 F. Supp. 2d 932, 953-54 (S.D. Iowa 2007) (holding that gross proceeds is amount received from health care fraud scheme without any set-off for services actually performed), aff'd in part, 541 F.3d 838 (8th Cir. 2008); United States v. Palazzo, No. CIV.A. 05-0266, 2008 WL 5381581, at *10 (E.D. La. Dec. 18, 2008) ("There is no authority for [defendant]'s argument that she is entitled to a set-off for services that were actually performed.") (citing Boesen), aff'd, 372 F. App'x 445 (5th Cir. 2010).[4]   As the district court stated in Boesen when it denied the defendant's request to deduct from the forfeiture amount the value of the services provided, "[t]o allow the perpetrator of a fraud to mitigate his eventual forfeiture exposure by such a set-off procedure would seem fundamentally inconsistent with the purpose of the statute and challenging, if not impossible, in its application from case to case."  473 F. Supp. 2d at 954.

The defendant committed the health care fraud offenses through Global Healthcare, Inc. ("Global").  When a business is "used as a vehicle to commit fraud" and "that fraud touched everything," all "items connected to [the business's] revenue stream are subject to forfeiture." United States v. Smith, 749 F.3d 465, 488-89 (6th Cir. 2014); see also United States v. Lang, No. 1:12-CR-104, 2015 WL 4207109, at *2 (E.D. Tenn. July 10, 2015) (finding that when "vast majority" of business's proceeds comes from illegal activity, government can forfeit "entirety"

---

[4] The civil forfeiture statute similarly defines health care fraud proceeds as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A).

Other criminal forfeiture provisions do not permit a deduction for expenses when determining forfeitable proceeds.  For example, under 18 U.S.C. § 982(a)(2)(A), a person convicted of certain offenses must forfeit "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."  18 U.S.C. § 982(a)(2)(A).  "[P]roceeds under § 982(a)(2)(A) means gross receipts without reduction for costs and expenses rather than net profit or a similar concept."  United States v. Joel, No. 8:11-CR-89-T-23TGW, 2012 WL 2499424, at *3 (M.D. Fla. June 5, 2012) (internal quotations omitted), report and recommendation adopted, No. 8:11-CR-89-T-23TGW, 2012 WL 2451822 (M.D. Fla. June 27, 2012), aff'd sub nom., United States v. Vernon, 593 F. App'x 883 (11th Cir. 2014).

of the proceeds even if the business was not "a wholly illegitimate enterprise").  In United States v. Warshak, 631 F.3d 266 (6th Cir. 2010), the Sixth Circuit held that "the entirety" of a company's revenue was forfeitable, "including money generated through supposedly legitimate transactions," because even legitimate sales "resulted 'directly or indirectly' from a conspiracy to commit fraud."  Id. at 332; see also United States v. Torres, 703 F.3d 194, 199 (2d Cir. 2012) ("so long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense . . . . the forfeiture statute envisions and tolerates some attenuation of the chain of events between the crime and the related property or gain it makes subject to forfeiture.").

The Court should find that all of the revenue or receipts of Global's D.C. office ("Global - D.C.")[5] are subject to forfeiture under section 982(a)(7).  At its core, Global - D.C. was a corrupt business which was controlled, managed, and operated by Florence Bikundi and Michael Bikundi.  The fraudulent conduct in Counts One and Two involved, among other things, payments to Medicaid beneficiaries to retain those beneficiaries as Global patients and to falsely certify that Global PCAs were providing home care services; falsification of Global patient files to make it appear that they were authorized to receive services; falsification of Global employee files to make it appear that they were qualified to provide services; and billing D.C. Medicaid for services that were never provided.  From January 2012 until February 2014, when Global - D.C. was effectively shut down, D.C. Medicaid paid approximately $29.5 million to Global – D.C. for services it purportedly provided to 567 beneficiaries.  Govt. Ex. 439; Testimony of Donald Shearer, Transcript of Jury Trial, Nov. 4, 2015, Morning Session ("Shearer Nov. 4, 2015 Test.") at 99-102, 104.  These same 567 beneficiaries did not receive any services from any D.C.

---

[5] Global also had an office located at 3042 Mitchellville Road, Bowie, Maryland.  Affidavit of Nicole S. Hinson ("Hinson Affid."), Ex. C, at ¶ 4.

Medicaid provider between March 1, 2014, and December 31, 2014.  Shearer Nov. 4, 2015 Test. at 102.  D.C. Medicaid made no payments for these beneficiaries to any home care agencies during that time period.  Id. at 104.

Global's entire D.C. operation was "permeated with fraud."  Warshak, at 332.  The attached Declaration of Donald Shearer ("Shearer Declaration") details the multitude of federal and local regulations that the defendants violated.  Shearer Declaration, Ex. A.  These violations caused Global - D.C. to receive Medicaid payments to which it was not entitled and would have resulted in the suspension and termination of its provider agreement if D.C. Medicaid had been aware of the violations.  Id.

The D.C. Department of Health, Health Regulations, and Licensing Administration would not have initially licensed Global as a home care agency if it knew that, among other things: (a) Florence Bikundi was excluded; (b) Global employees did not have criminal background checks; (c) home care aides did not have legitimate home care aide training certificates; (d) home care aides were not being supervised by a registered nurse; (e) nurses were not going to patient's homes; and (f) Global presented counterfeit and forged documents during surveys; and it would have moved to terminate the license if it later discovered these facts. Testimony of Sharon Mebane, Transcript of Jury Trial, Oct. 16, 2015, Morning Session ("Mebane Test.") at 42, 45-46, 48, 73, 74, 82, 89.  As stated in the attached Declaration of Sharon Mebane ("Mebane Declaration"), willful submission of false or misleading information in connection with an application for licensure is grounds for license denial, suspension, downgrade or revocation.  Mebane Declaration, Ex. B., at ¶ 5.  A home care agency cannot bill Medicaid if it has no license, or its license has been suspended or revoked.  Mebane Test. at 49.

Global – D.C. would have ceased to function as a business without D.C. Medicaid funds.

Its only source of payments for any services it may have legitimately provided was D.C. Medicaid.  It did not receive payments from other insurers or patients.  Hinson Affid. at ¶ 8. Global – D.C. was a rogue home care agency operated by Florence Bikundi and Michael Bikundi with complete contempt for all of the rules and regulations governing Medicaid providers and home care agencies. Providing legitimate services with qualified employees to deserving patients was an afterthought.  It is appropriate for the Court to find that all revenues generated or obtained by Global – D.C. constituted or were derived, directly or indirectly, from gross proceeds traceable to the commission of each of the health care fraud offenses and thus are forfeitable under 18 U.S.C. § 982(a)(7).

### B.  Forfeiture Money Judgment

If the government seeks a forfeiture money judgment, "the court must determine the amount of money that the defendant will be ordered to pay."  Fed. R. Crim. P. 32.2(b)(1)(A). The government is entitled to a money judgment in the amount of the gross proceeds for each health care fraud offense.  See United States v. Louthian, No. 1:12CR00002, 2013 WL 594232, at *3 (W.D. Va. Feb. 15, 2013), amended, No. 1:12CR00002, 2013 WL 3007174 (W.D. Va. Apr. 15, 2013) aff'd, 756 F.3d 295 (4th Cir. 2014); see also Jafari, 85 F. Supp. 3d at 688 ("the Government may recover a forfeiture judgment equal to the gross proceeds traceable to the underlying fraudulent [health care] scheme."); Boesen, 473 F. Supp. 2d at 953 (money judgment amount is "gross proceeds from the overall scheme charged in the indictment.").  "The calculation of forfeiture amounts is not an exact science."  United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011).  A reasonable estimation is sufficient.  Id.

 "The fact that a defendant is indigent or otherwise lacks adequate assets to satisfy a judgment does not operate to frustrate entry of a forfeiture order.  Forfeiture is calculated on the

basis of the total proceeds of a crime, not the percentage of those proceeds remaining in the defendant's possession at the time of the sentencing hearing." United States v. Blackman, 746 F.3d 137, 143-44 (4th Cir. 2014). Accord United States v. Day, 524 F.3d 1361, 1377-78 (D.C. Cir. 2008) (noting that forfeiture statute did not contain any "language limiting the amount of money available in a forfeiture proceeding to those assets in the defendant's possession at the time forfeiture is ordered.").

As discussed in the previous section, the gross proceeds of each health care offense are the entire revenue stream generated by Global – D.C. This amount is approximately $81,876,065.87, which consists of $80,620,929.20 in D.C. Medicaid payments and additional deposits of $1,255,136.67.[6] Govt. Trial Ex. 5 & Hinson Affid. at ¶ 12.

The same funds account for the money judgments for Count One and Count Two. The judgments should therefore be imposed concurrently to one another.

### C. Specific Property Subject to Forfeiture

Federal Rule of Criminal Procedure 32.2(b)(1)(A) requires the government to establish the "requisite nexus" between the specific property it seeks to forfeit and the offense of conviction. Fed. R. Crim. P. 32.2(b)(1)(A). For health care fraud offenses, the nexus determination is satisfied by tracing the gross proceeds of the offense "back to the commission of the crime." Poulin, 690 F. Supp. 2d at 427-28.

Florence Bikundi and Michael Bikundi moved and transferred the gross proceeds of their health care fraud offenses to and through over 100 accounts that they controlled and which contained funds not derived from Global - D.C. Testimony of Nicole Hinson, Transcript of Jury

---

[6] Forfeiture and loss calculations for sentencing purposes are "distinct." United States v. Hoover-Hankerson, 511 F.3d 164, 171 (D.C. Cir. 2007) (quoting United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir.2006)). "Though the two calculations may at times yield the same outcome, they are not identical." Hoover-Hankerson, at 171.

Trial, Nov. 3, 2015, Morning Session ("Hinson Nov. 3, 2015 Morning Test."), at 131, 134; Govt. Trial Ex. 184; Hinson Affid. at ¶¶ 5, 6.  They conducted tens of thousands of transactions in these accounts.  Hinson Nov. 3, 2015 Morning Test. at 130; Hinson Affid. at ¶ 6.  "The tracing of dollars emanating from a bank account . . . to specific dollars deposited into a bank account" is "a mathematical impossibility."  United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1353 (D.C. Cir. 2002); see also United States v. Walsh, 712 F.3d 119, 123 (2d Cir. 2013) (tracing commingled funds in a bank account is a "fiction").  "Money is fungible, and when funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset, the illicitly-acquired funds and the legitimately-acquired funds (or the respective portions of the property purchased with each) cannot be distinguished from each other that is, they cannot be traced to any particular source, absent resort to accepted, but arbitrary, accounting techniques."  United States v. Moore, 27 F.3d 969, 976-77 (4th Cir. 1994) (internal citation omitted); see also United States v. BCCI Holdings (Luxembourg), S.A., 961 F. Supp. 287, 304 (D.D.C. 1997) ("When tainted and untainted funds are commingled in a specific account, accounting principles have been applied to trace the funds.").

Courts have used one of the three "accounting choices" discussed in United States v. Banco Cafetero Panama, 797 F.2d 1154 (2d Cir. 1986), "to determine what amount of commingled funds are traceable to criminal activity."  Walsh, 712 F.3d at 124.  The first tracing method discussed in Banco Cafetero is the "drugs-in,[7] last-out" rule or "lowest intermediate balance" rule.  797 F.2d at 1159.  This rule "posits that when commingled funds are in an account, legitimate funds are withdrawn first, leaving the tainted funds in the account. When there is insufficient legitimate funds to cover a specific withdraw, then tainted funds are used to cover the withdrawal."  United States v. Haleamau, 887 F. Supp. 2d 1051, 1057 (D. Haw. 2012).

[7] The illegally obtained funds in Banco Cafetero were drug proceeds.

The second accounting method "is to consider 'traceable proceeds' to be a pro rata share of any withdrawal from the account or of any asset purchased with such withdrawal, the share determined by the ratio of the . . . tainted deposit to the funds in the account immediately after the deposit." Banco Cafetero, 797 F.2d at 1159.  The third approach is the "drugs-in, first-out" rule, which "consider[s] 'traceable proceeds' to be any one withdrawal, or any asset purchased with such withdrawal, to the extent of" the amount of tainted funds deposited into the account. Id.

In In re Moffitt, Zwerling & Kemler, P.C., 875 F. Supp. 1152 (E.D. Va. 1995), the court recognized that "when tracing commingled funds, the government is accorded flexibility to choose among various accounting approaches." Id. at 1159, aff'd in part, rev'd in part sub nom., United States v. Moffitt, Zwerling & Kemler, P.C., 83 F.3d 660, 671 (4th Cir. 1996) (noting that "district court enjoys wide discretion in guiding tracing efforts").  "It would be inconsistent with Congress' purposes to immunize a party from forfeiture merely because its financial activities are complex.  Thus, the government must be given some latitude in charting its way through a tangled web of financial transactions." In re Moffit, 875 F. Supp. at 1160.

In United States v. Voigt, 89 F.3d 1050 (3d Cir. 1996), the Third Circuit, however, suggested that any tracing method involving commingled funds is "ultimately unworkable," even in "a situation where $500,000 is added to an account containing only $500." Id. at 1087.  The "solution" proposed by the Voigt court was "to give effect to the substitute asset provision." Id. at 1088.

As explained more fully below, 21 U.S.C. § 853(p) governs the forfeiture of substitute property.[8]  Section 853(p) provides that "the court shall order the forfeiture of any other property of the defendant," if any property subject to forfeiture, "as a result of any act or omission of the defendant (A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty."  21 U.S.C. § 853(p)(1)-(2).  In Voigt, the Third Circuit found that "once a defendant has commingled laundered funds with untainted funds— whether in a bank account or in a tattered suitcase -  such that they 'cannot be divided without difficulty,' . . . the government must satisfy its forfeiture judgment through the substitute asset provision."  Voigt, at 1088.  It understood the phrase "cannot be divided without difficulty" to apply to commingled funds even if "one readily could separate out the amount subject to forfeiture."  Id. at 1088 n.24.

In a later case, the Third Circuit characterized the Voigt court's statement about applying the substitute asset provision even if "one readily could separate out the amount subject to forfeiture," as "dicta."  United States v. Stewart, 185 F.3d 112, 129 (3d Cir. 1999).  It found that the government "clearly traced" $3 million in illegal proceeds to an account which contained $160,000, and had no "difficulty . . . in separating out" the tainted $3 million from the untainted $160,000."  Id. at 130.

The Eleventh Circuit has held that "in a very simple case involving few individual deposits, traced proceeds within a commingled account may be directly forfeited without resort to the substitute asset provision."  In re Rothstein, Rosenfeldt, Adler, P.A., 717 F.3d 1205, 1213

---

[8] The procedures in 21 U.S.C. § 853, other than subsection (d), "apply to all stages of a criminal forfeiture proceeding."  28 U.S.C. § 2461(c); see also 18 U.S.C. § 982(b)(1) (providing that section 853, other than subsection (d), "govern[s]" the forfeiture of property under section 982).

(11th Cir. 2013).   Otherwise, "it is far more appropriate to apply the Third Circuit's rule in Voigt."   Id.

In United States v. Smith, 749 F.3d 465 (6th Cir. 2014), the Sixth Circuit traced funds without resorting to an accounting principle.   The court affirmed the forfeiture of two cashier's checks drawn from two different accounts.   Id. at 488.   It found that the illegally obtained funds deposited into the accounts "greatly exceeded the amounts payable in the checks," permitting the district court to "reasonably infer that "sufficient liquidity existed to have had the checks honored."   Id.   The checks were therefore traceable to the defendant's fraud.   Id.

The government believes that the pro rata or proportional method is the most realistic approach to tracing the gross proceeds of the defendant's health care fraud offenses to the specific property it seeks to forfeit.   See In re Moffitt, Zwerling & Kemler, P.C., 875 F. Supp. at 1160 ("the government's tracing theories and accounting methods should "not trump realism and common sense.").   "[A] proportionality rule is more sensitive to the fungible nature of money." United States v. Loe, 248 F.3d 449, 467 n.81 (5th Cir. 2001).   It "recognizes that a withdrawal mirrors the sources of the money in the account. If the account is the product of clean and dirty money, a withdrawal should reflect this arrangement in equal proportions."   Id.

Courts have applied the pro rata method in similar circumstances.   In a case involving the forfeiture of cash and investment accounts traceable to a stock sale that "had both a legal and illicit component," the United States District Court for the Eastern District of New York utilized a proportional approach.   United States v. Hatfield, 795 F. Supp. 2d 219, 245 (E.D.N.Y. 2011). It held that the cash and investment accounts could "be forfeited in the same percentage it determines the insider sales to be ill-gotten gains (*i.e.,* if 40% of the insider sales are ill-gotten gains, then 40% of each asset is forfeitable)."   Id.

The United States District Court for the Southern District of New York has also applied the pro-rata method to forfeit property purchased with commingled funds.  In <u>In re 650 Fifth Ave.</u>, No. 08 CIV. 10934 KBF, 2014 WL 1516328 (S.D.N.Y. Apr. 18, 2014), the government sought to forfeit investments of the Alavi Foundation, an Iranian corporation, in seven real properties as proceeds traceable to IEEPA violations and as property involved in money laundering.  <u>Id.</u> at *21.  The investments were made from accounts which received 89% of their funds from rental income traceable to the IEEPA violations.  <u>Id.</u> at *25.  The court found that 89% of the payments made from those accounts to the seven properties were "similarly traceable to the IEEPA proceeds," and thus 89% of the expenditures on the properties were forfeitable.  <u>Id.</u>

Alavi argued that the government had "not shown that exactly 89% of the funds spent on each property are traceable to the 89% forfeitable portion of Alavi's proceeds."  <u>Id.</u>  The court concluded that "the Government is entitled to forfeit a *total* of 89% of Alavi's expenditures on all seven properties as a whole—equivalent, as mathematical matter, to forfeiting 89% of each property."  <u>Id.</u> (emphasis added).  It accepted that "Alavi may well have invested more of its illicit funds in some properties than in others."  <u>Id.</u> at n.23.  However, 89% of Alavi's income was "traceable to IEEPA violations" and "[t]he Government is thus entitled to forfeit 89% of Alavi's investments in its properties as a whole.  That is equivalent mathematically to forfeiting 89% of each property, even if some properties received more [untainted] investments than others did, and some properties received more tainted investments than others did."  <u>Id.</u>; <u>see also</u> <u>United States v. 250 Lindsay Lane, Russellville, Kentucky</u>, No. CIV.A.1:04CV00056JHM, 2005 WL 1994762, at *7 (W.D. Ky. Aug. 16, 2005) (holding that 82% of the value of properties is tainted when purchased with funds from an account in which 82% of the deposits were fraudulently obtained Medicaid and Medicare payments).

The government seeks to forfeit, pursuant to 18 U.S.C. § 982(a)(7), the 83 properties[9] listed in Attachment A of its proposed Preliminary Order of Forfeiture as specific property that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of each health care offense. Under the proportional approach, the government has a forfeitable interest in each property proportional to the percentage of tainted funds used to purchase the property.

From November 16, 2009 to February 21, 2014, a total of $86,570,411.04 was deposited into accounts controlled by Florence and/or Michael Bikundi, including the accounts listed in Attachment A.  Hinson Affid. at ¶ 14.  Global - D.C.'s revenues of $81,876,065.87 account for approximately 94.5% of this amount.  Id. at ¶ 15.  Under the pro-rata method, approximately 94.5% of the value of each Attachment A property is forfeitable to the extent that the property was funded or purchased during the November 16, 2009 to February 21, 2014 time period.

Three of the Attachment A properties were, in part, funded or purchased outside of this time period:  (1) the 2007 Cadillac Escalade with VIN 1GYFK638X7R386354 ("the 2007 Cadillac") (property number 81); (2) the real property located at 806 Jennings Mill Drive, Mitchellville, Maryland 20721, more particularly described as Lot 27, in Block B, as shown on Plat entitled, Plat Four, Woodmore at Oak Creek, per Plat Book REP 200 at Page 59, and recorded among the Land Records of Prince George's County, Maryland ("the 806 Jennings Mill Drive property") (property number 83); and (3) $84,529.95 seized from Bank of America

---

[9] All of these properties were identified in either the Indictment or the Bill of Particulars.  In the Bill of Particulars, the government sought forfeiture of the contents of five Banque Internationale du Cameroun pour l'Epargne et le Crédit ("BICEC") accounts because the bank had not yet provided any funds from the accounts to the government pursuant to seizure warrants.  The amounts listed in Attachment A for the five BICEC accounts (property numbers 73 through 77) are the actual amounts that the bank later turned over to the government.  The seized amounts listed for property numbers 55, 63, and 68 are the amounts that remained in each account after the Court ordered the government to return some funds from the accounts to Michael Bikundi.  See Mem. Order, ECF No. 267 & Minute Order Amending ECF No. 267, Sept. 7, 2015.

account no. 446028722267 (property number 53).  Id. at ¶ 16.  The forfeitable percentage of each of these properties is as follows:  51.3% for the 2007 Cadillac, 78.3% for the 806 Jennings Mill Drive property, and 68.2% for Bank of America account no. 446028722267.  Id. at ¶¶ 19, 22, 23.

The government seeks to forfeit the untainted portions of all the Attachment A properties as substitute property.  As explained in further detail below, the government has satisfied the criteria to forfeit substitute property.

In the event that the court disagrees with the government's tracing method or finds that the properties in Attachment A cannot be subdivided without difficulty, the government, in the alternative, seeks to forfeit all of the properties as substitute assets.  Property that the government does not successfully forfeit as directly forfeitable property can be forfeited as substitute assets.  See Smith, 770 F.3d at 642; United States v. Saccoccia, 564 F.3d 502, 507 (1st Cir. 2009); United States v. Henry, No. 94-6188, 1995 WL 478635, at *4 (6th Cir. 1995); United States v. Davis, 177 F. Supp. 2d 470, 485 (E.D. Va. 2001), aff'd sub nom. United States v. Blanco, 46 F. App'x 193 (4th Cir. 2002), and aff'd, 63 F. App'x 76 (4th Cir. 2003).

## IV.  MONEY LAUNDERING CONSPIRACY

### A.  Property Subject to Forfeiture Under the Applicable Statute

The applicable forfeiture statute for Count Fifteen, the money laundering conspiracy, is 18 U.S.C. § 982(a)(1).  It provides that "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 1956 . . . of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  18 U.S.C. § 982(a)(1).

"Money laundering forfeiture pursuant to § 982(a)(1) applies to a larger class of property than proceeds forfeiture."  United States v. Coffman, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012).

"The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the money laundering offense." United States v. Schlesinger, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005) (collecting cases), aff'd, 514 F.3d 277 (2d Cir. 2008).

Property involved in a money laundering offense includes "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." United States v. Puche, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal citation omitted). "Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." United States v. Schlesinger, 396 F. Supp. 2d at 272. "Involved in" property also includes any property that is exchanged for the laundered property or is otherwise the subject of the money laundering transaction. See United States v. Nektalov, 461 F.3d 309, 319 (2d Cir. 2006) (holding that diamonds intended to be exchanged for laundered drug proceeds were forfeitable); United States v. Real Prop. Identified as Parcel 03179-005R, 311 F. Supp. 2d 126, 130 (D.D.C. 2004) (concluding that aircraft is forfeitable when money laundering transaction resulted in release of lien).

"The corpus of a money-laundering conspiracy is the funds that the defendant conspired to launder." United States v. Huber, 404 F.3d 1047, 1056 (8th Cir. 2005). "[P]roperty identified as criminal proceeds of a conspiracy, or as property derived from such proceeds, may be forfeited criminally from a convicted member of the conspiracy, even where the property relates to substantive acts which were not charged or on which the defendant was acquitted." United States v. Molina-Sanchez, 298 F.R.D. 311, 313 (W.D.N.C. 2014).

"[C]lean money can be involved in a money laundering offense and subject to forfeiture"

in two ways.  Coffman, 859 F. Supp. 2d at 875.  First, if a money laundering transaction involves an account containing commingled illegal funds and untainted funds, "all of the money laundered out of the account constitutes the corpus of the money laundering."  Id.  Second, clean money "can be used to facilitate the money laundering."  Id. at 876.  Untainted funds facilitate money laundering "by helping to conceal the illegal funds,"  United States v. Baker, 227 F.3d 955, 970 n.4 (7th Cir. 2000), and by "disguis[ing] the nature and source of [the] scheme," United States v. Bornfield, 145 F.3d 1123, 1135 (10th Cir. 1998).  "[I]t is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue." United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1353 (D.C. Cir. 2002) (internal citation omitted).

In the instant case, the corpus of the money laundering conspiracy is the fraudulently obtained D.C. Medicaid payments to Global.  Florence Bikundi and Michael Bikundi conspired to launder these fraud proceeds to and through over 100 accounts.  The money laundering conspiracy "encompasse[d] the whole of [the defendants'] scheme and [their] attempts and plans to conceal and disguise the nature, location, source, ownership and control of the proceeds of the fraud."  Coffman, 859 F. Supp. 2d at 879 (finding non-investor funds commingled with fraud proceeds forfeitable as property involved in money laundering conspiracy).

The conspiracy's course of conduct involved the movement of commingled fraud proceeds and untainted funds throughout the expanse of the defendant's financial portfolio. Hinson Affid. at ¶¶ 24, 25.  The untainted funds, including Maryland Medicaid funds and non-D.C. Medicaid deposits, furthered the conspiracy.  See United States v. Tencer, 107 F.3d 1120, 1135 (5th Cir. 1997) ("Criminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme.") (internal citation omitted).  The

untainted funds helped "to shield" the defendant's fraud.  United States v. Aguasvivas-Castillo, 668 F.3d 7, 12 (1st Cir. 2012) (forfeiting legitimately obtained food stamp funds commingled with food stamp fraud proceeds).  The defendants shuffled fraud proceeds and commingled untainted funds through multiple corporate, personal, investment, trust, and international accounts, and used the proceeds to purchase life insurance policies, annuities, college savings plans, and IRAs.  They utilized commingled funds in corporate accounts in the name of CFC and Tri-Continental to create the appearance that they had a legitimate real estate investment business and an import-export business.  Global funds were shifted to Flo-Diamond accounts and commingled with Maryland Medicaid funds.  The defendants purchased 184 cashier's checks totaling over $7.7 million from accounts they controlled and withdrew over $1 million in cash from the accounts to obscure the connection of the funds to their fraud.  Testimony of Nicole Hinson, Transcript of Jury Trial, Nov. 3, 2015, Afternoon Session, at 25 27; Govt. Trial Ex. 154. The defendants engaged in a concerted course of conduct, utilizing commingled fraud proceeds and clean funds, which made it more difficult to determine that the source of their extraordinary wealth was derived from the massive fraud they engaged in at Global.  See United States v. Seher, 562 F.3d 1344, 1369 (11th Cir. 2009) (forfeiting untainted property that "create[d] a facade of legitimacy"); United States v. Puche, 350 F.3d at 1154 (rapid movement of legitimate and illegitimate funds into bank accounts sufficient for jury to find that "the legitimate proceeds facilitated the illegal proceeds by acting as a 'cover' and hence reduced suspicion of the latter's source.").  The Court should find that the commingled untainted funds facilitated the money laundering conspiracy and thus are forfeitable as property involved in the conspiracy.  Any property traceable to the untainted funds is likewise forfeitable under section 982(a)(1).

**B.  Forfeiture Money Judgment**

The government is entitled to a money judgment for Count Fifteen "equal in value to the property, real or personal, involved in the money laundering offenses of which defendant was found guilty, and/or equal in value to the property traceable to such property."  United States v. Tardon, 56 F. Supp. 3d 1309, 1318-20 (S.D. Fla. 2014).   This amount is $86,570,411.04, consisting of the $80,620,929.20 in fraudulently obtained D.C. Medicaid payments (the corpus of the money laundering conspiracy) and $5,949,481.84 in untainted property which facilitated the conspiracy.

The forfeiture money judgment amount includes the same funds as the gross proceeds of the defendant's health care fraud offenses.  See United States v. Schlesinger, 261 F. App'x 355, 361 (2d Cir. 2008) (proceeds of fraud counts and money laundering counts "are subject to separate orders of forfeiture" even if same funds).  Consequently, the forfeiture money judgment should be imposed concurrently to the health care fraud judgments.  See United States v. Brown, No. 04 CR 159 NGG, 2006 WL 898043, at *4 (E.D.N.Y. Apr. 4, 2006) (forfeiture money judgments for fraud counts and money laundering counts "in effect are concurrent").

**C.  Specific Property Subject to Forfeiture**

"[T]he requisite nexus for money laundering is property 'involved in' the offense, or property 'traceable to' that property."  United States v. Parenteau, 805 F. Supp. 2d 438, 448 (S.D. Ohio 2011).  The government seeks to forfeit, pursuant to 18 U.S.C. § 982(a)(1), the properties in Attachment A as property, real or personal, involved in the money laundering conspiracy, or any property traceable to such property.

All of the Attachment A properties are forfeitable in their entirety under section 982(a)(1) (except the 2007 Cadillac, the 806 Jennings Mill Drive property, and Bank of America account

no. 446028722267) because they were purchased or funded entirely between November 16, 2009 and February 21, 2014 with commingled fraudulently obtained D.C. Medicaid proceeds and untainted funds which facilitated the money laundering conspiracy, or are traceable to the commingled funds.  As previously discussed, a portion of the 2007 Cadillac, the 806 Jennings Mill Drive property, and Bank of America account no. 446028722267 was purchased or funded outside this time period.  The government seeks to forfeit this portion of the properties as substitute assets.

## V.  SUBSTITUTE PROPERTY

"[W]hen the Government cannot reach the property initially subject to forfeiture, federal law requires a court to substitute assets for the unavailable tainted property."  United States v. Alamoudi, 452 F.3d 310, 314 (4th Cir. 2006).  "The Court may order the forfeiture of substitute assets in two ways—by including the substitute property in the preliminary order of forfeiture . . . or by amending the order of forfeiture 'at any time' after sentencing to include substitute property pursuant to Fed. R. Crim. P. 32.2(e)."  United States v. Smith, No. 3:08-CR-31-JMH, 2010 WL 4962917, at *1 (E.D. Ky. Dec. 1, 2010).

Title 21, United States Code, Section 853(p) governs the forfeiture of substitute property. "[T]he substitute assets provision of § 853(p) was enacted to make the government's forfeiture efforts more effective."  United States v. Moffitt, Zwerling & Kemler, P.C., 83 F.3d 660, 669 (4th Cir. 1996).  "Section 853(p) is not discretionary; rather, the statute mandates forfeiture of substitute assets when the tainted property has been placed beyond the reach of a forfeiture." Alamoudi, 452 F.3d at 314 (internal quotations and citation omitted).  "Courts interpret this provision liberally so as to thwart efforts by a defendant to circumvent the economic impact of an anticipated criminal forfeiture sentence."  Id. at 316 (internal citation omitted); see also 21

21

U.S.C. § 853(o) (providing that section 853 "shall be liberally construed to effectuate its remedial purpose").

The government is entitled to forfeit substitute property if it can establish that "as a result of any act or omission of the defendant," directly forfeitable property "(A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty."  21 U.S.C. § 853(p)(1).  Section 853(p)(1) is *written in the disjunctive*" so only one requirement must be met "to trigger the substitute-asset provision."  United States v. Zorrilla-Echevarria, No. CIV. 07-0448 JAF, 2012 WL 359745, at *3 n.9 (D.P.R. Feb. 2, 2012) (emphasis in original), aff'd, 723 F.3d 298 (1st Cir. 2013).

The government is entitled to forfeit substitute property in this case because directly forfeitable property (1) cannot be located upon the exercise of due diligence; and (2) has been dissipated through the transfer, sale, or deposit with a third party.  See, e.g., United States v. Gordon, 710 F.3d 1124, 1166 (10th Cir. 2013) (relying on affidavit to find section 853(p)(1) satisfied).  All of the defendant's assets traceable to his offenses have been seized.[10]  Hinson Affid. at ¶ 28.  The defendant dissipated directly forfeitable property through personal expenditures, such as travel, home improvements services, and department store purchases; and through business expenditures such as payments to personal care aides, office employees, nurses, and rent.  Id. at  ¶¶ 26-27.  See United States v. Warshak, No. 1:06-CR-00111, 2008 WL 2705044, at *5 (S.D. Ohio July 8, 2008) (noting that the court was "compelled to order the forfeiture of substitute assets" based on "statements in the record that show assets have dissipated"),

---

[10] The defendant has acknowledged that all of his assets were seized by the government.  Presentence Investigation Report, ECF No. 409, at ¶ 176.

aff'd in part, remanded in part, 631 F.3d 266 (6th Cir. 2010).  Investigator Hinson's Affidavit and the evidence at trial establishes that the Government has satisfied the criteria to forfeit substitute property.

The government seeks to forfeit a portion of each property listed in Attachment A as substitute property for the health care offenses; a portion of the 2007 Cadillac, the 806 Jennings Mill Drive property, and Bank of America account no. 446028722267 as substitute property for Count Fifteen; and the jewelry listed in Attachment B as substitute property for all of the offenses.  The forfeited substitute assets will be used to partially satisfy the defendant's money judgment.  See Candelaria-Silva, 166 F.3d at 42.

## V.  THIRD PARTY INTERESTS

A preliminary order of forfeiture for specific property does not address any interest that a third party may have in that property.  See  Fed. R. Crim. P. 32.2(b)(2)(A) (requiring court to "enter the order without regard to any third party's interest").  "Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding."  Fed. R. Crim. P. 32.2(b)(2)(A); see also id. 32.2(e)(2)(b) (requiring ancillary proceeding if third party claims interest in substitute property).  Although a preliminary order becomes final as to a defendant at sentencing, it "remains" a preliminary order as to third parties until the ancillary process is completed.  Id. 32.2(b)(4)(A).

Third party interests are "resolve[d]" in an ancillary proceeding.  United States v. Cox, 575 F.3d 352, 358 (4th Cir. 2009).  The Government initiates the ancillary process by publishing notice of the forfeiture order and "send[ing] notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture."  Fed. R. Crim. P. 32.2(b)(6)(A); see also 21 U.S.C. § 853(n)(1) (Government must publish notice of the order and "may also, to the

extent practicable provide direct written notice to any person known to have alleged an interest in the property.").  A person asserting a legal interest in forfeited property "may, within thirty days of the final publication of notice or his receipt of [direct written] notice . . . whichever is earlier," petition the court for a hearing to adjudicate the validity of his alleged interest in the property."  21 U.S.C. § 853(n)(2).

## VI.  SEIZURE OF PROPERTY SUBJECT TO FORFEITURE ORDER

The government's proposed Preliminary Order of Forfeiture authorizes it to seize, inventory, and otherwise maintain custody and control of the forfeited property, pursuant to Federal Rule of Criminal Procedure 32.2(b)(3) and 21 U.S.C. § 853(g).  Rule 32.2(b)(3) authorizes the Attorney General (or a designee) to seize property subject to a forfeiture order. Fed. R. Crim. P. 32.2(b)(3); see also United States v. Kennedy, 201 F.3d 1324, 1326 (11th Cir. 2000) ("Preliminary forfeiture orders . . . are primarily used to enable the Government to marshal the defendant's assets subject to forfeiture.").  Section 853(g) authorizes the Attorney General upon entry of the order to seize all the forfeited property "upon such terms and conditions as the court shall deem proper."  21 U.S.C. § 853(g).

Michael Bikundi has filed a motion, pursuant to Federal Rule of Criminal Procedure 32.2(d), to stay the forfeiture of the 806 Jennings Mill Drive property pending appeal.  ECF No. 369.  The defendant has joined in the motion.  ECF No. 370.  The government has filed an opposition to the motion.  Govt. Opp., ECF No. 422.

The Court's ruling on the motion will not affect the government's ability to seize the property.  Rule 32.2(b)(3) "specifically states that 'the entry of a preliminary order of forfeiture authorizes the Attorney General . . . to seize the specific property subject to forfeiture.'"  United States v. Neal, No. CRIM.A. 03-35-A, 2003 WL 24307070, at *4 (E.D. Va. Sept. 29, 2003)

(ellipsis in original); see also United States v. Ramirez, 285 F. App'x 609, 611 (11th Cir. 2008)

("The preliminary order of forfeiture permits the Attorney General to seize the forfeited

property.").  Rule 32.2(d) does not bar or in any way impede seizure of forfeited property

pursuant to Rule 32.2(b)(3).  "There is nothing in" Rule 32.2(d) that "authoriz[es] the Court to

stay" the seizure of forfeitable property.  United States v. Miller, No. 06-40151-JAR, 2009 WL

2949784, at *9 (D. Kan. Sept. 10, 2009) (denying motion to stay seizure of forfeited property,

including a residence). "The purpose of [Rule 32.2(d)] is to ensure that the property remains

intact and unencumbered so that it may be returned to the defendant in the event the appeal is

successful." Fed. R. Crim. P. 32.2 advisory committee's notes.

## VII.  DISCOVERY AUTHORITY

Federal Rule of Criminal Procedure 32.2(b)(3) authorizes the Attorney General, or a

designee, upon the entry of a preliminary order of forfeiture, to "conduct any discovery the court

considers proper in identifying, locating, or disposing" of property subject to forfeiture.  Fed. R.

Crim. P. 32.2(b)(3); see also United States v. Smith, No. 3:08-CR-31-JMH, 2010 WL 5300945,

at *1 (E.D. Ky. Dec. 20, 2010) (authorizing the government, pursuant to Rule 32.2(b)(3), "to

conduct discovery for the purpose of identifying and locating assets forfeited to the United

States, property traceable to such assets, or assets of the defendant that may be substituted up to

the value of the forfeited assets.").  The government's proposed Preliminary Order of Forfeiture

grants discovery authority to the government.

## VIII.  CREDITING OF FORFEITED PROPERTY TO MONEY JUDGMENT

The value of any asset found forfeitable must be credited to the money judgment.  See

United States v. Ponzo, No. CRIM.A. 97-40009-NMG, 2014 WL 3893790, at *5 (D. Mass. Aug.

6, 2014) (applying directly forfeitable property to money judgment); Candelaria-Silva, 166 F.3d

at 42 (applying substitute property).   "This eliminates any concern" that the total value of the forfeited property will exceed the money judgment amount and subject the defendant to a "double forfeiture."  See Tardon, 56 F. Supp. 3d at 1320; see also United States v. Hailey, 887 F. Supp. 2d 649, 654 n.12 (D. Md. 2012) (ordering the government to return any forfeited assets to the extent they "exceed the amount of the money judgment").

## IX. APPLICATION OF CANO-FLORES TO CALCULATION OF FORFEITURE MONEY JUDGMENTS AND CREDITING OF FORFEITED PROPERTY

This Court must impose a forfeiture judgment in accordance with the D.C. Circuit's recent decision in United States v. Cano-Flores, 796 F.3d 83, 90-95 (D.C. Cir. 2015), which altered the landscape of co-conspirator forfeiture liability.   Prior to Cano-Flores, this circuit followed the universal rule that forfeitures can be apportioned and credited among co-conspirators under a theory of joint and several liability.   See, e.g., United States v. DeFries, 909 F. Supp. 13, 19-20 (D.D.C. 1995) (holding that RICO defendants "each should be held jointly and severally liable for the forfeiture of that portion of the aggregate that he could reasonably foresee as accruing to either himself or his co-conspirators"), rev'd on other grounds, 129 F.3d 1293 (D.C. Cir. 1997); United States v. McHan, 101 F.3d 1027, 1042–43 (4th Cir. 1996) (holding that defendants can be "jointly and severally liable" for forfeiture); United States v. Edwards, 303 F.3d 606, 643–44 (5th Cir. 2002) (same); United States v. Corrado, 227 F.3d 543, 553 (6th Cir. 2000) (same); United States v. Pitt, 193 F.3d 751, 765 (3d Cir. 1999) (same); United States v. Simmons, 154 F.3d 765, 769 (8th Cir. 1998) (same); United States v. Hurley, 63 F.3d 1, 22 (1st Cir. 1995) (same); United States v. Masters, 924 F.2d 1362, 1369 (7th Cir. 1991) (same); United States v. Benevento, 663 F.Supp. 1115, 1118 (S.D.N.Y. 1987) (same), aff'd, 836 F.2d 129 (2d Cir. 1988); United States v. Caporale, 806 F.2d 1487, 1506 (11th Cir. 1986) (same); Fed. R. Crim. P. 32.2 Advisory Committee Notes to 2000 Adoption (citing DeFries,

<u>Hurley</u>, and other cases for proposition that "[c]riminal defendant may be jointly and severally liable for the forfeiture of the entire proceeds of the criminal offense").

Under joint and several liability, each co-conspirator defendant can be required to individually forfeit as much as all reasonably foreseeable proceeds of the conspiracy, but the defendant also gets credit for amounts forfeited by his co-conspirators.  <u>See, e.g.</u>, <u>Masters</u>, 924 F.2d at 1369 ("This is joint and several liability, meaning that $42,000 is the cap on the total amount that the government can collect but that subject to the ceiling each defendant is liable for the full amount") (internal citation omitted).  Joint and several forfeiture liability was rooted in the principle of vicarious liability under <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946).  As Judge Boudin explained on behalf of the First Circuit:  "'[J]oint and several' roughly describes the result without explaining the underlying theory of liability.  Here, we think the theory is the familiar rule that a member of a conspiracy is responsible for the foreseeable acts of other members of the conspiracy taken in furtherance of the conspiracy."  <u>Hurley</u>, 63 F.3d at 22 (citing <u>Pinkerton</u>).

In <u>Cano-Flores</u>, however, the D.C. Circuit rejected this body of case law.  It considered a defendant who was convicted of narcotics trafficking as a mid-level operative in the Gulf Cartel. 796 F.3d at 85.  The district court sentenced the defendant to a $15 billion forfeiture judgment, making him jointly and severally liable for the proceeds of the entire cartel pursuant to <u>Pinkerton</u>.  <u>Id.</u> at 90.  But the panel vacated the forfeiture judgment and held that the narcotics-related forfeiture provision in 21 U.S.C. § 853(a)(1) did not authorize the application of <u>Pinkerton</u> to forfeiture or the concomitant "'joint and several' calculation procedure" for the forfeiture money judgment.  <u>Id.</u> at 95.  In so doing, the panel announced its departure from the rule of joint and several forfeiture liability adopted in virtually every other circuit.  <u>See id.</u> at 91

27

(stating that panel "respectfully disagree[s]" with McHan, Edwards, Corrado, Pitt, Simmons, Hurley, Masters, Benevento, and Caporale).

Cano-Flores advanced two broad rationales for the decision.  First, it held that joint and several liability was inconsistent with the statutory text of § 853(a)(1), which calls for forfeiture of illegal proceeds that the defendant "obtained."[11]  Id.  Second, it held that there was no affirmative basis in the statutory text or legislative history for grafting Pinkerton liability and its corollary, joint and several liability, onto the forfeiture statutes.  The panel reasoned that, "as Congress made no mention of the case [Pinkerton] or the principle in either the statute or in the legislative history, the fact that it is and was 'established' would seem to *weaken* the case for its implicit incorporation."  Id. at 94.  In that vein, the panel contrasted § 853(a)(1) with the criminal restitution statute, 18 U.S.C. § 3664(h),[12] which it found "does indeed authorize (but does not require) application of joint and several liability as a means of protecting victims."  Id. at 95. The panel also criticized the reasoning in other circuits adopting joint and several liability.  Id. ("[T]he language of 'joint and several liability' is derived from torts, but the courts invoking it have not deeply considered where there is a sound analogy between forfeiture and tort law.  We doubt there is one.").  In short, Cano-Flores found no statutory basis for the imposition of joint and several forfeiture liability under § 853(a)(1).[13]

---

[11] That statute reads: "Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States . . . (1) any property constituting, or derived from, any proceeds the person *obtained*, directly or indirectly, as the result of such violation."  21 U.S.C. § 853(a)(1) (emphasis added).

[12] "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C. § 3664(h).

[13] The panel in Cano-Flores appears to have believed it was bound by the canon of constitutional avoidance to adopt its novel construction of § 853(a)(1) rather than address the appellant's Eighth Amendment challenge to a $15 billion forfeiture money judgment.  796 F.3d at 91 (explaining that panel "ordered supplemental briefing in order to determine whether a correct interpretation of the statute would allow [the panel] to avoid Cano-Flores's

The government respectfully submits that Cano-Flores governs the forfeitures here and bars this Court from imposing a single forfeiture money judgment for which the defendants are to be held jointly and severally liable. The defendants are required to forfeit the "gross proceeds" of their Federal health care offenses under 18 U.S.C. § 982(a)(7) and any property "involved in" their money laundering offenses under 18 U.S.C. § 982(a)(1). To be sure, neither of those statutes was directly at issue in Cano-Flores, and they are textually distinguishable from 21 U.S.C. § 853(a)(1) in the sense that neither statute limits the forfeiture to amounts "obtained" by the defendant. But the statutes arguably are subject to the broader language of Cano-Flores: they provide no *affirmative* basis for the imposition of joint and several forfeiture liability— nothing, for instance, remotely close to the explicit authorization in the restitution statute, 18 U.S.C. § 3664(h). See Cano-Flores, 796 F.3d at 95.[14]

Given the unique nature of the Cano-Flores ruling, there is no template for imposing forfeiture sentences on co-defendants without relying on joint and several liability. As discussed above, the total forfeiture amount is $81,876,065.87 in gross proceeds for Counts One, Two, Thirteen, and Fourteen, and $86,570,411.04 in property "involved in" money laundering for Count Fifteen. The government proposes that these totals be divided and attributed to individual defendants based on what each defendant *obtained*.

Accordingly, for the Federal health care offenses charged in Counts One, Two, Thirteen, and Fourteen, the calculation begins with the total amount of gross proceeds ($81,876,065.87).

---

constitutional challenge); see also id. at 94 (citing "canon of constitutional avoidance"). Neither the government nor the appellant advocated for the wholesale rejection of joint and several liability. See United States v. Cano-Flores, Nos. 13-3051 & 13-3054 (D.C. Cir.), ECF Nos. 1505036 (Gov't Br.), 1555198 (Gov't Supp. Br.), 1488430 (Appellant's Br.), 1555338 (Appellant's Supp. Br.).

[14] Cano-Flores also expressed disagreement with at least one sister circuit decision construing the money laundering forfeiture statute, 18 U.S.C. § 982(a)(1), as authorizing joint and several liability. See Pitt, 193 F.3d at 765 ("We interpret § 982(a)(1) as imposing a rule of joint and several liability in the case of a money laundering conspiracy."); Cano-Flores, 796 F.3d at 91 (rejecting Pitt).

The amounts to be forfeited from the six co-defendants who have already pled guilty in connection with the Federal health care offenses charged in this case, collectively $1,217,400.36 from all six co-defendants, would first be deducted from that amount (i.e., $81,876,065.87 − $1,217,400.36 = $80,658,665.51).[15]   The resulting balance, $80,658,665.51, would then be divided between Florence Bikundi and Michael Bikundi (i.e., $80,658,665.51 ÷ 2 = $40,329,332.76).  An equal division is fair under the circumstances here, where the defendants were married, they obtained their illicit funds in concert together through their shared control over Global, and they effectively treated the proceeds as joint property.[16]  For Counts One and Two, that yields a $40,329,332.76 money judgment for Florence Bikundi and a $40,329,332.76 money judgment for Michael Bikundi.  For Counts Thirteen and Fourteen, although Florence Bikundi was the sole defendant charged and convicted, the government is seeking forfeiture from the same gross proceeds as above; therefore a $40,329,332.76 money judgment for Florence Bikundi would be appropriate as to each of these Counts as well.  To the extent discrete properties are forfeited from Florence Bikundi and Michael Bikundi, they should be credited on a 50% pro rata basis to both defendants.

---

[15] See United States v. Nicola C. White, No. 14-cr-216 (BAH), ECF No. 12 (Consent Order of Forfeiture) (Nov. 7, 2014); United States v. Florence Bikundi, et al., No. 14-cr-30 (BAH), ECF No. 166 (Consent Order of Forfeiture for Irene M. Igwacho) (June 16, 2015); ECF No. 177 (Consent Order of Forfeiture for Elvis N. Atabe) (June 19, 2015); ECF No. 184 (Consent Order of Forfeiture for Carlson M. Igwacho) (June 22, 2015); ECF No. 189 (Consent Order of Forfeiture for Melissa A. Williams) (June 22, 2015); ECF No. 243 (Consent Order of Forfeiture for Bernice W. Igwacho) (Aug. 4, 2015).  The government notes that the plea agreements for these co-defendants agreed that any forfeitures would be joint and several with the other defendants in the case.  However, the general rule is that "a judicial construction of a statute is an authoritative statement of what the statute meant *before* as well as after the decision of the case giving rise to that construction," and it should "ordinarily be given full retroactive effect in all cases still open on direct review."  United States v. McKie, 73 F.3d 1149, 1152-53 (D.C. Cir. 1996) (emphasis in original; internal quotation marks and alterations omitted).  Consequently, the forfeiture sentences for these co-defendants may have to conform to Cano-Flores, although that issue is not presently before the Court.

[16] The Eleventh Circuit left open this approach to valuing gross receipts obtained by a corporation jointly held by a husband and wife for purposes of the sentencing enhancement in § 2B1.1 of the United States Sentencing Commission Guidelines Manual ("U.S.S.G." or the "Guidelines"), one of the Guidelines relied on by the panel in Cano-Flores for its holding as to joint and several forfeiture liability.  See United States v. Ubieta, --- F. App'x ----, 2015 WL 6685488, at *19 (11th Cir. Nov. 3, 2015) (noting issue but declining to decide it based on waiver and lack of record evidence); Cano-Flores, 796 F.3d at 92-93 (citing U.S.S.G. § 2B1.1 and similar provisions).

For Count Fifteen, the property "involved in" the money laundering offense includes the illegal proceeds being laundered (the corpus) and other property that facilitates or is otherwise "involved in" the laundering transactions.  See supra at 17-18.  Thus, the total forfeiture amount for Count Fifteen, $86,570,411.04, includes the $81,876,065.87 in gross proceeds and another $4,694,345.17 in "untainted" funds.  The gross proceeds component is calculated as above, deducting amounts attributable to co-conspirators and leaving $40,329,332.76 each for Florence Bikundi and Michael Bikundi.  The untainted portion would be divided equally between Florence Bikundi and Michael Bikundi (i.e., $4,694,345.17 ÷ 2 = $2,347,172.59).  Thus, Florence Bikundi and Michael Bikundi would each be liable for a money judgment of $42,676,505.35 for Count Fifteen (i.e., $40,329,332.76 + $2,347,172.59 = $42,676,505.35).  As with Counts One, Two, Thirteen, and Fourteen, properties forfeited from Florence Bikundi and Michael Bikundi should be credited on a 50% pro rata basis to both defendants.

As noted above, the forfeiture money judgments for each count are concurrent.  See supra at 20 (citing Brown, 2006 WL 898043, at *4).

Wherefore, the government respectfully requests that the Court enter the attached Preliminary Order of Forfeiture.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney


By: _____/s/_____
Lionel A. André (D.C. Bar No. 422534)
Michelle Bradford (D.C. Bar No. 491910)
Christopher Brown (D.C. Bar No. 1008763)
` Anthony Saler (D.C. Bar No. 448254)
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
Tel: 202.252.6971 (Saler)
Anthony.Saler@usdoj.gov