**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Case No. 14-030 (BAH) |
| FLORENCE BIKUNDI, | Judge Beryl A. Howell |
| MICHAEL D. BIKUNDI, SR., | |
| Defendants. | |

**<u>MEMORANDUM OPINION</u>**

Following their conviction at a jury trial of conspiring to defraud and defrauding the

District of Columbia Medicaid program, in violation of 18 U.S.C. §§ 2, 1347 and 1349, and

conspiring to engage in and engaging in the laundering of monetary instruments, in violation of

18 U.S.C. §§ 2, 1956(a)(1)(B)(i), 1956(h), the defendants Florence Bikundi and her spouse,

Michael D. Bikundi, Sr. ("Michael Bikundi"), filed separately the pending motions for a

judgment of acquittal or, alternatively, a new trial, under Federal Rules of Criminal Procedure

29(a) and 33(a), respectively.  Michael Bikundi's Mot. New Trial ("Def. MB's R. 33 Mot."),

ECF No. 391; Michael Bikundi's Renewed Mot. J. Acquittal ("Def. MB's R. 29 Mot."), ECF

No. 392; Florence Bikundi's Renewed R. 29 Mot. J. Acquittal ("Def. FB's R. 29 Mot."), ECF

No. 393; Florence Bikundi's Mot. New Trial ("Def. FB's R. 33 Mot."), ECF No. 394.  The

defendants also joined in each other's motions.  *See* Minute Order (Dec. 15, 2016) (granting

Florence Bikundi's motions, ECF Nos. 395, 396, to join and adopt Michael Bikundi's

motions); Minute Order (Jan. 6, 2016) (granting Michael Bikundi's motion, ECF No. 412, to

join and adopt Florence Bikundi's motions).  For the reasons set forth below, the defendants'

four motions are denied.

## I.      BACKGROUND

Ten months after the original indictment was returned against only defendant Florence

Bikundi, Indictment, ECF No. 1, the government filed a multi-count Superseding Indictment

against Florence Bikundi, her spouse and co-defendant at trial, Michael Bikundi, and seven

additional co-defendants, Superseding Indictment, ECF No. 44.[1]  Both Florence and Michael

Bikundi were charged in thirteen counts, with, from about August 2009 to about February 2014,

conspiring to commit health care fraud and committing health care fraud by, *inter alia*,

submitting and causing to be submitted false and fraudulent claims for payment to the D.C.

Medicaid program, in violation of 18 U.S.C. §§ 2, 1347, 1349, *id.* ¶¶ 67–75 (Counts One and

Two); conspiring to commit money laundering and committing money laundering to conceal

proceeds illegally derived from the health care fraud, in violation of 18 U.S.C. §§ 2,

1956(a)(1)(B)(i), 1956(h), *id.* ¶¶ 83–89 (Counts Fifteen through Twenty-Two); and engaging in

monetary transactions with proceeds illegally derived from the health care fraud, in violation of

18 U.S.C. §§ 2, 1957, *id.* ¶¶ 90–91 (Counts Twenty-Three through Twenty-Five).

Defendant Florence Bikundi was also charged separately in two counts with committing

health care fraud by concealing her exclusion from participation in all federal health care

programs and making other false and fraudulent representations to obtain payments from the

D.C. Medicaid program, in violation of 18 U.S.C. §§ 2, 1347, and 42 U.S.C. § 1320a-7b(a)(3).

---

[1]      Of the seven co-defendants, two remain fugitives (Christian S. Asongcha and Atawan Mundu John) and five entered pleas of guilty to Count Two of the Superseding Indictment charging Health Care Fraud, in violation of 18 U.S.C. §§ 2, 1347.  *See* Plea Agreement of Elvis Atabe, ECF No. 174; Plea Agreement of Melissa Williams, ECF No. 186; Plea Agreement of Carlson Igwacho, ECF No. 179; Plea Agreement of Irene Igwacho, ECF No. 163; Plea Agreement of Berenice Igwacho, ECF No. 240.  A sixth cooperating defendant entered a plea in a separate case. *See United States v. White*, No. 14-cr-216, Plea Agreement of Nicola White, ECF No. 8.

*Id.* ¶¶ 78–82 (Counts Thirteen and Fourteen, respectively).  The latter two charges were based on

allegations that Florence Bikundi, a former licensed practical nurse, *id.* ¶¶ 36, 38, was excluded

in April 2000 by the United States Department of Health and Human Services Office of

Inspector General ("HHS-OIG") from participating in all federal health care programs, and

thereby "prohibited . . . from submitting or causing the submission of claims to, and receiving

funds from, Federal health care programs such as Medicaid," *id.* ¶ 45.  Despite her exclusion,

Florence Bikundi allegedly "was a director, administrator, officer, and primary

owner/stockholder of" Flo-Diamond, Inc. ("Flo-Diamond") and Global Healthcare, Inc.

("Global"), which between July 2007 and December 2014, received over $78 million in

payments from Medicaid programs.  *Id.* ¶ 20.[2]

Following extensive motions practice, the case proceeded to trial against Florence and

Michael Bikundi on October 13, 2015.[3]  Over the course of the month-long trial, the jury was

---

[2]        The Court ruled that the government would be permitted to use at trial for impeachment purposes, under
Federal Rule of Evidence 609(a)(2), Florence Bikundi's conviction of Personal Identifying Information Theft upon
her plea of guilty in May 2003 in the Circuit Court of Maryland for Baltimore City, for which conviction she was
sentenced to one year imprisonment.  *See* Minute Order (Sept. 18, 2015).  The factual basis for this conviction was
that the defendant fraudulently used the personal identification information and Maryland Registered Nurse license
of a long-time acquaintance, without her consent, unlawfully to obtain employment as a registered nurse ("RN")
through at least three nursing staff agencies.  *See* Gov't Notice, Ex. A, ECF No. 247-1.  The government did not
seek to use the defendant's two prior convictions for Theft of Property with less than $300.00 Value in District
Court for Montgomery County, or for Practicing Nursing without a License in Prince George's County Circuit Court
in 1998 and 2002, respectively.  *See* Gov't Notice at 5 n.2, ECF No. 247.  The record is not entirely clear whether
the defendant's 1998 Maryland conviction prompted the revocation of her licensed practical nurse ("LPN") license
in Virginia on August 4, 1999, *see* Gov't Exs. 103, 104, but the Virginia revocation led to her indefinite exclusion
by HHS-OIG from participation in federal health care programs, *see* Gov't Ex. 108.
[3]        Prior to trial, the Court resolved, *inter alia*, the following motions: (**1**) granting (**a**) the United States'
Motion to Disqualify Sheryl Wood as Counsel for Michael Bikundi, ECF No. 78; (**b**) the United States' Request for
Defendants to Provide Notice Whether They Intend to Seek Jury Determination on Forfeitability of Specific
Property, ECF Nos. 198, 213; (**c**) the United States' Motion to Permit a Designated Law Enforcement Agent to be
Present at Counsel Table During Trial, ECF No. 259, as conceded; (**d**) the United States' Motion to Forego Certain
Redactions in its Filings, ECF No. 260, as conceded; and (**e**) the United States' Notice of Intent to Use Defendant's
Conviction for Identity Theft as Impeachment Evidence, ECF No. 247; (**2**) denying (**a**) Michael Bikundi's First
Motion to Sever His Case From Florence Bikundi Based Upon Disparity of Evidence, ECF No. 155; (**b**) Michael
Bikundi's Motion to Sever Counts in the Indictment, ECF No. 208; (**c**) Florence Bikundi's Motion to Dismiss
Indictment and/or Pretrial Release for Violation of her Statutory and Constitutional Rights to Speedy Trial, ECF No.
211; (**d**) Florence Bikundi's Motion for Immediate Production of Brady Material, ECF No. 201; (**e**) Florence
Bikundi's Motion to Strike Surplusage or in the Alternative to Preclude the Government From Introducing Evidence
at Trial, ECF No. 209, without prejudice to renew; (**f**) the United States' Motion in Limine to Preclude the

3

presented with over three hundred exhibits and heard from forty witnesses, three of whom were

called by the defendants.[4]  Among the witnesses were local and federal officials responsible for

administering federal health care programs, the D.C. Medicaid program, and the licensing of

home care agencies ("HCAs") and nurses; cooperating witnesses and co-defendants, who were

formerly employed at Global, which was owned and managed by Florence and Michael Bikundi;

beneficiaries of the D.C. Medicaid program, who received personal care services through Global

and admitted to receiving regular kickback payments from Global employees to certify

timesheets of personal care aids ("PCAs") that falsely indicated the number of hours worked by

the PCAs; and Special Agents of the various law enforcement agencies that participated in the

execution of search warrants on Global's office and defendants' homes and the analysis of seized

records.  The voluminous trial evidence is only briefly summarized below as necessary to assess

the defendants' pending motions challenging the sufficiency of the evidence and provide context

for review of the challenged rulings before and during trial.

A.     OVERVIEW OF REGULATORY REQUIREMENTS FOR D.C.
       MEDICAID AND HOME PERSONAL CARE AIDS

Medicaid is a health insurance program administered at the federal level by the Centers

for Medicare and Medicaid Services, an agency within HHS, and by each individual state.  Trial

---

Defendants From Arguing That the Government Targeted Family Members & From Commenting on the Status of
Co-Defendants Christian Asongcha & Atawan Mundu John, ECF No. 274; **(g)** the United States' Motion to Forego
Redaction to Exhibit, ECF No. 275, with instructions to redact the child's name; and **(h)** the United States' Motion
in Limine to Exclude Defendant's Proposed Experts From Trial, ECF No. 277; and **(3)** granting in part and denying
in part **(a)** the United States' Motion to Admit Other Crimes Evidence Pursuant to Federal Rule of Evidence 404(b),
ECF No. 206; **(b)** the United States' Motion In Limine for Willful Blindness Instruction to Counts Thirteen &
Fourteen & Permission for the Government to Refer to Willful Blindness in its Opening Statement When Discussing
These Counts, ECF No. 205; and **(c)** Michael Bikundi's Motion to Partially Vacate the Seizure Warrant & to Permit
Use of a Portion of Funds From Seized Bank Accounts for Purposes of Household Necessities, & Request for a
Pretrial Evidentiary Hearing, ECF No. 149.  *See* Minute Order (July 31, 2015); Minute Order (Sept. 18, 2015);
*United States v. Bikundi*, 80 F. Supp. 3d 9 (D.D.C. 2015); *United States v. Bikundi*, No. 14-cr-030, 2015 U.S. Dist.
LEXIS 136768 (D.D.C. Oct. 7, 2015); *United States v. Bikundi*, No. 14-cr-030, 2015 U.S. Dist. LEXIS 114181
(D.D.C. Aug. 28, 2015).
[4]      To be exact, 297 government exhibits were admitted and fifteen defense exhibits.  The pending defense
motions challenge the admission of a single government exhibit.

Tr. ("Tr.") (Oct. 15, 2015 PM) at 96–97 (Test. of Donald Shearer), ECF No. 309.[5]  In the District

of Columbia, D.C. Medicaid is jointly funded by the federal and District of Columbia

governments and administered by the D.C. Department of Health Care Finance ("DHCF").  *Id.* at

69; Tr. (Oct. 15, 2015 AM) at 4–5 (Shearer), ECF No. 310; Tr. (Nov. 4, 2015 PM) at 37 (Test. of

Paul Toulouse), ECF No. 345.  D.C. Medicaid provides health insurance coverage to

beneficiaries, who are D.C. residents with incomes that fall below a certain financial threshold.

Tr. (Oct. 15, 2015 AM) at 5 (Shearer), ECF No. 310.  D.C. Medicaid is a "'health care benefit

program' as defined in 18 U.S.C. § 24(b)," Superseding Indictment ¶ 1, and a "'Federal health

care program' as defined in 42 USC § 1320a-7b(f)," *id.  See* Tr. (Oct. 15, 2015 AM) at 5–6

(Shearer), ECF No. 310.

     D.C.'s Department of Health ("DOH"), Health Regulation and Licensing Authority

("HRLA") licenses HCAs in the District of Columbia to provide home care services, including

personal care services, to D.C. Medicaid beneficiaries.  *Id.* at 12–13; Tr. (Oct. 16, 2015 AM) at

46 (Test. of Sharon Mebane), ECF No. 311.  To become licensed, an HCA must submit a

provider enrollment application and an executed provider agreement to HRLA to obtain a unique

D.C. Medicaid provider number as an identifier for billing purposes.  *See* Tr. (Oct. 15, 2015 AM)

at 6–14, 22–24 (Shearer), ECF No. 310; Tr. (Oct. 15, 2015 PM) at 5–8 (Shearer), ECF No. 309.

As part of the review of the application, DHCF checks that no individual holding a five percent

or greater ownership with the applicant company has been excluded from participation in any

federal health care program by comparing the names of affiliated individuals to an "Exclusion

List" maintained by HHS-OIG.  Tr. (Oct. 15, 2015 AM) at 7–10 (Shearer).  Licensed HCAs are

---

[5]    For ease of reference, the name of the witness whose testimony is cited as well as docket numbers for trial transcripts are provided throughout the opinion since these transcripts are numerous and not docketed in chronological order.

subject to audits or annual licensure surveys to ensure that the company is operating within the rules and regulations of the District. *Id.* at 18; Tr. (Oct. 16, 2015 AM) at 46, 49–50 (Mebane), ECF No. 311.

PCAs employed by HCAs assist D.C. Medicaid beneficiaries in performing activities of daily living ("ADLs"), which are defined to include the ability to get in and out of bed, bathe, dress, eat, take medication prescribed for self-administration, and engage in toileting. Tr. (Oct. 15, 2015 AM) at 14, 18 (Shearer), ECF No. 310. To qualify for personal care services covered by D.C. Medicaid, a beneficiary must obtain a prescription from a licensed physician who has determined after a physical examination that the beneficiary has functional limitations in one or more ADLs, and that the medical, nursing, and social needs of the beneficiary could be adequately and safely met in the beneficiary's home. *Id.* at 17; Tr. (Oct. 16, 2015 AM) at 47 (Mebane), ECF No. 311. The prescription is then presented by the beneficiary to an HCA, which assigns a PCA to the beneficiary and arranges for a registered nurse to conduct an assessment of the beneficiary's functional status and needs in order to prepare a plan of care ("POC") that is tailored to address the individual needs of the beneficiary. Tr. (Oct. 15, 2015 AM) at 16–17 (Shearer), ECF No. 310; Tr. (Oct. 16, 2015 AM) at 47–48 (Mebane), ECF No. 311. Approval of the POC by a physician or advanced practice registered nurse is supposed to occur within thirty days after the start of personal care services being provided and must be recertified by the prescribing physician or advanced practice registered nurse at least once every six months thereafter. *See* Tr. (Oct. 15, 2015 PM) at 12, 16–19 (Shearer), ECF No. 309; *see also* Tr. (Oct. 21, 2015 AM) at 123 (Test. of Elvis Atabe), ECF No. 318; Tr. (Oct. 16, 2015 PM) at 81 (Test. of James Mbide), ECF No. 312. Generally, at least once every 30 days, a nurse is required to visit the patient at home to determine if the patient is receiving the requisite services and to confer

with the PCA to ensure that the required services are delivered competently.  Tr. (Oct. 16, 2015 AM) at 48 (Mebane), ECF No. 311.

The PCAs providing personal care services to D.C. Medicaid beneficiaries in the beneficiary's home are required to document the services provided and the amount of time spent with the beneficiary on a timesheet submitted to the HCA.  Tr. (Oct. 15, 2015 AM) at 14 (Shearer), ECF No. 310.  The timesheet is required to be signed by both the PCA and the beneficiary to certify that personal care services were provided as reflected on the timesheet. *See* Tr. (Oct. 16, 2015 AM) at 7–8 (Shearer), ECF No. 311; Tr. (Oct. 16, 2015 AM) at 69 (Mebane), ECF No. 311.  The HCA uses these certified timesheets to submit claims to D.C. Medicaid for payment.  Tr. (Oct. 22, 2015 PM) at 78 (Test. of Edward Mokam), ECF No. 320 (testifying that he submitted claims to D.C. Medicaid on Global's behalf based on "timesheets that they have given me and I assume that the timesheets are correct").  Personal care services are billed in 15 minute increments, with each increment representing one unit of service.  Tr. (Oct. 15, 2015 AM) at 15 (Shearer), ECF No. 310.  D.C. Medicaid authorizes a maximum of 32 units (or 8 hours) of personal care services per beneficiary per day, and a maximum of 64 units (or 16 hours) of personal care services per beneficiary per day for beneficiaries who qualify for the Elderly and Individuals with Physical Disabilities ("EPD") waiver.  *Id.* at 34–35, 38.  Federal law prohibits HCAs and PCAs from paying money to beneficiaries to either recruit or retain them.  Tr. (Oct. 16, 2015 AM at 37 (Shearer), ECF No. 311.

## B.   EXCLUSION OF FLORENCE BIKUNDI

The defendant Florence Bikundi obtained nursing licenses from Virginia and other jurisdictions, including Washington, D.C., under her maiden name, "Florence Igwacho," and the revocation of her Virginia licenses led to her exclusion from participation in any federal health

care program.[6]  Specifically, by letter dated June 22, 1999, the Virginia Board of Nursing notified Florence Bikundi (at the time "Florence Igwacho") of a hearing regarding the revocation of her licensed practical nurse ("LPN") license from the Commonwealth of Virginia.  Tr. (Oct. 26, 2015 PM) at 10–11 (Test. of Nancy Durrett), ECF No. 327; Gov't Ex. 101.  This letter was sent to the defendant's address at 9127 Edmonton Terrace, #304, Greenbelt, Maryland ("Greenbelt address").  Gov't Ex. 101.  Subsequently, on August 4, 1999, the order revoking the defendant's LPN license was sent to the same Greenbelt address and required return of her license.  Tr. (Oct. 26, 2015 PM) at 12 (Durrett), ECF No. 327; Gov't Ex. 104.  The defendant complied with the order and returned her license in a letter received by the Virginia Board of Nursing on October 12, 1999.  Tr. (Oct. 26, 2015 PM) at 13–14 (Durrett), ECF No. 327; Gov't Ex. 102.  The return address of the defendant's letter enclosing her license was the same Greenbelt address.  *Id.*  Florence Bikundi applied to reinstate her license in 2004, but the Virginia Board of Nursing denied this request in December 2004.  Tr. (Oct. 26, 2015 PM) at 16 (Durrett), ECF No. 327.

HHS-OIG received notice of Virginia's revocation of Florence Bikundi's LPN license on September 2, 1999.  Tr. (Oct. 26, 2015 PM) at 23–24 (Test. of Teresa Hoffman), ECF No. 327. On September 7, 1999, Teresa Hoffman, an HHS-OIG investigations analyst, sent a letter to "Florence Igwacho" at the same Greenbelt address used by the Virginia Board of Nursing.  *Id.* at 26; Gov't Ex. 106.  The HHS-OIG letter required the defendant to respond within 30 days.  Tr. (Oct. 26, 2015 PM) at 29 (Hoffman); Gov't Ex. 106.  Florence Bikundi did, in fact, respond to

---

[6]      For example, the District of Columbia issued an LPN license to Florence Bikundi in the name of "Florence Igwacho" in November 2002, and an RN license to her in the name of "Florence I. Ngwe" in September 2003.  Tr. (Nov. 2, 2015 PM) at 38–39 (Test. of Karen Scipio-Skinner), ECF No. 340.  Both of these licenses were revoked in May 2005 and have not been reinstated.  *Id.*

HHS-OIG in a letter, received by HHS on October 8, 1999, that used the same Greenbelt address.  Gov't Ex. 107.  In her response, the defendant requested that she be afforded additional time to obtain an attorney and asked that she be informed of HHS' decision.  *Id.*  Hoffman testified that she attempted to call the defendant several times to discuss the requested extension, but her calls were never returned.  Tr. (Oct. 26, 2015 PM) at 29 (Hoffman), ECF No. 327. Consequently, Hoffman proceeded with the exclusion process, which culminated in a letter sent on March 31, 2000, to Florence Igwacho notifying her of her exclusion.  *Id.* at 31–33; Gov't Ex. 108.  The letter was sent via U.S. Mail to the same Greenbelt address that the defendant used in her letter requesting additional time to respond.  Tr. (Oct. 26, 2015 PM) at 31–33 (Hoffman), ECF No. 327.[7]  The letter was never returned to HHS as undeliverable.  *Id.* at 33.

As a result, Florence Bikundi is excluded from participation in Medicare, Medicaid, and all federal health care programs, as defined in 42 USC § 1320a-7b(f).  Tr. (Oct. 26, 2015 PM) at 22, 32 (Hoffman), ECF No. 327.  Persons "excluded" from federal health care programs cannot be an administrator, director, or officer of any Medicaid provider.  *Id.* at 19.  An excluded person may be an owner of a Medicaid provider, provided that he or she hold no more than a five percent interest and are not involved in the day-to-day operations of the company.  *Id.*  HHS-OIG makes publicly available the names of excluded individuals in an online database, which has been available since March 1999.  Tr. (Oct. 26, 2015) at 51, 56 (Test. of Joanne Francis), ECF No. 327.  In addition, from 1993 until December 2006, the agency published the names of excluded persons in the Federal Register.  *Id.* at 53, 56, 61.

---

[7]        An attorney at HHS-OIG testified that certified mail was not required to be used for sending the notice of exclusion that applied to Florence Bikundi and that the practice of HHS-OIG is to use regular mail to send such notices.  Tr. (Nov. 4, 2015 AM) at 128–29, 139 (Test. of Susan Gillin), ECF No. 344.

## C.    GLOBAL'S CREATION AND OPERATIONAL PROBLEMS

In June 2009, Florence Bikundi, using the name "Florence Bikundi," which was not the name under which she had been excluded by HHS-OIG and, timing-wise, was several months prior to her legal marriage to Michael Bikundi, *see* Gov't Ex. 27 at 3 (Florence and Michael Bikundi's Virginia marriage certificate, dated September 5, 2009), submitted a D.C. Medicaid provider application on behalf of Global to DHCF, along with a D.C. Medicaid provider agreement, *see* Gov't Ex. 1; Tr. (Oct. 29, 2015 AM) at 65 (Test. of Ernest Igwacho), ECF No. 332 (Florence Bikundi's brother identifying handwriting as that of Florence Bikundi). As part of the application, Global was required to identify all individuals "having direct or indirect ownership or controlling interest" in the company, but none were listed. Gov't Ex. 1. The application and agreement were purportedly signed by "James Mbide" as Global's authorized representative, and contained other signatures of "individuals responsible to enforce compliance with these conditions," including the purported signatures of "James Mbide," "Dr. Ernest Igwacho," and "Nicola White." *Id.* These three individuals testified at trial that they did not sign and did not authorize anyone to sign their names on this document, and were unaware that their names had been used on this application until so advised by law enforcement agents in the course of the investigation. Tr. (Oct. 16, 2015 PM) at 95–96 (Mbide), ECF No. 312; Tr. (Oct. 29, 2015 AM) at 65–67 (Ernest Igwacho), ECF No. 332; Tr. (Oct. 20, 2015 PM) at 37–38 (Test. of Nicola White), ECF No. 316.

Donald Shearer, as the Director of Health Care Operations at DHCF approved the D.C. Medicaid provider application and executed the D.C. Medicaid provider agreement on behalf of D.C. Medicaid, effective on August 13, 2009, and Global was assigned a D.C. Medicaid provider number to submit claims for PCA services. Tr. (Oct. 15, 2015 PM) at 89 (Shearer), ECF No.

309.  Shearer testified that had he known that the signatures on the agreement were forged, he would not have approved the Global provider agreement.  *Id.* at 7–8.  Similarly, Sharon Mebane, a HRLA program manager, testified that if, during Global's initial licensing application, DOH had learned or knew that the administrator, president or director of Global had been an excluded person, "we would recommend that that entity not be licensed."  Tr. (Oct. 16, 2015 AM) at 40, 73 (Mebane), ECF No. 311.

Global's difficulties in complying with requirements to maintain its HCA license were noted by regulators conducting licensure surveys almost at the outset of its business operations and continuously thereafter.  These surveys were critical to the continued operation of Global, and one former employee testified that Florence Bikundi "was always there during surveys."  Tr. (Oct. 22, 2015 AM) at 48 (Atabe), ECF No. 319.  During HRLA's first annual survey of Global, which took place from December 1 through 7, 2010, the HRLA surveyors noted major deficiencies in Global's record-keeping, its policies and procedures, and its employee and patient files, including, for example, evidence that Global was missing complete background checks and health certificates for employees and that patient services were not being provided consistent with POCs.  Tr. (Oct. 16, 2015 AM) at 57–63, 65–66, 70 (Mebane), ECF No. 311; Tr. (Oct. 22, 2015 PM) at 18–19 (Test. of Roland Follot), ECF No. 320; Gov't Ex. 22.

In follow-up surveys conducted in February and September 2011, persistent significant record-keeping deficiencies were reported by surveyors.  Gov't Exs. 23, 24.  Roland Follot, a HRLA surveyor who participated in these two follow-up surveys, testified about the changing information provided to him in response to his questions.  For example, during the February 2011 survey, Follot was given conflicting information by both defendants about the role of James Mbide:  Michael Bikundi told Follot that Mbide was a "director," who had been out for

six months, while Florence Bikundi said that Mbide was ill and had been working up until the last week.  Tr. (Oct. 22, 2015 PM) at 19–22 (Follot), ECF No. 320.  Follot testified that Mbide's role "was hard to determine.  I—I would get different answers on different days and I was referring to different documents."  *Id.* at 23.  Unbeknownst to Follot, Michael Bikundi had fired Mbide several months prior to the survey, "towards the end of 2010."  Tr. (Oct. 16, 2015 PM) at 105 (Mbide), ECF No. 312; Tr. (Oct. 19, 2015 AM) at 23 (Mbide), ECF No. 314.

Also, on the first day of the survey, February 14, 2011, Follot met Florence Bikundi at Global's office and she avoided answering his question about her title, while Michael Bikundi introduced himself as "just the president."  Tr. (Oct. 22, 2015 PM) at 11–13, 15 (Follot), ECF No. 320.  When Follot asked Florence Bikundi for her personnel file, she responded that she did not have one, *id.* at 15–16, but the following day told Follet that Global employee Elke Johnson had "shredded her file on the day before," *id.* at 16, 27–28.  Indeed, Elke Johnson confirmed during her testimony that, during a survey, Michael Bikundi handed Florence Bikundi's personnel file containing "her driver's license, it had her passport and her Social Security," to Johnson and instructed her to shred it, without explaining why, and Johnson complied with this instruction.  Tr. (Oct. 20, 2015 AM) at 55–58 (Test. of Elke Johnson), ECF No. 315.  Any one of those credentials in Florence Bikundi's personnel file may have reflected her maiden name, under which she had been excluded by HHS-OIG.

Additionally, Follot sought, as part of the February 2011 survey, to review board of director minutes in order to assess Global's compliance with "the plan of correction for the December survey," in which Global had been "cited . . . for various policy issues for which the board of directors was responsible."  Tr. (Oct. 22, 2015 PM) at 25 (Follot), ECF No. 320.  Florence Bikundi told Follot that the board of directors had met since the December 2010 survey

and, variously, that Nicola White or James Mbide had taken notes at the meeting. *Id.* at 24, 29.
After two days of asking for the minutes, White finally handed the purported board minutes to
the surveyors. *Id.* at 26. Although Follot was unaware at the time, those board minutes were
fabricated. Global's board of directors meeting minutes, dated January 8, 2010 and January 28,
2011, show "Nicola White" as the "Recording Secretary," and the latter minutes further indicate
that White was present at the meeting. Gov't Exs. 270, 271. White testified, however, that she
had never been asked to join the board, was not the recording secretary and had never attended a
Global board meeting. Tr. (Oct. 20, 2015 PM) at 41–44 (White), ECF No. 316. Moreover,
White was not familiar with the names listed for several other board members purportedly
present at the same meeting with her. *Id.* She admitted to signing the January 28, 2011 minutes
at the instructions of Florence Bikundi, *id.* at 43, but denied that she had signed her name on
subsequent board minutes that nevertheless reflected her purported signature, *id.* at 46–48, 50.
Similarly, James Mbide, whose attendance at board meetings is noted on certain board minutes
reflecting his purported signature, denied that he was ever a member of the Global board,
attended any board meetings or signed any minutes. Tr. (Oct. 19, 2015 AM) at 23–26 (Mbide),
ECF No. 314; Gov't Exs. 271, 272.

A follow-up survey scheduled for August 30, 3011 had to be "aborted" because Global
employees advised that the requested files were not available. Gov't Ex. 26; Tr. (Oct. 22, 2015
AM) at 101–02 (Test. of Theresa Waters), ECF No. 319.

At the next follow-up survey in September 2011, Follot issued a notice of infraction,
which was sent to Michael Bikundi, due to continuing major deficiencies related to missing
health certificates for employees, and a missing comprehensive background check in one of the
sampled employee files. Tr. (Oct. 22, 2015 PM) at 44–48 (Follot), ECF No. 320; Gov't Ex. 18.

The surveyors observed that it took a noticeably long time for the Global employees to provide the files randomly selected by the surveyors to review.  *Id.* at 41–42 (Follot); Tr. (Oct. 22, 2015 AM) at 102 (Waters), ECF No. 319.  The explanation for the delay was revealed by former Global employees who testified about the flurry of document alterations underway even when the surveyors were present in other parts of Global's offices.

D.     **FALSIFICATION OF GLOBAL PATIENT AND EMPLOYEE RECORDS**

In addition to forged signatures on Global's Medicaid application and agreement and the fraudulent Global board of directors minutes presented to HRLA surveyors, each of the cooperating Global employees, six of whom entered guilty pleas in connection with this case, *see supra* n.1, testified about the rampant falsification of patient and employee records at Global in order to avoid Medicaid licensure issues for the company during surveys and to ensure reimbursement from D.C. Medicaid.  The falsified documents for patients included POCs, recertifications for POCs, nursing notes and, as discussed in more detail *infra* in Part I.E, PCA timesheets.  The falsified documents for Global employees included key records in PCA personnel files, such as health certificates, training certificates, and background checks.  Further, these witnesses detailed the intimate involvement of both Florence and Michael Bikundi in falsifying records to facilitate this fraud scheme.

1.     *James Mbide*

James Mbide is a registered nurse ("RN") and was identified as Global's Director of Nursing on Global's Medicaid provider application. Gov't Ex. 1.  He was hired for that position by Florence Bikundi in late 2009.  Tr. (Oct.16, 2015 PM) at 89–90 (Mbide), ECF No. 312.  He had met Florence Bikundi earlier in 2009, when she was using her maiden name, Florence Igwacho, and operating Flo-Diamond in Maryland.  *Id.*  Sometime after the defendants got

married, Michael Bikundi became Global's CEO, *id.* at 101, and Mbide continued to work full-

time as Global's Director of Nursing until Michael Bikundi dismissed him at the end of 2010, *id.*

at 105, at which point Mbide continued to provide services to Global through his own staffing

agency, Eban Health Service ("Eban"), *id*. at 106.  At Florence Bikundi's request, in the summer

of 2012, Mbide returned to work part-time, two days per week as Global's Director of Nursing.

*Id.* at 103–06.

      Mbide testified about his own and others' activity during his tenure at Global in falsifying

records for patient files in order to appear compliant for surveys "[s]o that the company will not

be charged to do reimbursement."  *Id.* at 83.  If Mbide was not in the Global office when the

surveyors arrived, either Florence or Michael Bikundi would call Mbide to come to Global's

offices to assist by creating missing nurse notes to say that a nurse visit was done, even when it

was not, and to recertify a patient's continuing need for PCA services.  *Id.* at 80–84; *see also* Tr.

(Oct. 19, 2015 AM) at 12–15 (Mbide), ECF No. 314.  Mbide testified that Florence Bikundi

offered and paid Mbide $15 per false recertification and nurse note.  Tr. (Oct. 16, 2015 PM) at

81–83 (Mbide), ECF No. 312; Tr. (Oct. 19, 2015 PM) at 49 (Mbide), ECF No. 313.  Florence

Bikundi also instructed Mbide that when he created fake nurse notes for patients whom he had

not actually visited, he was supposed to write down that the PCA was present, because this was a

Medicaid requirement.  Tr. (Oct. 16, 2015 PM) at 84–85 (Mbide), ECF No. 312; Tr. (Oct. 19,

2015 AM) at 19–20 (Mbide), ECF No. 314.  Mbide testified that Florence Bikundi assisted in the

creation of fake nurse notes, and sat at a table with him and other Global nurses to create fake

nurse notes for visits that did not take place.  Tr. (Oct. 19, 2015 AM) at 13–14 (Mbide), ECF No.

314.

Mbide confirmed that Michael Bikundi was present when he and other Global nurses were creating nurse notes in preparation for surveys. *Id.* at 14–15. Either of the defendants "would go through charts. If they found out there was a hole in the charts . . . he would give it to me or to anybody around to do the notes." Tr. (Oct. 16, 2015 PM) at 84 (Mbide), ECF No. 312. In one instance, Mbide testified that, after Michael Bikundi told him that $3,000 had been returned to Medicaid due to a lapsed POC for a patient funneled to Global through Eban, Mbide observed Elvis Atabe creating counterfeit documents by "cutting and pasting" and backdating POCs for the same patient. Tr. (Oct. 19, 2015 AM) at 31–32 (Mbide), ECF No. 314. Elvis Atabe informed Mbide that Michael Bikundi had given him the patient's file "to . . . cut and paste" and backdate. *Id.* at 32.

In addition to fake nurse notes, Mbide testified about the falsification of other Global records in employee files, including annual physicals and CPR certificates for nurses and PCAs, to make the documents appear current, which was a Medicaid requirement for those who had patient contact. *Id.* at 33–35.

Mbide recounted a conversation with Michael Bikundi about how the Global business was to be operated. At a meeting with Michael Bikundi and another Global employee, Mbide advised that some Medicaid beneficiaries "appeared not to be qualified to receive personal care services" because they were "able-bodied," and that they needed to be discharged. *Id.* at 21–22. Mbide testified that he asked Michael Bikundi, "Give me the authority. Let me go out there, and let me do a reassessment so that we can begin to discharge some of the patients." *Id.* at 22. In response, Michael Bikundi asked Mbide "to put a business hat on [his] head," which Mbide understood to mean "I'm here to make money, don't interrupt." *Id.* Thereafter, Mbide never

complained to Michael Bikundi again because Michael Bikundi had "established what he want[ed] to do for his business." *Id*.

### 2. *Elvis Atabe*

In April 2011, Elvis Atabe applied to work at Global. Tr. (Oct. 21, 2015 AM) at 109–10 (Atabe), ECF No. 318. On the day of his interview, James Mbide introduced Atabe to Florence Bikundi, who then sent him to be interviewed by Michael Bikundi, who actually hired him. *Id*. at 111–12. Atabe started work at Global about a week later and was advised by Florence Bikundi that he would be doing quality assurance. *Id*. at 113–14. Atabe shared an office with Florence Bikundi. *Id*. at 114. A few days after he started at Global, Atabe "was introduced to the various things like wiping out, changing signatures on the computer, and all that." Tr. (Oct. 21, 2015 PM) at 94–95 (Atabe), ECF No. 317. Atabe testified that when he found discrepancies in patient folders given to him by Florence Bikundi to review, Florence Bikundi showed him what he was "supposed to do." Tr. (Oct. 21, 2015 AM) at 114–15 (Atabe), ECF No. 318. Florence Bikundi explained that if a POC did not conform to the 30-day period required by Medicaid, he was to use white-out to alter the dates to make sure the dates conform to Medicaid's requirements. *Id*. In his presence, Florence Bikundi used white-out to alter patient files. *See id*. at 115–16. Afterwards, Nicola White showed Atabe how to erase a signature on a computer and put in another signature, although Atabe told Nicola White that he was not very good with the computer. *Id*. at 116. Atabe testified that, at times, he sat with Florence Bikundi and Irene Igwacho—one of Florence Bikundi's sisters—"in that little office" to try to figure out ways to better alter the documents. *Id*. at 119. Atabe and Florence Bikundi sat side by side, with their chairs "rubbing each other" while they created fake documents. *Id*. at 120. Irene Igwacho, Nicola White, and Eveline Takang assisted in creating fake documents too. *Id*. at 120–21.

According to Atabe, Global had so many charts, that when surveyors were coming, one person could not do the job of fixing the charts, "it was like a [sic] teamwork." *Id.* at 121. Atabe further testified that POCs mailed to Global's offices were delivered to Michael Bikundi and, if the dates "were not good enough," Michael Bikundi directed Atabe to alter the dates. *Id.* at 125.

Atabe testified that the "whole system was bad in Global." Tr. (Oct. 21, 2105 PM) at 25 (Atabe), ECF No. 317. Office workers participated in the fraudulent scheme at various levels. *Id.* at 25–26. Elke Johnson altered personnel files and Eveline Takang created false nurse visit notes. *Id.* at 26–28. Atabe created cut-outs of doctors' signatures that were used by nurses to do corrections on the POCs that were not signed with compliant dates. *Id.* at 31; Gov. Ex. 413. The use of cut-outs was kept a secret from the surveyors. Tr. (Oct. 21, 2105 PM) at 32 (Atabe), ECF No. 317. Michael Bikundi knew that Global employees were using the cut-outs "because he used to come and oversee sometimes what we are doing." *Id.* at 32–33. Florence Bikundi knew that Atabe used the cut-outs to alter documents because he did it "right in front of her." *Id.* at 33. Atabe further stated that Irene Igwacho, Nicola White and Chris Asongcha knew that Global was using the cut-outs because "we were doing it together." *Id.* During surveys, while surveyors were in another part of the office, Atabe and other Global employees, including Irene Igwacho, James Mbide, Eveline Takang and Vanessa Sona sat in the chart room, where patient files were maintained, and created fake documents, such as nurse visit notes, to help Global pass the surveys. *Id.* at 57–58. Michael Bikundi knew that the Global employees were in the chart room altering documents while the surveyors were in the other room waiting for the files because "once in a while" he would walk around to check on the progress. *Id.* at 84.

### 3.     *Elke Johnson*

Elke Johnson, who is an undocumented immigrant, started working for Florence Bikundi at Flo-Diamond in 2005, before working at Global as the HR Coordinator.  Tr. (Oct. 19, 2015 PM) at 139–41 (Johnson), ECF No. 313; Tr. (Oct. 20, 2015 AM) Tr. at 8, 14, 85 (Johnson), ECF No. 315.  Johnson testified that Florence Bikundi and Michael Bikundi hired as PCAs other undocumented immigrants, who used fake credentials that actually belonged to people authorized to work in this country, and who were paid less than documented workers.  Tr. (Oct. 20, 2015 AM) at 14–18 (Johnson), ECF No. 315.  Background checks for undocumented PCAs were performed using the credentials of the assumed identity, not the actual PCA.  *Id.*  In preparation for surveys, both Florence and Michael Bikundi directed Johnson to make sure that she altered expired dates on any CPR or physical examinations in employee files so that Global would not be cited by the surveyors since such citations could result in a fine of as much as $500 per employee file.  *Id.* at 51–53.  To alter the dates, Johnson "would Wite-Out the current date, make a photocopy, then put a present date to make it look like it's valid, and then make another copy and put it in the file."  *Id.*; *see also id.* at 86–87.  In preparation for surveys, Johnson observed Irene Igwacho altering dates on POCs, *id.* at 53–54, 88, and testified that Michael Bikundi told the employees "to get everything in order, do whatever it takes to make them right" because he did not "want to be cited," *id.* at 55.

### 4.     *Nicola White*

Nicola White began working for Florence and Michael Bikundi at Flo-Diamond in 2006, when Elke Johnson worked there, and both White and Johnson continued working for the defendants at Global.  Tr. (Oct. 20, 2015 PM) at 25–28, 34 (White), ECF No. 316.  White was an administrative assistant at Global responsible for collecting the employees' timesheets, preparing

their checks and putting the checks together with the timesheets to present to the Bikundi's for approval and signature. *Id*. at 50. She testified that when the Medicaid surveyors were expected, Florence Bikundi told her "to actually fix the POC" and alter any dates that were out of compliance. *Id*. at 70–72. She would also change doctors' signatures on POCs by cutting and pasting doctors' signatures onto POCs, so that they would appear to have been approved by the doctors. *Id*. at 73.

White testified that she heard "an argument" between Florence and Michael Bikundi, during which Michael Bikundi complained that White's "cut and paste" jobs on the computer did not look "real enough." *Id*. at 73–74. In an effort to improve the apparent authenticity of the fake documents, Florence Bikundi would take the forged POCs and fax them to one of Flo-Diamond's offices and have them faxed back to her so that the POCs would look "more real." *Id*. at 74–75. On another occasion, Florence Bikundi told White that "Mr. Michael Bikundi saying that the documents that -- you know, the way how I'm doing it, it doesn't even look real enough because of whenever I do the signature, it appear bigger than what the original signature looked like." *Id*. at 75. After that, Elvis Atabe took over the task of altering doctors' signatures on POCs. *Id*. at 75–76. Michael Bikundi instructed White to order all of the supplies that Atabe needed, such as white-out and different pens to perform this document alteration task. *Id*.

In addition to altering POCs, White also changed dates on employees' CPR certifications "to make it current," in accordance with Florence Bikundi's direction "to make sure all of those -- everything is okay, or during the survey we will have -- we will just make those document changes and then bring it to the surveyors." *Id*. at 77. The alteration of these documents would sometimes occur with the surveyors in Global's offices. *Id*.

20

On two occasions when White was on maternity leave from August through November, 2011, Florence and Michael Bikundi went to White's home to retrieve POCs that White had created. *Id.* at 95–97; Tr. (Oct. 21, 2015 AM) at 82–83 (White), ECF No. 318. The POCs were so numerous that they could not be emailed and did not fit into an envelope. Tr. (Oct. 20, 2015 PM) at 96–97 (White), ECF No. 316; Tr. (Oct. 21, 2015 AM) at 84 (White), ECF No. 318. White corroborated the testimony of Atabe, Mbide and others that Florence Bikundi directed her, as well as other employees, to falsify documents when the surveyors were still present in Global's offices to avoid the imposition of fines. Tr. (Oct. 20, 2015 PM) at 76–77 (White), ECF No. 316.

> ### 5.   *Melissa Williams*

Melissa Williams first began working for Florence Bikundi as a PCA at Flo-Diamond, using false credentials since she was an undocumented immigrant. Tr. (Oct. 29, 2015 PM) at 32–33 (Test. of Melissa Williams), ECF No. 334. Florence Bikundi was aware of her undocumented status since she provided Williams with paychecks under Williams' assumed name used for credentials. *Id.* at 36–37. Williams continued her PCA work at Global after she received her work authorization in December 2008. *Id.* at 42. Through her relationship with Michael Bikundi's son, Williams is the mother of Michael Bikundi's grandchild and calls Michael Bikundi "Dad." *Id.* at 102.

In approximately April 2011, Florence Bikundi permitted Williams to work in Global's office rather than working with patients as a PCA and promoted her to Human Resources Coordinator. *Id.* at 53–55, 78. During the first survey that Williams observed at Global, she saw nurses creating false nurse notes when notes were missing from patient files. *Id.* at 60–61. Florence Bikundi, Chis Asongcha and Elvis Atabe were in the chart room at the time that the

fake nurse notes were created and then inserted into the patient files. *Id.* at 61–62. Williams also observed Elvis Atabe change dates on POCs in Florence Bikundi's presence, *id.* at 64–65, and Chris Asongcha alter employee physical examinations and CPR certificates in employee files in Florence Bikundi's presence, *id.* at 66. Williams testified that "we knew that we had an obligation to make sure that our folders were kept updated at all times. And whenever we had a survey and it was not so, it was expected of us to forge the paperwork." Tr. (Nov. 2, 2015 AM) at 12 (White), ECF No. 338; *id.* at 22–23 (testifying that, for every survey, "it was always the same thing, just with my employees' folders, just making the adjustments for whatever folders that the surveyors needed that were not updated . . . [meaning they] Frauded the paperwork"). During surveys, Florence Bikundi supervised this activity of Global employees "making adjustments, Wite-Out, whatever it is, to the physical or whatever paperwork that needed to be updated in the eyes of the surveyors" and, on one occasion asked Chris Asongcha why a document was not done and approved Williams altering the document. *Id.* at 13.

Williams testified that in order to manage costs, Florence Bikundi canceled Global's contract with Kroll—a company with which it had contracted to conduct criminal background checks on PCAs—and required PCAs to provide their own background checks. Tr. (Oct. 29, 2015 PM) at 84–86 (Williams), ECF No. 334; Tr. (Oct. 20, 2015 PM) at 83 (White), ECF No. 316. Subsequently, during surveys, when criminal background checks were missing from employee files, Chris Asongcha and Nicola White started creating phony criminal background checks to insert in the employee files. Tr. (Oct. 29, 2015 PM) at 86–87 (Williams), ECF No. 334; *see also* Tr. (Nov. 2, 2015 AM) at 115 (Williams), ECF No. 338. This aspect of Williams' testimony was corroborated by Nicola White, who admitted to making fraudulent background checks for Global employees, *see* Tr. (Oct. 20, 2015 PM) at 84 (White), ECF No. 316, as well as

by a Kroll representative, who testified that out of 31 Kroll background checks in Global

employee files, a review confirmed that only three were authentic, *see* Tr. (Nov. 2, 2015 PM) at

15 (Test. of Craig Olsen), ECF No. 340; Gov't Ex. 440.

### E.   FALSIFICATION OF TIMESHEETS AND ILLEGAL PAYMENTS TO GLOBAL PATIENTS

In addition to the fraudulent alteration of patient and employee files that took place

within Global's offices, extensive testimony was provided at trial about the kickbacks paid to

beneficiaries for their false certification of PCA timesheets for work that was not performed and

about the defendants' knowledge of these kickbacks and fraudulent timesheets.  Florence and

Michael Bikundi required that the timesheets supporting each employee's work be attached to

the employee's paycheck before the paycheck would be approved and signed.  Tr. (Oct. 20, 2015

PM) at 50 (White), ECF No. 316; Tr. (Oct. 21, 2015 AM) at 78, 90 (White), ECF No. 318; Tr.

(Nov. 2, 2015 AM) at 122 (Williams), ECF No. 338; Tr. (Oct. 20, 2015 AM) at 39 (Johnson),

ECF No. 315.  Thus, the defendants were aware of which PCAs claimed to work 16-hour days

and which PCAs claimed on their timesheets to be providing services to a beneficiary when

those PCAs were actually on vacation, in the office, in school or at another job.  When Florence

or Michael Bikundi concluded that PCAs had submitted timesheets for services not provided,

they would at times withhold the PCAs' paychecks but would not terminate them, void the

claims or initiate reversals to repay Medicaid for the hours that Global billed for these aides.  Tr.

(Oct. 19, 2015 AM) at 39–40 (Mbide), ECF No. 314; Tr. (Oct. 20, 2015 AM)  at 39–40, 49–50,

110 (Johnson), ECF No. 315; Tr. (Oct. 20, 2015 PM) at 120–21 (White), ECF No. 316; Tr. (Oct.

28, 2015 PM) at 31–32 (Test. of Carlson Igwacho), ECF No. 335; Tr. (Nov. 2, 2015 AM) at 35–

39 (Williams), ECF No. 338.  Summarized below is testimony from the cooperating witnesses

and beneficiaries about the fraudulent timesheets and kickbacks to Global's patients.

1.    *Melissa Williams*

While working as a PCA at Global, Melissa Williams was assigned, by Elke Johnson, to patient Carolyn Baldwin (beneficiary no. xxxx2921, *see* Def. FB's R. 29 Mem. at 11; Superseding Indictment ¶ 75(3)).  Tr. (Oct. 29, 2015 PM) at 44 (Williams), ECF No. 334.  After a few weeks of working with Baldwin, Baldwin demanded money from Williams.  *Id.*  Baldwin explained to Williams that she had been previously receiving money from Elke Johnson and Florence Bikundi, *id.* at 45–46, and if she were not paid, "she would leave Global and go to a different home health aide company," *id*. at 46.  Williams stated that she gave Baldwin money from her paycheck and money given to her by Johnson.  *Id*. at 46.

Carolyn Baldwin largely corroborated the testimony of Johnson and Williams.  She testified that Florence Bikundi came to her house with her then-boyfriend, "a tall fellow," to recruit her as a patient.  Tr. (Nov. 3, 2015 AM) at 30 (Test. of Carolyn Baldwin), ECF No. 343.  At the time, Florence Bikundi told her, "I take care of my girls."  *Id.*  When Baldwin asked what that meant, Florence Bikundi replied, "you know, I give them a little money."  *Id.* at 31.  Thereafter, Baldwin became a patient and Florence Bikundi mailed Baldwin a check of about $75 to $150.  *Id.*  Baldwin recalled picking up money from "Elke" one time when the business was located on Georgia Avenue, *id*., and also from Williams, who was assigned to be her PCA, *id.* at 32–33, 44–45.

Williams explained the reason for the kickbacks to Global patients was "[i]n order to maintain or keep these patients, because the patients will tell you that -- just even as an aide, if you don't pay me, I'm going to take my services somewhere else.  So in order to keep the patient, money would be given to the patient . . . . So in order for the patient to stay with the company, which is Global, the -- Florence would -- because she wouldn't want the patient to go

to a different agency where services would be rendered under a different company name, then she would pay to keep the patients happy." Tr. (Nov. 2, 2015 AM) at 20 (Williams), ECF No. 338.

Williams provided details about the blatant nature of this fraud activity. For example, she saw Irene Igwacho socializing with Michael and Florence Bikundi at times when Irene Igwacho was supposed to be providing PCA services to Global patients. Tr. (Oct. 29, 2015 PM) at 103–04 (Williams), ECF No. 334. The defendants were aware of this since Michael Bikundi did not sign Irene Igwacho's paychecks without seeing the timesheets, because "without time sheets, you don't get paid." *Id.* at 104. Similarly, Berenice Igwacho—another of Florence Bikundi's sisters—attended social functions at the defendants' residence at times that coincided with when she claimed on timesheets to be providing PCA services to Global patients. *Id.* at 105. Both Florence and Michael Bikundi observed Berenice Igwacho at the social functions. *Id.* In another instance Williams testified that, from December 22, 2012 through January 6, 2013, she accompanied Florence Bikundi, Michael Bikundi, Carlson Igwacho, who is Florence Bikundi's son, Violet Igwacho, who is Carlson Igwacho's wife, and others on a family vacation to California, and timesheets for this period were submitted by certain of the vacationers for PCA services. *Id.* at 105–07. As another example, Williams testified that there were times that she submitted timesheets indicating she had provided home health services to a patient at certain hours that coincided with the hours that she was actually working in the office. Tr. (Nov. 2, 2015 AM) at 116 (Williams), ECF No. 338. At one point, Florence Bikundi told Williams that Williams could no longer work with the patient, but did not fire Williams. *Id.*

25

### 2.      *Nicola White*

Nicola White testified that she would submit timesheets for working with patients during the week and weekends, despite working full-time in the office during the week and not working on the weekends.  Tr. (Oct. 20, 2015 PM) at 89–90, 94 (White), ECF No. 316; Tr. (Oct. 21, 2015 AM) at 78 (White), ECF No. 318.  Michael and Florence Bikundi knew that Nicola White was working full-time in the office yet also submitting timesheets used to bill Medicaid for PCA services.  Tr. (Oct. 20, 2015 PM) at 94–95 (White), ECF No. 316.  Although Michael Bikundi told her to stop, he did not ask for return of the money or initiate a refund to D.C. Medicaid.  *Id.* at 95.  White's testimony was corroborated by Williams, who testified that when Michael Bikundi learned that White had submitted a timesheet claiming that she had provided services to a Global patient while White was actually in Jamaica, Michael Bikundi decided that he was not going to allow Global office workers to work as PCAs on the weekends anymore.  Tr. (Nov. 2, 2015 AM) at 32–33 (Williams), ECF No. 338.

Nicola White testified about the regular, "numerous of times" that Florence Bikundi asked her to cash checks and "[s]he would normally give me a list with the total amount for each individual and write the check in my name."  Tr. (Oct. 21, 2015 AM) at 92 (White), ECF No. 318.  "Sometimes she would be the one to give to those individuals and sometimes she asked me to do it."  *Id.* at 93.  Cash would be paid to "aides that weren't legally to work in the United States," to Carlson Igwacho, and "every two weeks" to Medicaid beneficiaries who "actually come to the office for it; some of the time they will send a family member."  *Id.*

### 3.      *Elke Johnson*

Elke Johnson testified that Florence Bikundi gave her cash to pay at least three Medicaid beneficiaries—Carolyn Baldwin, William Smith, and Gary Miller—for becoming or remaining

clients of Global in order "to build her list of recipients." Tr. (Oct. 20, 2015 AM) at 27–28

(Johnson), ECF No. 315. Florence Bikundi instructed Johnson to pay $300 to William Smith

(beneficiary no. xxxx4279, *see* Def. FB's R. 29 Mem. at 10, Superseding Indictment ¶ 75(1)), a

patient of Carlson Igwacho, when Carlson Igwacho was in Cameroon and his timesheet, which

falsely reflected the provision of PCA services during that period, had already been submitted for

reimbursement from Medicaid. *Id.* at 30–32. In other words, Carlson Igwacho submitted post-

dated timesheets for the beneficiary which contained the beneficiary's signature in advance of

him leaving on a trip to Cameroon. *Id.* at 31.

Johnson further testified that Berenice, Irene, Carlson and Violet Igwacho were working

in the office or attending school at times they indicated on timesheets that they were performing

PCA work. *Id.* at 46–48.

### 4.    *Francis James*

Francis James testified that, after his girlfriend Elke Johnson suggested that he become a

home health aide, he met with Florence Bikundi, who told him that she had a patient for him,

Gary Miller (beneficiary no. xxxx0062, *see* Def. FB's R. 29 Mem. at 11; Superseding Indictment

¶ 75(2)), whom she had already been paying. Tr. (Oct. 19, 2015 PM) at 74–75, 107 (Test. of

Francis James), ECF No. 313. James already had a full-time job working in construction, and

Florence Bikundi told James that he did not have to see his patient for the full eight hours each

day that Medicaid would be billed, *id.* at 75, 86–88, 106; *see also id.* at 84 ("Miss Florence told

me, it's okay for to go – for to work and – I mean, I could put eight hours and I don't have to

work."). James paid his patient $100 to $150 every pay period in return for the patient certifying

timesheets weekly for services that James did not perform. *Id.* at 77, 80, 107. After James began

working at Global, Michael Bikundi told him that he would have to pay Michael Bikundi $300

every two weeks, which James understood he would be required to do in order to keep his job. *Id*. at 88–89, 120, 125.  James therefore paid Michael Bikundi the $300 kickback every two weeks, either by the office building or by a Kentucky Fried Chicken.  *Id*. at 89, 107, 115, 120, 125.

### 5.   *Irene Igwacho*

Irene Igwacho, who is an RN and the sister of Florence Bikundi, testified about submitting false timesheets for two Global patients, Joan Gross and Sergio Zuniga (beneficiary no. xxxx7041, *see* Def. FB's R. 29 Mem. at 12; Superseding Indictment ¶ 75(9)), reflecting time she had purportedly performed work when she was actually in school, as Florence Bikundi was well aware.  Tr. (Oct. 27, 2015 AM) at 44–45 (Test. of Irene Igwacho), ECF No. 328.  Gross agreed to sign the timesheets falsely certifying that Irene Igwacho had performed work in return for biweekly payments of $150.  *Id*. at 47.  Irene Igwacho never met Sergio Zuniga even though she was supposed to provide PCA services to him on the weekends and submitted timesheets reflecting that work.  *Id*. at 53.  She simply paid another aide $50 to have Zuniga sign the timesheets, including for time periods when Irene Igwacho was traveling out of the country and both defendants knew this.  *Id*. at 53, 55–56.

Irene Igwacho's testimony was corroborated by Sergio Zuniga, who suffers from a spinal deformity.  Tr. (Oct. 20, 2015 PM) at 4–5 (Test. of Sergio Zuniga), ECF No. 316.  Zuniga testified that he was recruited to use Global for PCA services through an aide named Darnell Williams.  *Id*. at 5, 19.  Darnell Williams would visit Zuniga "roughly every two weeks," and give him $175, which helped him financially.  *Id*. at 7–8.  Zuniga "signed the timesheets to basically continue receiving the help that he was . . . giving."  *Id*. at 11.  Darnell Williams also told Zuniga that a different aide, Irene Igwacho, would be assigned to work with him on the

weekends, but that aide never went to see him and the timesheets for that aide's work did not contain his signature. *Id.* at 15–16. After Darnell Williams stopped paying him every two week, Zuniga never sought another home health aide. *Id.* at 18.

### 6.    *Carlson Igwacho*

Carlson Igwacho, the son of Florence Bikundi, is an RN and worked as a Global PCA in May 2009, following his discharge from military service. *See* Tr. (Oct. 28, 2015 AM) at 129–30, 132 (Carlson Igwacho), ECF No. 329. He denied recognizing a number of documents, including a health certificate, school certificates and other information contained in his Global personnel file, some of which documents reflected his forged signature. *Id.* at 135–39. He also denied that he was aware of having an ownership interest in Flo-Diamond, as reflected in the Medicaid provider agreement that Flo-Diamond had with Maryland. *Id.* at 140.

Carlson Igwacho testified that he was assigned to work eight hours per day, seven days per week with beneficiary William Smith, who appeared to know Florence Bikundi by asking "How's Miss Flo?" Tr. (Oct. 28, 2015 PM) at 9, 15 (Carlson Igwacho), ECF No. 335. Smith told Carlson Igwacho that he did not want his PCA around all of the time and threatened to use a different HCA unless he received payments. *Id.* at 10–13. Carlson Igwacho visited him only one to two days per week, and paid him to certify false timesheets reflecting PCA services for 56 hours per week. *Id.* at 13–15.

Carlson Igwacho also paid other beneficiaries, Glenn Scott and Mary Drayton (beneficiary no. xxxx2282, *see* Def. FB's R. 29 Mem. at 11; Superseding Indictment ¶ 75(5)), for falsely certifying timesheets for PCA work not performed. *Id.* at 21–26. He paid Mary Drayton $300 every pay period to sign fraudulent timesheets stating that she received 56 hours of services per week from him. *Id.* at 25. In sum, from January 2010 to March 2012, Carlson Igwacho

submitted timesheets reflecting that he worked 16 hours per day, every day, divided into eight hour shifts between Mary Drayton and William Smith, even though during this same time period, from Fall 2009 through Spring 2011, and in the summer, he was (1) attending school, for which Florence Bikundi contributed funds; (2) had alcohol-related arrests, about which the defendants were aware; (3) was hospitalized for malaria; and (4) traveled to Cameroon, a trip Florence Bikundi knew about, and on vacation with the defendants.  *See id.* at 27–40, 43–48; Gov't Ex. 245.

This testimony was corroborated by multiple witnesses.  Nicola White testified that Carlson Igwacho was assigned to work as a PCA with two patients, for a total of sixteen hours every day.  Tr. (Oct. 20, 2015 PM) at 100–01 (White), ECF No. 316.  Melissa Williams recounted a conversation between herself and Nicola White, during which White informed her that Florence Bikundi had assigned Carlson Igwacho to be the PCA for Mary Drayton, who had previously been assigned to White.  Tr. (Nov. 2, 2015 AM) at 21 (Williams), ECF No. 338. White explained that because Mary Drayton had been a former client of Flo-Diamond, Florence Bikundi knew she would accept money to certify false timesheets and had sent money over to Mary Drayton.  *Id.*  Likewise, Elke Johnson confirmed that, during a period when Carlson Igwacho was in Cameroon and unable to visit his patient, Florence Bikundi told Johnson to pay the patient $300 because Carlson Igwacho's timesheet, which falsely indicated that he had provided services to the patient, had already been submitted.  Tr. (Oct. 20, 2015 AM) at 30–32 (Johnson), ECF No. 315.  Finally, Mary Drayton, the beneficiary herself, confirmed that she, and her son, R.C., were both paid money in exchange for signing timesheets that falsely indicated that Carlson Igwacho (and, for some period, Violet Igwacho), had provided sixteen hours of service every day.  Tr. (Oct. 28, 2015 AM) at 39–44 (Test. of Mary Drayton), ECF No. 329.

### 7. *Other PCAs Falsifying Timesheets*

The testifying former Global employees admitted to paying kickbacks to patients for certifying false timesheets and also provided evidence of other Global employees who engaged in the same illegal activity. In addition to beneficiaries Carolyn Baldwin, Mary Drayton and Sergio Zuniga, other former Global patients testified about being recruited to be Global patients and the kickbacks they received to certify false timesheets. Tywonda Fenner (beneficiary no. xxxx0699, *see* Def. FB's R. 29 Mem. at 12; Superseding Indictment ¶ 75(8)) testified that initially, when she told a prospective home health aide about attending class during the day, the aide's "boss," a female, advised Fenner over the telephone that services could not be provided unless Fenner were home. Tr. (Nov. 2, 2015 PM) at 43–45 (Test. of Tywonda Fenner), ECF No. 340. Nevertheless, Berenice Igwacho subsequently showed up with doctors' forms for Fenner to sign. *Id.* at 47–48, 59. Berenice Igwacho paid Fenner approximately $140 every two weeks and, in exchange, Fenner signed Berenice Igwacho's timesheets. *Id.* at 49–51. Fenner did not ever receive any PCA services from any Global PCA. *See id.*

Another Global patient, Alma McPherson (beneficiary no. xxxx4210, *see* Def. FB's R. 29 Mem. at 13; Superseding Indictment ¶ 75(14)), testified that a woman named "Yvette" visited her at home to ask if she wanted to make some extra money. *Id.* at 62–63, 75 (Test. of Alma McPherson). Sometime thereafter, McPherson, along with two others, went to a clinic with Yvette, who told McPherson to walk with a cane, even though she did not need one. *Id.* at 63–66. She met with a doctor who prescribed home health services that she did not need. *Id.* at 65–67. After the doctor visit, "Yvette" paid McPherson $100. *Id.* at 66. Thereafter, McPherson and her husband were each assigned a PCA, who came approximately once a week and had McPherson sign a timesheet. *See id.* at 67–70. "Linda," Yvette's sister, or, at times, Yvette herself, would then pay McPherson $200 in exchange for the signed timesheets. *See id.*

31

## F.       EVIDENCE SUPPORTING MONEY LAUNDERING CHARGES

The government presented the testimony of Department of Justice Special Agent Nicole Hinson of the U.S. Attorney's Office for the District of Columbia, along with underlying bank and financial records, to support the money laundering charges against the defendants.  Tr. (Nov. 3, 2015 AM) at 113 (Test. of Nicole Hinson), ECF No. 343.  From November 2009 to February 2014, D.C. Medicaid paid Global a total of $80,620,929.20.  *Id.* at 130; Gov't Ex. 5.  Over this time period, D.C. Medicaid payments to Global increased from $1,359,726.88 in 2009, to $9,956,505.60 in 2010, to $14,277,324.23 in 2011, to $23,696,990.89 in 2012, and to $27,166,587.08 in 2013.  Tr. (Nov. 3, 2015 AM) at 89–90 (Hinson), ECF No. 343; Gov't Ex. 133.  In January and February 2014, alone, D.C. Medicaid paid a total of $4,193,079.12 to Global.  Tr. (Nov. 3, 2015 AM) at 90 (Hinson), ECF No. 343; Gov't Ex. 133.

D.C. Medicaid payments were transferred directly to three different Global accounts— PNC Bank ("PNC") account #5874, and Bank of America ("BOA") account #2254 and account #2241 ("Intake Accounts")—for which Florence and Michael Bikundi were the sole signatories. Tr. (Nov. 3, 2015 AM) at 132–33 (Hinson), ECF No. 343; Gov. Ex. 184.  These defendants then moved D.C. Medicaid funds from these three Intake Accounts into additional Global corporate accounts to pay operational expenses and into two Flo-Diamond accounts (BOA account #2267 and PNC account #6271).  Tr. (Nov. 3, 2015 AM) at 133–34 (Hinson), ECF No. 343; Gov. Ex. 184.  From these secondary accounts, Florence and Michael Bikundi distributed the D.C. Medicaid funds to over one hundred other financial accounts they controlled, where they conducted "tens of thousands of transactions," including to pay for personal expenses.  Tr. (Nov. 3, 2015 AM) at 130–31, 134 (Hinson), ECF No. 343; Tr. (Nov. 4, 2015 AM) at 72–73 (Hinson), ECF No. 344; Tr. (Oct. 20, 2015 PM) at 125–26 (White), ECF No. 316; Gov. Ex. 184.

Approximately ninety percent of the funds that went into the defendants' accounts came from D.C. Medicaid.  Tr. (Nov. 3, 2015 AM) at 131 (Hinson), ECF No. 343.[8]

The types of financial institution accounts controlled by Florence and Michael Bikundi included accounts in the names of multiple corporations, personal bank accounts, life insurance accounts, investment accounts, trust accounts, college savings plans, annuities, IRAs, and international bank accounts.  *Id.* at 119, 127–30; Gov't Ex. 184.  From November 2009 to February 2014, the defendants purchased over $7,700,000 in cashier's checks from funds from some of these accounts.  Tr. (Nov. 3, 2015 PM) at 27, 93–94 (Hinson), ECF No. 342; Gov't Ex. 154.  Among the accounts to which the defendants transferred D.C. Medicaid funds were three accounts in the name of CFC Home Trade & Investment, LLC ("CFC") and two accounts in the name of Tri-Continental Trade & Development ("Tri-Continental").  Tr. (Nov. 3, 2015 AM) at 139, 143 (Hinson), ECF No. 343; Gov't Exs. 151, 152, 184, 250.  Agent Hinson expressed her belief that "the use of Tri-Continental and CFC were attempts to use a false name" to conceal the source of illegal funds and make it appear that the funds were coming from another corporation, and that tracing the funds could not be easily accomplished by those without the "ability to subpoena all the records involved."  Tr. (Nov. 4, 2015 AM) at 28, 32, 69, 71–72 (Hinson), ECF No. 344; *id.* at 79 (testifying that "essentially that is important in money laundering because money coming from Global Health Care is being provided to Florence Bikundi and Michael Bikundi under the name of a second company").  No evidence was uncovered that these two companies, CFC and Tri-Continental, which were formed to conduct altogether different lines of business than Global, generated any income on their own.  *Id.* at 78.

---

[8]     Agent Hinson testified that she spent months of working seven days per week to trace all of the funds in the accounts controlled by the defendants.  Tr. (Nov. 4, 2015 AM) at 74 (Hinson), ECF No. 344.  Indeed, she detailed that she obtained over 80 seizure warrants for financial institution accounts and five cars traceable to funds paid from D.C. Medicaid to Global.  Tr. (Nov. 3, 2015 AM) at 118 (Hinson), ECF No. 343.

1.     *CFC Accounts*

According to its Articles of Organization, dated October 17, 2012, CFC was a real estate investment business.  Gov't Ex. 249.  Carlson Igwacho testified that he formed this company with his mother, Florence Bikundi, and Chris Asongcha, with the name "CFC" derived from the first letters of each of their first names, and with the intent to do residential real estate business in Baltimore, Maryland.  Tr. (Oct. 28, 2015 PM) at 66–67 (Carlson Igwacho), ECF No. 335.[9]  He testified, however, that, to his knowledge, CFC never actually did any business because he could not borrow the money needed to invest in real estate.  *Id.*  A property in Baltimore was titled in the name of CFC, but was purchased on June 5, 2013, with funds transferred from Global Intake Account, BOA account #2254.  Gov't Ex. 172; Tr. (Oct. 29, 2015 PM) at 23–27 (Test. of Andrew Levy), ECF No. 334; Tr. (Nov. 3, 2015 AM) at 141–43 (Hinson), ECF No. 343.

Although the registered agent listed on CFC's Articles is Carlson Igwacho, someone else signed his name on the Articles and "one of Global's office[]" addresses was listed as the CFC company address.  Gov. Ex. 249; Tr. (Oct. 28, 2015 PM) at 68–70 (Carlson Igwacho), ECF No. 335.  Florence and Michael Bikundi were listed as CFC's "managing members" and were both signatories on CFC's three bank accounts.  Gov't Ex. 250; Tr. (Nov. 3, 2015 AM) at 143 (Hinson), ECF No. 343.  Review of these CFC accounts revealed no payments to title or insurance companies, home inspectors, or cleaning services, and no deposits from tenants or property sales.  Tr. (Nov. 3, 2015 AM) at 144 (Hinson), ECF No. 343.  The only expenditures from the three CFC accounts consistent with real estate investment were three checks totaling approximately $40,000 that may have been related to home renovations.  *Id.* at 143–44.

---

[9]     Michael Bikundi was not supposed to have a role in CFC, which is why his name was not included in the company name.  *See* Tr. (Oct. 29, 2015 AM) at 5 (Carlson Igwacho), ECF No. 332.

Although no evidence indicates that any business relationship existed between Global and CFC, or that CFC provided any services to Global, *id.* at 149, over $6,300,000 was transferred to CFC's BOA account #6749, which was opened on April 25, 2013, and closed on February 20, 2014, from four different Global accounts controlled by the defendants, *id.* at 145; Gov't Ex. 151 at 1. During that time period, an additional $150,000 was transferred from a Tri-Continental account, Citibank account #3303, to the same CFC BOA account #6749. Gov't Ex. 151 at 1; Tr. (Nov. 3, 2015 AM) at 146 (Hinson), ECF No. 343 (Hinson). A total of $6,653,612.08 was deposited into that CFC account. *Id.*

As support for Count Nineteen, Agent Hinson summarized the flow of D.C. Medicaid funds in the amount of $463,131.90 deposited on May 10, 2013 by DHCF into Global Intake Account, BOA account #2241. Tr. (Nov. 3, 2015 PM) at 46–47 (Hinson), ECF No. 342; Gov't Ex. 177. The same day, $460,000 was wire transferred from that intake account to a secondary Global account, from which $370,000 was then wire transferred the same day to CFC's BOA account #6749. Tr. (Nov. 3, 2015 PM) at 46–47 (Hinson), ECF No. 342.

As support for Count Twenty, Agent Hinson summarized the flow of D.C. Medicaid funds in the amount of $503,224.44 deposited on June 7, 2013 by DHCF into Global Intake Account, BOA account #2241. *Id.* at 47–48; Gov't Ex. 178. The same day, $450,000 was wire transferred from that intake account to a secondary Global account and a check for $400,000 signed by Florence Bikundi from that secondary Global account was deposited into CFC's BOA account #6749. Tr. (Nov. 3, 2015 PM) at 47–48 (Hinson), ECF No. 342.

As support for Count Twenty-One, Agent Hinson summarized the flow of D.C. Medicaid funds in the amount of $511,481.30 deposited on June 21, 2013 by DHCF into Global Intake Account, BOA account #2241. *Id.* at 48–49; Gov't Ex. 179. The same day, $510,000 was wire

transferred from that intake account to a secondary Global account and a check for $240,000 signed by Florence Bikundi from that secondary Global account was deposited into CFC's BOA account #6749.  Tr. (Nov. 3, 2015 PM) at 48–49, ECF No. 342.

As support for Count Twenty-Two, Agent Hinson summarized the flow of D.C. Medicaid funds in the amount of $530,052.90 deposited on August 2, 2013 by DHCF into Global Intake Account, BOA account #2241.  *Id.* at 49–50; Gov't Ex. 180.  The same day, $430,000 was wire transferred from that intake account to a secondary Global account and a check for $360,000 signed by Florence Bikundi from that secondary Global account was deposited into CFC's BOA account #6749.  Tr. (Nov. 3, 2015 PM) at 49–50 (Hinson), ECF No. 342.

Approximately $2,390,000 in checks were written from CFC's BOA account #6749 to Florence Bikundi and $517,000 in checks were written to Michael Bikundi.  Gov't Ex. 151 at 2–57; Tr. (Nov. 3, 2015 AM) at 146 (Hinson), ECF No. 343.  These checks included a $50,000 check payable to Florence Bikundi referencing "mortgage;" a $150,000 check payable to Florence Bikundi referencing "Citibank savings/checking;" a $300,010 check payable to Florence Bikundi referencing "M&T Savings;" a $10,000 check payable to Michael Bikundi referencing "contractor pay [b]onus;" a $10,000 check payable to Florence Bikundi referencing "pay [b]onus;" a $91,000 check payable to Florence Bikundi; a $100,000 check payable to Florence Bikundi referencing "Money Market Savings (M&T Bank);" a $30,000 check payable to Florence Bikundi referencing "contractor's pay;" a $15,000 check payable to Michael Bikundi; and a $300,000 check payable to Florence Bikundi.  Gov't. Ex. 151 at 7–8, 11, 18–19, 21, 30, 40, 48, 53; Tr. (Nov. 3, 2015 AM) at 147–49 (Hinson), ECF No. 343.

## 2.   *Tri-Continental Account*

According to its Articles of Incorporation, Tri-Continental was an import/export business, created in May 2008 and located at the same address as Flo-Diamond.  Tr. (Nov. 3, 2015 AM) at 135–36 (Hinson), ECF No. 343; Gov't Ex. 187.  Florence Bikundi served as the resident agent. *Id*.  Tri-Continental had two bank accounts, for which both Florence and Michael Bikundi were signatories.  Tr. (Nov. 3, 2015 AM) at 139 (Hinson), ECF No. 343.  Citibank account #3303 in the name of Tri-Continental was opened on August 23, 2012, and closed on February 20, 2014. Gov't Ex. 152 at 1; Tr. (Nov. 3, 2015 AM) at 136 (Hinson), ECF No. 343.  During that time period, a total of $6,390,028.31 was deposited into the account.  Gov't Ex. 152 at 1; Tr. (Nov. 3, 2015 AM) at 137 (Hinson), ECF No. 343.

Although no evidence indicates any business relationship existed between Global and Tri-Continental or that Tri-Continental provided any services to Global, over $3,000,000 was deposited into Tri-Continental's Citibank account #3303 from two different Global accounts, almost $1,400,000 from a Flo-Diamond account, and $30,000 from a CFC account, all controlled by the defendants.  Gov't Ex. 152; Tr. (Nov. 3, 2015 AM) at 136–37 (Hinson), ECF No. 343; Tr. (Nov. 4, 2015 AM) at 77–78 (Hinson), ECF No. 344.

As support for Count Sixteen, Agent Hinson summarized the flow of D.C. Medicaid funds in the amount of $528,552.72 deposited on November 5, 2012 by DHCF into Global Intake Account, PNC account #5874.  Tr. (Nov. 3, 2015 PM) at 42–43 (Hinson), ECF No. 342; Gov't Ex. 174.  The next day, $531,000 was wire transferred from that intake account to a secondary Global account; then $400,000 was wire transferred to a Flo-Diamond account; and a check from the Flo-Diamond account was written in the same amount for deposit into Tri-Continental's Citibank account #3303.  Tr. (Nov. 3, 2015 PM) at 42–43 (Hinson), ECF No. 342.

As support for Count Seventeen, Agent Hinson summarized the flow of D.C. Medicaid funds in the amount of $524,354.30 deposited on March 15, 2013 by DHCF into Global Intake Account, BOA account #2241. *Id.* at 44–45; Gov't Ex. 175. The same day, $500,000 was wire transferred from that intake account to a secondary Global account, and then Michael Bikundi wrote a check in the amount of $500,000 from the secondary Global account for deposit into Tri-Continental's Citibank account #3559. Tr. (Nov. 3, 2015 PM) at 44–45 (Hinson), ECF No. 342.

As support for Count Eighteen, Agent Hinson summarized the flow of D.C. Medicaid funds in the amount of $478, 958.40 deposited on April 26, 2013 by DHCF into Global Intake Account, BOA account #2241. *Id.* at 45–46; Gov't Ex. 176. The same day, $400,000 was wire transferred from that intake account to a secondary Global account and, three days later, Florence Bikundi wrote a check in the amount of $400,000 from the secondary Global account for deposit into Tri-Continental's Citibank account #3303. Tr. (Nov. 3, 2015 PM) at 45–46 (Hinson), ECF No. 342.

Agent Hinson also testified about various transactions supporting Counts Twenty-Three through Twenty-Five, but the defendants were acquitted of those charges.[10]

## G.    DEFENSE CASE

The defendants called three witnesses. First, Joseph Igwacho testified that his daughter, Florence Bikundi, started using "Bikundi" over ten years ago, about the same time that Michael Bikundi, who had been Florence Igwacho's boyfriend, expressed his intentions to marry her by providing a gift of dowry in "[a]bout 2003, 2005, thereabout," in accord with Cameroonian

---

[10]     At the close of the government's case-in-chief, the defendants moved for judgment of acquittal, under Federal Rule of Criminal Procedure 29(a), on all charges, which motion was denied in part and reserved in part. Tr. (Nov. 4, 2015 PM) at 3–8, 10–18, ECF No. 345. Specifically, the Court reserved decision, under Federal Rule of Criminal Procedure 29(b), on the defendants' motions for acquittal on all the money laundering charges in Counts Sixteen through Twenty-Five. *Id.* at 18.

custom.  Tr. (Nov. 4, 2015 PM) at 21–22 (Test. of Joseph Igwacho), ECF No. 345.  Second, the

defense called Special Agent Christopher Steinbauer, who testified that an active arrest warrant

was outstanding for Chris Asongcha for his role in the Global health care fraud case.  *Id.* at 32–

33 (Test. of Christopher Steinbaughter).  Finally, the defense called Paul Toulouse, an attorney

who was retained by Michael Bikundi to handle civil and regulatory matters for Global.  *Id.* at

35–36 (Toulouse).  He testified about his successful representation of Global to defeat the

District's efforts to revoke Global's license as a home care agency.  *See id.* at 34–36, 39–41, 51–

53.  Global continued to operate until execution of search warrants in connection with the

investigation of this case in February 2014.  *Id.* at 53.[11]

## H.    THE VERDICT

The jury returned guilty verdicts against both Florence and Michael Bikundi on:  Count

One (conspiracy to commit health care fraud), finding unanimously that the object of the

conspiracy was to violate 18 U.S.C. §§ 1347 and 1035, and that Florence Bikundi also conspired

to violate 42 U.S.C. § 1320a-7b(b), Verdict Form at 1, ECF No. 361; Count Two (health care

fraud), *id.* at 2; Count Fifteen (money laundering conspiracy), finding unanimously that the

object of the conspiracy was to violate 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957, *id.*; and Counts

Sixteen through Twenty-Two (laundering of monetary instruments), *id.* at 3–4.  Florence

Bikundi was also found guilty of Counts Thirteen (health care fraud – exclusion from program)

and Fourteen (Medicaid fraud – false statements, concealing and failing to disclose).  *Id.* at 2.

The jury acquitted the defendants of Counts Twenty-Three through Twenty-Five

(engaging in monetary transactions in property derived from specified unlawful activity) related

---

[11]     At the close of all the evidence, the defendants renewed their motions for judgment of acquittal, which the Court denied as to Counts One, Two, Thirteen and Fourteen, and reserved as to the money laundering charges. *See* Minute Entry (Nov. 5, 2015).

to checks, dated January 28, 2013, June 24, 2013 and July 2, 2013, drawn on accounts into which

Global funds had allegedly been deposited.  *Id.* at 5.[12]

*        *        *

In accordance with the briefing schedule set by the Court, the parties timely filed their

pending post-trial motions.[13]

## II.      LEGAL STANDARDS

### A.      RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

Federal Rule of Criminal Procedure 29(a) requires a court to grant a defendant's motion

for a judgment of acquittal of any "offense for which the evidence is insufficient to sustain a

conviction" and, further, authorizes the court "on its own" to "consider whether the evidence is

insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  The Supreme Court has

emphasized that, in evaluating the sufficiency of the evidence, "[t]he reviewing court considers

only the 'legal' question 'whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt.'"  *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (emphasis

in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see United States v.*

*Thompson*, 279 F.3d 1043, 1050–51 (D.C. Cir. 2002) ("[T]he court need only determine whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."); *United States*

*v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983) (articulating standard as "whether, viewing

---

[12]      After the jury returned its verdict, the Court denied the defendants' motions for acquittal, which had previously been reserved, on the money laundering charges in Counts Sixteen through Twenty-Two.  Minute Entry (Nov. 12, 2015).

[13]      A motion for new trial under Rule 33 must be filed within 14 days after the verdict, unless the motion is "grounded on newly discovered evidence," in which case the motion must be filed within three years.  FED. R. CRIM. P. 33(b).  The Court granted the defendants' motion for additional time to file any motion for a new trial until December 7, 2015.  Minute Order (Nov. 16, 2015).

the evidence in the light most favorable to the Government, according the Government the benefit of all legitimate inferences, and recognizing that it is the jury's province to determine credibility and to weigh the evidence, a reasonable jury must necessarily entertain a reasonable doubt on the evidence presented" (emphasis omitted)); *see also United States v. Shmuckler*, 792 F.3d 158, 161–62 (D.C. Cir. 2015) (same); *United States v. Gooch*, 665 F.3d 1318, 1326 (D.C. Cir. 2012) (same).

This standard preserves "the factfinder's role as weigher of the evidence" and "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. As "expressed more fully," the role of a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326); *see also United States v. Bostick*, 791 F.3d 127, 137 (D.C. Cir. 2015) (noting that "evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt" to suffice to sustain guilty verdict) (quoting *United States v. Kwong-Wah*, 924 F.2d 298, 302 (D.C. Cir. 1991)); *United States v. Laureys*, 653 F.3d 27, 31 (D.C. Cir. 2011) (noting that even when "evidence in this case may be susceptible of more than one interpretation, . . . we cannot say it was insufficient for the jury to find the necessary intent beyond a reasonable doubt"). Thus, the evidence does "not need to be overwhelming" to clear the bar for the sufficiency of evidence. *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015). In short, "[t]he standard for such challenges is very high." *Id.*

## B.      RULE 33 MOTION FOR NEW TRIAL

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a).  As reflected by the use of the word "may" in Rule 33, "[t]rial courts enjoy broad discretion in ruling on a motion for a new trial." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (citing *Gaither v. United States*, 413 F.2d 1061, 1078 (D.C. Cir. 1969)). While the rules "do not define 'interests of justice,'" the D.C. Circuit has instructed that "granting a new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *Wheeler*, 753 F.3d at 208 (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)).

A new trial motion based, in particular, on the sufficiency of the evidence, requires the court to "weigh[] the evidence and evaluate[] the witnesses' credibility and decide[] whether 'a serious miscarriage of justice may have occurred.'" *United States v. Dale,* 991 F.2d 819, 838 (D.C. Cir. 1993) (quoting *Rogers*, 918 F.2d at 213)).  When "the court denies the new trial motion because the court's decision accords with the jury's," any appellate "review of the district court's decision is particularly narrow." *Id.*; *see also United States v. Pettiford*, 517 F.3d 584, 591 (D.C. Cir. 2008) ("In reviewing the District Court's decision on a new trial motion, [the D.C. Circuit] appl[ies] a deferential standard, and will reverse only if the court abused its discretion or misapplied the law." (quoting *United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993))); *United States v. Kelly*, 748 F.2d 691, 701 (D.C. Cir. 1984) (holding that, as long as the weight of the evidence clearly weighs in favor of conviction, not against it, there is no abuse of discretion in denying a new trial motion).

## III.    DISCUSSION

Florence and Michael Bikundi generally raise overlapping arguments in support of their motions for acquittal and for a new trial, including their claims that the government presented insufficient evidence to support their convictions, with related arguments regarding the inherent unbelievability of the government's witnesses, the prejudicial impact of admitting one of the government's almost three hundred exhibits, a supposed variance in proof on the health care fraud conspiracy charge in Count One, and the purported need for a unanimity instruction on the substantive health care fraud charge in Count Two.  *See generally* Florence Bikundi's Mem. Supp. Mot. New Trial ("Def. FB's R. 33 Mem."), ECF No. 394-1; Florence Bikundi's Mem. Supp. Mot. J. Acquittal ("Def. FB's R. 29 Mem."), ECF No. 393-1; Def. MB's R. 33 Mot.[14] Michael Bikundi also seeks a new trial for failure to sever his trial from that of his spouse and for selective prosecution.  Def. MB's R. 33 Mot. at 47–53.  Each of these arguments is addressed below.

### A.    CHALLENGES TO HEALTH CARE FRAUD CONVICTIONS

As noted, the defendants raise a number of inter-related arguments regarding the sufficiency of the evidence presented to support their convictions for conspiracy to commit and committing health care fraud.  For the reasons discussed below, these arguments are unavailing.

#### 1.    *Cooperators' Testimony Was Not "Inherently Incredible"*

As a threshold issue, Florence and Michael Bikundi attack the credibility of the government's cooperating witnesses in an effort to have this testimony discounted or put aside in

---

[14]    Since each defendant joined any argument made by the other in support of their motions, the arguments will generally be considered as made by both defendants.  *See* Minute Order (Dec. 15, 2016) (granting Florence Bikundi's motions to join and adopt Michael Bikundi's motions); Minute Order (Jan. 6, 2016) (granting Michael Bikundi's motion to join and adopt Florence Bikundi's motions); *see also* Def. MB's R. 29 Mot. ¶ 4 (adopting "all relevant arguments made on behalf of co-defendant Florence Bikundi"); Def. FB's R. 33 Mem. at 3 n.1 (adopting "arguments made in Mr. Michael Bikundi's Rule 29(c) and Rule 33 Motions, as to the arguments that apply to Mrs. Bikundi as well").

evaluating the sufficiency of the evidence supporting the defendants' convictions on Counts One and Two.  They urge that their health care fraud conspiracy and substantive charges be vacated due to the "questionable" credibility of the cooperating witnesses, whose testimony they characterize as "inherently incredible."  Def. FB's R. 33 Mem. at 10; *see also* Michael Bikundi's Reply Opp'n Renewed Mot. J. Acquittal ("Def. MB's R. 29 Reply") at 8, ECF No. 416 ("[T]he inherently incredible testimony of the cooperators should be disregarded as it was in its entirety highly questionable and utterly lacking in belief.").  As support, these defendants revive arguments about the credibility of multiple "purported co-conspirators," who "had a previous health care fraud experience prior to joining Global" by "engag[ing] in identical conduct in their prior employment."  Def. FB's R. 33 Mem. at 10.  These same arguments were made at trial, rejected by the jury, *see, e.g.*, Tr. (Nov. 9, 2015 PM) at 98–113, ECF No. 376 (Florence Bikundi's summation); Tr. (Nov. 10, 2015 AM) at 11–30, ECF No. 377 (Michael Bikundi's summation), and certainly fare no better under more stringent standards applicable to the doctrine of inherent unbelievability invoked by the defendants.

Consistent with the standard to be applied in evaluating the sufficiency of the evidence— *i.e.*, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Wright v. West*, 505 U.S. 277, 284 (1992) (emphasis omitted) (quoting *Jackson*, 443 U.S. at 319)—the defendants' invocation of the inherent unbelievability doctrine essentially asks this Court to conclude that no rational juror could have relied upon the challenged testimony.  *Accord Millar v. FCC*, 707 F.2d 1530, 1539 (D.C. Cir. 1983) (noting "that a witness's testimony may be, under the circumstances of the case, so incredible, or contrary evidence may be so overwhelming, that demeanor could not convince a reasonable factfinder that the witness was

telling the truth").  This is a heavy burden, since generally the jury has the responsibility "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  As the Supreme Court "[e]xpressed more fully, this means" that when the record contains "facts that support[] conflicting inferences," a reviewing court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *McDaniel*, 558 U.S. at 133 (quoting *Jackson*, 443 U.S. at 326).

Thus, the D.C. Circuit has rejected defense claims that testimony must be set aside as inherently incredible based upon lack of clarity in timing or chronology of events or inconsistencies, which "are not so glaring that the . . . testimony must be a fabrication."  *United States v. Streater*, 70 F.3d 1314, 1318 (D.C. Cir. 1995) (internal quotation omitted); *see also Johnson v. United States*, 426 F.2d 651, 654 (D.C. Cir. 1970) ("Having made this determination based on testimony which was not inherently incredible, the case was for the trier and not the trial judge, and the motion for a directed verdict of acquittal was properly denied.");  *accord Farrar v. United States*, 275 F.2d 868, 869 (D.C. Cir. 1959) (reversing rape conviction upon finding that "[i]t is nearly or quite incredible that appellant could have used a knife as extensively as the girl said he did without her ever seeing it").  In *Jackson v. United States*, 353 F.2d 862 (D.C. Cir. 1965), which involved review of judicial, rather than jury, fact-finding, the Court explained that the inherently incredible doctrine may apply "if the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave."  *Id.* at 867.

Set against these legal principles, the defendants are unable to demonstrate anything in the testimony of the government's cooperating witnesses that is inherently improbable or simply too incredible for a rational juror to accept.  Specifically, Florence Bikundi points out that Melissa Williams denied that Florence Bikundi knew about her fraudulent patient sharing activities with four other Global employees and for a patient at another company, Vizion One.[15] Def. FB's R. 33 Mem. at 11; Def. FB's R. 29 Mem. at 4–5.  This testimony that Williams did not actively broadcast her illegal schemes within the Global office to her bosses, Florence and Michael Bikundi, may be exculpatory of the defendants but that does not make the testimony "incredible."  In addition, Florence Bikundi challenges Williams' testimony about being present with Florence Bikundi during surveys as belied by the fact that Williams was not working in the office for the December 2010 survey or a follow-up survey in February 2011, and Florence Bikundi was not present during the September 2011 survey.  Def. FB's R. 33 Mem. at 11; Def. FB's R. 29 Mem. at 5.  The three dates cited by Florence Bikundi were not, however, the only visits of the surveyors to the Global offices since they also conducted (or attempted to conduct) surveys in Global's offices on August 30, 2011 and March 13–15, 2012.  *See, e.g.*, Gov't Ex. 21 at 6 (noting face-to-face meeting on March 13, 2012, with "Administrator . . . [and] Office Manager/Human Resource Coordinator"); Gov't Ex. 26 (noting "a follow-up survey was initiated on August 30, 2011" but "had to be aborted due to the agency's failure to have files available for review").  At most, Florence Bikundi's attack on Melissa Williams's testimony that she helped Florence Bikundi falsify documents for HRLA surveys shows a lack of clarity in the

---

[15]     Williams testified about "patient sharing" with other PCAs and described the arrangements to be that Williams and the other PCAs would all contribute to the kickbacks and benefit from the patients' false certification of timesheets.  *See, e.g.*, Tr. (Nov. 2, 2015 AM) at 6–9, 39–40 (Williams), ECF No. 338.

witness' recollection of survey timing that was fully disclosed during Williams' testimony.  Tr.
(Nov. 2, 2015 AM) at 82 (Williams), ECF No. 338.

Florence Bikundi also challenges the testimony of Francis James, who recounted his
conversation with Florence Bikundi when he was hired as a Global PCA.  According to James,
Florence Bikundi "gave [him] the job" as a PCA and told him that "she have a client and she
would assign me to him," but "that I don't have to go and work the whole time.  And she already
paid -- pays him, and if I want, I could just use discretion and give him a little something."  Tr.
(Oct. 19, 2015 PM) at 74 (James), ECF No. 313.  James testified he understood that although the
patient, Gary Miller, was supposed to have PCA services eight hours per day, James did not have
to work those hours.  *Id.* at 75.

Florence Bikundi proffers what she describes as a "more plausible explanation" for
James' employment as a PCA, Def. FB's R. 33 Mem. at 12, that places all the blame on Elke
Johnson, who "[a]s staffing coordinator, . . . brought Mr. James into Global, falsified his
documents and set him up with a patient.  Elke Johnson explained to Mr. James how to fill out
timesheets, and even filled them out for him at times," Def. FB's R. 29 Mem. at 8; *see also* Def.
FB's R. 33 Mem. at 12.  Elke Johnson conceded her role in using James' credentials to get paid
as a PCA and recruiting him to join her in the Global fraud scheme of paying patients to sign-off
on false timesheets in order to bill D.C. Medicaid for PCA service not performed.  Tr. (Oct. 20,
2015 AM) at 49 (Johnson), ECF No. 315.  This does not render "incredible" that Florence
Bikundi spoke to James with assurances that he could continue his full-time construction work
while also submitting false timesheets to enable Global to increase its billing to D.C. Medicaid
for PCA services.  *See generally* Tr. (Oct. 19, 2015 PM) at 74–86 (James), ECF No. 313.
Indeed, Florence Bikundi was aware from reviewing Elke Johnson's timesheets that Johnson

used Francis James' name, and his pertinent credentials, to get paid.  *See* Tr. (Oct. 20, 2015 AM) at 15, 49 (Johnson), ECF No. 315.

The defendants next describe Elvis Atabe as "an admitted perjurer."  Def. FB's R. 33 Mem. at 12; *see* Def. MB's R. 33 Mot. at 22.  As such, the defendants urge that Atabe's testimony that Florence Bikundi would show him how to create false documents "within weeks of being hired at Global" be rejected as "inherently incredible."  Def. FB's R. 33 Mem. at 12; *see* Def. FB's R. 29 Mem. at 7 ("[T]here is no juror that could have found beyond a reasonable doubt that after a couple weeks of working at Global, Mrs. Bikundi would sit in a chart room with Mr. Atabe, a man she does not know, and begin altering documents as part of a health care fraud conspiracy.").  Yet, this focus on the short time Florence Bikundi had personally known Atabe before engaging in illegal document alterations, ignores other salient information known to the defendants about Atabe, namely that he was a friend of, and had been recruited to Global by, James Mbide, who already knew the score about the fraudulent alteration of documents at Global.  *See* Tr. (Oct. 19, 2015 AM) at 5 (Mbide), ECF No. 314; Tr. (Oct. 21, 2015 PM) at 86, 93 (Atabe), ECF No. 317.  Indeed, Atabe had worked with Mbide at another company, T&N Reliable Nursing Services ("T&N"), where Mbide had engaged in the creation of false nurse notes, Tr. (Oct. 16, 2015 PM) at 89 (Mbide), ECF No. 312, the same service he performed at Global, Tr. (Oct. 19, 2015 PM) at 25, 48–49, 54 (Mbide), ECF No. 313.  In other words, the jury could reasonably conclude that Atabe was a known commodity when he was hired and, as a result, the defendants trusted that Atabe would do what was necessary, including falsifying documents, to extract money from D.C. Medicaid.  This trust turned out to be well-placed since Atabe testified about his creation of fake nurse notes and POCs at Global within his first week of

work there.  Tr. (Oct. 21, 2015 AM) at 115–16 (Atabe), ECF No. 318; Tr. (Oct. 21, 2015 PM) at

48–58 (Atabe), ECF No. 317.

      Similar to their challenge of Melissa Williams, the defendants contest Atabe's testimony

that he assisted Florence Bikundi in falsifying documents during surveys since he only began

working at Global in April 2011.  Def. FB's R. 33 Mem. at 12.  This does not render Atabe's

testimony about the fraudulent survey-related activity "incredible" since the HRLA surveyors

made subsequent visits to Global on, at least, August 30, 2011, September 27, 2011, and March

13–15, 2012.  *See* Gov't Exs. 21, 26, 202.

      Florence Bikundi expresses disbelief at "the demeanor and testimony of James Mbide,"

who despite his "sudden" shame had engaged "in falsifying documents not just at Global but also

at T&N Reliable."  Def. FB's R. 33 Mem. at 13; *see also* Def. FB's R. 29 Mem. at 6.  To the

extent that the defendants seek to discount Mbide's testimony about the defendants' involvement

in the fraud scheme by ascribing Mbide's illegal acts to his own efforts "to continue to

perpetuate his own fraud," Def. FB's Mem. at 13, they ignore the extensive corroboration by

other cooperating witnesses of Mbide's testimony regarding Florence and Michael Bikundi's

supervision of, and involvement in, falsifying documents and their management of Global's

business to maximize reimbursements from D.C. Medicaid.

      With respect to the beneficiaries' testimony, Florence Bikundi dismisses Carolyn

Baldwin's testimony about receiving pay-offs, explaining that Florence Bikundi "was not paying

Ms. Baldwin for signing timesheets, but instead for fixing a broken chair or providing a gift after

Ms. Baldwin's husband passed away."  Def. FB's R. 33 Mem. at 13.  In light of the

corroborating testimony of Melissa Williams and Elke Johnson about payments from Florence

Bikundi to Baldwin for false timesheet certifications, the jury could have reasonably concluded

that Baldwin's testimony on this issue was credible.  *See supra* Parts I.E.1, 3.  Florence Bikundi

also challenges beneficiary Alma McPherson's testimony about complaining to Global about not

receiving PCA services when she "continued to collect money every week from her aides instead

of transferring to another agency to receive the services that she claimed she needed."  Def. FB's

R. 33 Mem. at 13–14.  Again, nothing about this testimony is "incredible."  Both Baldwin and

McPherson fully acknowledged that they used the payments made by the PCAs in return for

certifying false timesheets for services not performed.  *See* Tr. (Nov. 2, 2015 PM) at 69

(McPherson), ECF No. 340 (testifying that she used the kickbacks on "food for the house" and

buy "dog food"); Tr. (Nov. 3, 2015 AM) at 53 (Baldwin), ECF No. 343 (testifying she used the

kickbacks "for myself" and "might have sent it to somebody in jail"); *see also* Tr. (Oct. 20, 2015

PM) at 6–9 (Zuniga), ECF No. 316 (testifying that, though he needed help because of his

disability, he also needed "help . . . financially").

      The defendants conveniently ignore the testimony from these and other witnesses that

demonstrates the defendants' knowledge and direction of the overall fraud scheme and the

corroboration by the cooperating witnesses of key details of each other's testimony.  For

example, James Mbide, Elvis Atabe, Elke Johnson and Nicola White all corroborated each other

about their participation in and observations of others, including Florence Bikundi, actually

creating fake documents for both patient and Global employee files.  Mbide also testified that

Michael Bikundi was present when false nurse notes were created to avoid problems with

surveys, Tr. (Oct. 19, 2015 AM) at 14 (Mbide), ECF No. 314, testimony further corroborated by

Nicola White who testified about Michael Bikundi being unsatisfied with the appearance of

falsified documents in the Global files, Tr. (Oct. 20, 2015 PM) at 73-74 (White), ECF No. 316.

Additionally, the testimony of the beneficiaries was confirmed by multiple cooperating

witnesses.  Melissa Williams and Elke Johnson corroborate that they made payments to Carolyn

Baldwin, Tr. (Oct. 29, 2015 PM) at 46 (Williams), ECF No. 334; Tr. (Oct. 20, 2015 AM) at 27–

28 (Johnson), ECF No. 315, a beneficiary who testified that she was recruited directly by

Florence Bikundi, who was accompanied by her "tall" "boyfriend," to be a patient of Flo-

Diamond and then became a patient of Global.  Tr. (Nov. 3, 2015 AM) at 30 (Baldwin), ECF No.

343.  After receiving payments from Florence Bikundi, Baldwin testified that she received

payments from "Elke" and from "Melissa."  *Id.* at 31–33, 45.

Moreover, the defendants' post-trial challenges to the credibility of the government's

witnesses were fully presented at trial, where the defendants had and exercised the opportunity to

impeach the witnesses about these subjects.  "Simply put, credibility judgments are the sole

province of the jury," which "ultimately decided whom to believe, and how important this issue

was to its verdict."  *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 167 (D.C. Cir. 2015); *see*

*United States v. Anderson*, 498 F.2d 1038, 1039 n.1 (D.C. Cir. 1974) (affirming "trial court's

refusal to grant a motion for judgment of acquittal" based on defense argument that "testimony

of the complaining witness was 'inherently incredible,'" since "[t]he question of credibility was

for the jury" and sufficient evidence sustained the verdicts).  Consequently, the defendants'

effort to persuade this Court to supplant the jury's assessment of the credibility of any or all of

the government's cooperating witnesses in evaluating the sufficiency of the evidence is rejected.

### 2.       *Ample Evidence Supports The Defendants' Health Care Fraud Convictions In Counts One And Two*

Florence and Michael Bikundi contend that their health care fraud convictions in Counts

One and Two for conspiracy and substantive health care fraud, respectively, were not supported

by sufficient evidence, warranting a judgment of acquittal or a new trial.  Def. FB's R. 29 Mem.

at 3.[16]  Contrary to the defendants' contention, the evidence of the defendants' involvement in

the health care fraud scheme at Global was overwhelming and supported by the corroborating

testimony of multiple former Global employees and patients and documentary proof.

As summarized *supra* in Part I.C through E, Florence Bikundi initiated the health care

fraud at Global by submitting an application and agreement with fraudulent signatures, at a time

when she was excluded from participation in any federal health care program.  She also issued

instructions to certain Global employees, including Francis James and Elke Johnson, to pay D.C.

Medicaid beneficiaries in return for certifying timesheets for services not performed.  Francis

James admitted to submitting false timesheets for beneficiary Gary Miller (beneficiary no.

xxxx0062, *see* Def. FB's R. 29 Mem. at 11; Superseding Indictment ¶ 75(2)), after Florence

Bikundi hired James, assigned a patient to him, told him she had already been paying the patient,

and told him that he should do the same and he would not have to go to work for the full eight

hours for which Medicaid would be billed.  Tr. (Oct. 19, 2015 PM) at 74-75 (James), ECF No.

313.  Elke Johnson testified that Florence Bikundi instructed her to pay $300 to beneficiary

William Smith (beneficiary no. xxxx4279, *see* Def. FB's R. 29 Mem. at 10, Superseding

Indictment ¶ 75(1)), a patient of Carlson Igwacho's who had signed timesheets, which had

already been submitted for payment, for a time period when Carlson Igwacho was in Cameroon.

Tr. (Oct. 20, 2015 AM) at 30-31 (Johnson), ECF No. 315.  Thus, contrary to defendant's

---

[16]     Michael Bikundi presents no explicit argument challenging the sufficiency of the evidence underlying the health care fraud convictions but instead, as noted *supra* in note 14, "adopts any additional relevant arguments rasied [sic] by co-defendant Florence Bikundi."  Def. MB's R. 33 Mot. at 53 (emphasis omitted).  The sufficiency challenge to the defendants' health care fraud convictions is, consequently, construed as applying to both defendants.  In addition, in response to the government's contention that admission of an exhibit, even if erroneous, was harmless, Michael Bikundi notes "the paucity of evidence introduced against Michael Bikundi" and "several exculpatory items of information that were brought to the attention of the jury."  Michael Bikundi's Reply Gov't Opp'n Mot. New Trial ("Def. MB's R. 33 Reply"), at 6–7, ECF No. 417.  The Court will consider these aspects of the defendant's argument as part of the challenge to the sufficiency of the evidence for the health care fraud convictions.

assertion that there "was no evidence presented that Mrs. Bikundi knew that Carlson Igwacho was not providing PCA services" to this patient, Def. FB's R. 29 Mem. at 10, Elke Johnson's testimony establishes that Florence Bikundi had knowledge that Carlson Igwacho was not providing the PCA services for which he was submitting timesheets.

Notwithstanding this evidence, Florence Bikundi contends that "there was insufficient evidence to show that Mrs. Bikundi participated in these alleged kickbacks or aided and abetting [sic] any of the other indicted or unindicted co-conspirators to do the same," as charged in Count Two. Def. FB's R. 29 Mem. at 10–13. She is wrong. Both beneficiary, Carolyn Baldwin, and Melissa Williams testified that Florence Bikundi had been paying Baldwin (beneficiary no. xxxx2921, *see* Def. FB's R. 29 Mem. at 11; Superseding Indictment ¶ 75(3)) before Melissa Williams became Baldwin's PCA and continued the payments for certification of false timesheets. Tr. (Oct. 29, 2015 PM) at 46 (Williams), ECF No. 334; Tr. (Nov. 3, 2015 AM) at 31-33 (Baldwin), ECF No. 343. Both Carlson Igwacho and Violet Igwacho submitted timesheets for PCA services to Mary Drayton (beneficiary no. xxxx2282, *see* Def. FB's R. 29 Mem. at 11; Superseding Indictment ¶ 75(5)), even when Violet Igwacho was on vacation in California with Florence and Michael Bikundi. *See* Gov't Ex. 443. Melissa Williams testified that she was present at the defendants' home with Irene Igwacho at times on the weekend when Irene Igwacho should have been with her patient, Sergio Zuniga (beneficiary no. xxxx7041, *see* Def. FB's R. 29 Mem. at 12; Superseding Indictment ¶ 75(9)), who also confirmed that he falsely certified timesheets in return for kickbacks. Tr. (Nov. 2, 2015 AM) at 99-100 (Williams), ECF No. 338; Tr. (Oct. 20, 2015 PM) at 15-16 (Zuniga), ECF No. 316.

Other witnesses provided additional testimony about both defendants' knowledge of the fraudulent timesheets being submitted by PCAs. Both defendants required that timesheets be

submitted for approval of payroll checks and, thus, were aware of the dates and times when the PCAs claimed on their timesheets to be providing services to patients. Tr. (Oct. 20, 2015 PM) at 50 (White), ECF No. 316; Tr. (Oct. 21, 2015 AM) at 78, 90 (White), ECF No. 318; Tr. (Nov. 2, 2015 AM) at 122 (Williams), ECF No. 338; Tr. (Oct. 20, 2015 AM) at 39 (Johnson), ECF No. 315. Yet, Melissa Williams, Irene Igwacho and Carlson Igwacho testified variously that they worked in Global's offices and attended school, vacations or family social events at the same time that timesheets indicated they were providing PCA services. Tr. (Oct. 29, 2015 PM) at 103-107 (Williams), ECF No. 334; Tr. (Oct. 27, 2015 AM) at 44-45 (Irene Igwacho), ECF No. 328; Tr. (Oct. 28, 2015 PM) at 29-30, 34-37, 39-40 (Carlson Igwacho), ECF No. 335. Similarly, Nicola White testified that, when Carlson Igwacho was assigned to work for a total of sixteen hours every day of the week for two separate patients at the same time he was known to be elsewhere, Florence Bikundi told White that she was just "trying to help Carlson" out. Tr. (Oct. 20, 2015 PM) at 100 (White), ECF No. 316.

Both Florence and Michael Bikundi also supervised Global employees in falsifying records in patient and employee files, as well as other records necessary for maintaining Global's license as a D.C. Medicaid provider. Elvis Atabe testified that Florence Bikundi showed him how to white-out documents. Tr. (Oct. 21, 2015 AM) at 114-115 (Atabe), ECF No. 318. Nicola White testified that Florence Bikundi told her to cut and paste doctors' signatures onto plans of care, so that they would appear to have been approved by the doctors. Tr. (Oct. 20, 2015 PM) at 73 (White), ECF No. 316. White even heard Florence and Michael Bikundi arguing about Michael Bikundi's view that the documents did not look real enough. *Id.* at 73–74. Florence Bikundi would then take the forged plans of care and fax them to one of Flo-Diamond's offices and have them faxed back to her so that the plans of care would look more real. *Id.* at 74–75.

White also testified about at least two occasions during her maternity leave when Florence

Bikundi was driven by Michael Bikundi to White's home to retrieve so many altered POCs,

which White had created, that they could not be emailed or fit in an envelope for mailing. *Id.* at

95–97; Tr. (Oct. 21, 2015 AM) at 82–84 (White), ECF No. 318.

       The defendants point to certain exculpatory testimony and evidence in a feeble effort to

undermine the vast amount of other evidence against them.  Specifically, Michael Bikundi notes,

first, that his name was not on Global's Medicaid Provider Agreement.  Gov't Ex. 1.  Def. MB's

R. 33 Reply at 6.  Yet, the evidence is indisputable that Michael Bikundi was integrally involved

as a "boss" at Global:  he exercised hiring and firing authority, including hiring Elvis Atabe and

firing James Mbide, *see* Tr. (Oct. 21, 2015 AM) at 109-110 (Atabe), ECF No. 318; Tr. (Oct. 16,

2015 AM) at 105 (Mbide), ECF No. 312; he reviewed timesheets and approved checks for

Global employees, *see* Tr. (Oct. 20, 2015 PM) at 50 (White), ECF No. 316; Tr. (Oct. 21, 2015

AM) at 90 (White), ECF No. 318; Tr. (Nov. 2, 2015 AM) at 122 (Williams), ECF No. 338; Tr.

(Oct. 20, 2015 AM) at 39 (Johnson), ECF No. 315; and he gave instructions to employees to

further the fraud scheme by checking the appearance of falsified documents for authenticity,

instructing Nicola White to order supplies for other Global employees to alter documents, Tr.

(Oct. 20, 2015 PM) at 75–76 (White), ECF No. 316, and instructing Elke Johnson to shred

Florence Bikundi's personnel file to avoid review by surveyors, Tr. (Oct. 20, 2015 AM) at 55–58

(Johnson), ECF No. 315.  *See also* Tr. (Oct. 19, 2015 PM) at 153 (Johnson), ECF No. 313

(testifying that Michael Bikundi would frequently say "I'm the boss here"); Tr. (Oct. 20, 2015

PM) at 28 (White), ECF No. 316 (testifying about Michael Bikundi that "I just know him as my

boss").

Second, the defendants assert that they were not present and did not participate when Global PCAs paid money to beneficiaries for certifying timesheets for services not performed. Def. MB's R. 33 Reply at 6; Def. FB's R. 29 Mem. at 3, 10–13.  The jury could reasonably have found this assertion to be spurious since the defendants' review of the timesheets as part of the process of approving and signing paychecks would make apparent that multiple PCAs were billing for time spent with Global patients when they were known to the defendants to be elsewhere.  The defendants also point out that Michael Bikundi instructed Elke Johnson "to make sure [PCAs] were at work" and Nicola White to "stop the practice of billing for services that were not provided," and that he "fired aids for not going to work," and hired field supervisors to ensure PCAs were performing their work.  Def. MB's R. 33 Reply at 7.  These instructions by Michael Bikundi demonstrate only that he was fully aware of the fraudulent timesheets being submitted for reimbursement by D.C. Medicaid and that, rather than return money to D.C. Medicaid, he took minimal steps to address the problem.  Finally, the defendants cite Melissa Williams' testimony that she did not tell Florence and Michael Bikundi about her illegal schemes with other Global employees and at Vizion One for patient sharing and kickbacks from job applicants.  Def. FB's R. 29 Mem. at 4.  This testimony likely bolstered rather than undermined Williams' credibility since in other instances she provided evidence of the defendants' knowledge and participation in the ongoing fraud at Global.

In any event, the defendants made each of these points at trial and, as such, they were subject to evaluation and weighing by the jury.  To the extent this evidence may be considered exculpatory, in light of the ample evidence presented of the defendants' culpability, the jury reasonably determined that the defendants were guilty of the charged health care fraud counts.  That jury determination will not be disturbed.

**3.**      ***Ample Evidence Supports Florence Bikundi's Health Care Fraud
Convictions In Counts Thirteen And Fourteen***

Florence Bikundi was convicted in Count Thirteen of engaging in health care fraud by "conceal[ing] her exclusion from participation in all federal health care programs in order to make money through payments from D.C. Medicaid," in violation of 18 U.S.C. § 1347, Superseding Indictment ¶ 79; and in Count Fourteen of failing to disclose her exclusion with intent fraudulently to secure payments from D.C. Medicaid, including by "actively participating in the management and administration of GLOBAL while she was excluded" and "submit[ing] D.C. Medicaid provider agreements that contained false and fraudulent representations and . . . forged signatures of individuals responsible for certifying that all claims for payment submitted to D.C. Medicaid by GLOBAL complied with" applicable regulations, in violation of 42 U.S.C. §1320a-7b(a)(3), *id.* ¶ 82.  To sustain a guilty verdict on these charges, the government had to prove, beyond a reasonable doubt, that Florence Bikundi knew about her exclusion from participation in all federal health care programs:  for Count Thirteen, that she knowingly attempted or carried out a scheme to conceal her exclusion; and, for Count Fourteen, that she concealed or failed to disclose the exclusion with the fraudulent intent to secure a payment from a federal health care program either in a greater amount than due or when no such payment was authorized.  *See* Jury Instructions at 20–21, ECF No. 350.

Underlying both charges in Counts Thirteen and Fourteen is the fact that Florence Bikundi is excluded from participation in all federal health care programs.  She does not contest this fact; she contends only that the evidence was not sufficient to prove beyond a reasonable doubt that she knew about her excluded status.  Def. FB's R. 29 Mem. at 13.

According to Florence Bikundi, even though she communicated with HHS-OIG using the Greenbelt address regarding consideration of her exclusion on October 8, 1999, by the time that

HHS-OIG sent via regular mail the final decision of exclusion by letter, dated March 31, 2000, to

that address, "she was no longer living at the [Greenbelt] address and there is no evidence that

she received notice that she was in fact excluded." *Id.* at 14.  In support, the defendant cites two

documents showing that Florence Bikundi used an address on Cherryville Terrace in Beltsville,

Maryland ("Beltsville address"), on February 23, 2000 and March 8, 2000. *Id.* (citing Defs.' Ex.

46 (stipulation that, on March 8, 2000, a lawsuit filed in District Court of Maryland for

Montgomery County showed this defendant's address to be the Beltsville address) and Gov't Ex.

112 (showing that the defendant's application for a nursing license, dated February 23, 2000,

listed her Beltsville address)).

Notwithstanding these two documents reflecting the defendant's use of an address other

than the Greenbelt address several weeks before HHS-OIG sent the exclusion notice to the

Greenbelt address, sufficient evidence was submitted at trial for the jury to conclude that

Florence Bikundi was fully aware of her exclusion.  First, this defendant was indisputably aware

that proceedings were underway to exclude her since she communicated with HHS-OIG about

requesting additional time to respond in a letter, which was received by HHS-OIG on October 8,

1999, and reflected the same Greenbelt address.  *See* Gov't Ex. 107.

Second, the exclusion notice was not returned to HHS-OIG as undeliverable, Tr. (Oct. 26,

2015 PM) at 33 (Hoffman), ECF No. 327, lending support to the inference that if Florence

Bikundi had, in fact, moved from the Greenbelt address to the Beltsville address, her mail,

including the exclusion notice, was forwarded to her.

Third, information about the defendant's exclusion was not limited to the notice sent to

her in the mail but was also publicly available, including online.  HHS-OIG published notice of

the defendant's exclusion in the Federal Register using the name, "Florence N. Igwacho."  Gov't

Ex. 113 (65 Fed. Reg. 19008 (April 10, 2000)).  In addition, her name is contained in an online, searchable database maintained by HHS-OIG of excluded persons.  Gov't Exs. 114–17.  Indeed, a document seized from the defendant's home reflects the handwritten web address for access to the exclusion database, "http://oig.hhs.gov/fraud/exclusions.asp," in the same red color ink as other handwriting that the defendant's own brother identified as written by the defendant.  Gov't Ex. 428; Tr. (Oct. 29, 2015 AM) at 71 (Ernest Igwacho), ECF No. 332; Tr. (Oct. 29, 2015 AM) at 51 (Test. of Robert Mosley), ECF No. 332.

Fourth, while disputing whether she received notice from HHS-OIG in March 2000 of her exclusion, Florence Bikundi raises no dispute about her awareness of the revocation in May 2005 of both her D.C. LPN and RN licenses in the name of "Florence Ngwe aka Florence Igwacho."  Gov't Ex. 120; Tr. (Nov. 2, 2015 PM) at 38–39 (Test. of Karen Scipio-Skinner), ECF No. 340.  Given that Global required certain employees to execute "Certificates of Eligibility to Participate in Federal Health Care Programs," to certify that the employee was "not subject to exclusion or debarment under federal law or designated in a nurse aid registry as having a finding concerning abuse, neglect, or mistreatment of a patient or misappropriation of a patient's property," Gov't Ex. 119 (certificates, dated June 5, 2012, for five Global employees), the jury could reasonably infer that Florence Bikundi, as Global's owner and boss, was well versed in this exclusion bar.

Finally, documents introduced as evidence at trial reflect that the defendant avoided using her maiden last name "Igwacho," under which she was excluded, in communications with government agencies in connection with Global.[17]  Instead, she used her married last name "Bikundi," before she was actually married in executing Global documents.  *See* Gov't Ex. 27 at

---

[17]     She also used her middle name "Ngwe" as her last name, rather than "Igwacho," in the Flo-Diamond 2005 application, for a certificate of authority to transact business in D.C.  *See* Gov't Ex. 335.

3 (Florence and Michael Bikundi's Virginia marriage certificate, dated September 5, 2009); Tr. (Nov. 3, 2015 AM) at 126 (Hinson), ECF No. 343.  Global's "Medicaid Provider Agreement" was signed by "Florence Bikundi" on June 2, 2009, Gov't Ex. 1.[18]  Likewise, when registering Flo-Diamond as doing business in D.C., in April 2008, the defendant listed herself as a "director" and signed her name as "Florence Bikundi." Gov't Ex. 335.  At the same time that the defendant used the last name "Bikundi" in communications with government agencies about Global, she used her maiden name "Igwacho" in other contexts.  *See, e.g.*, Tr. (Oct. 16, 2015 PM) at 92 (Mbide), ECF No. 312 (Mbide testifying that when he first joined Global in 2009, the defendant used the name "Florence Igwacho").

In sum, when viewing the evidence in the light most favorable to the government, the jury had ample evidence to find beyond a reasonable doubt that Florence Bikundi knew she was excluded from federal health care programs under the name "Florence Igwacho" and, as the government posits, deliberately used the name "Florence Bikundi" in order "to deceive Medicaid officials regarding her true identity" and "obtain payments from D.C. Medicaid in violation of her excluded status."  Gov't Opp'n Def. Florence Bikundi's Renewed R. 29 Mot. J. Acquittal ("Gov't Opp'n FB's R. 29 Mot.") at 33–34, ECF No. 405.

### 4.    *Government Utilization Report (Gov't Ex. 439) Was Properly Admitted*

Florence and Michael Bikundi claim that the admission of Government Exhibit 439, a 13-page document titled "Claim Summary for Dates of service 1/1/2012-2/28/2014 For Beneficiaries receiving services in 2/2014," out of nearly three hundred government exhibits,

---

[18]    Florence Bikundi asserts that Global's "DDS Waiver Application actually lists Florence Igwacho as one of the shareholders, and therefore the government should have known at the time of Global submitting its application that Mrs. Bikundi was excluded."  Def. FB's R. 29 Mem. at 15.  This document was never admitted into evidence, however.  *See* Tr. (Oct. 16, 2015 AM) at 30, ECF No. 311 (government's withdrawal of the exhibit).

was so "extremely" and "severely prejudicial" that a new trial is required in "the interests of justice."  Def. FB's R. 33 Mem. at 4, 7; Def. MB's R. 33 Mot. at 38 (seeking new trial due to "prejudicial impact" of Gov't Ex. 439).  The defendants' hyperbole notwithstanding, this exhibit was properly admitted.

The challenged exhibit, called the "PCA Services Utilization Report," Tr. (Nov. 3, 2015 PM) at 13, ECF No. 342, was admitted, over defense objection, during the government's case-in-chief when DHCF's Director of Health Care Operations Administration, Donald Shearer, was recalled as a witness.  Tr. (Nov. 4, 2015 AM) at 101, ECF No. 344 (ruling "allow[ing] introduction of the report").  He testified that, on February 20, 2014, law enforcement conducted search warrants at four HCAs, including Global, which together had billed D.C. Medicaid for PCA services for 3,200 Medicaid beneficiaries.  Tr. (Nov. 4, 2015 AM) at 99 (Shearer), ECF No. 344.  When these four HCAs were shut down, D.C. Medicaid attempted to reach the Medicaid beneficiaries, who were patients of the closed HCAs, to re-assign the beneficiaries to other HCAs and ensure the continuation of needed services.  *Id.* at 100.  DHCF generated the PCA Services Utilization Report to show the beneficiaries who received services from Global prior to the execution of the search warrant, but who were not subsequently receiving services from another HCA from March 31, 2014 through December 31, 2014.  *Id.* at 100–01.  The PCA Services Utilization Report shows a total of 567 D.C. Medicaid beneficiaries for whom Global was paid for providing services who did not continue to receive PCA services after February 28, 2014, *id.* at 100, excluding those beneficiaries who had died, *id.* at 115.  This report also shows the amount of $29,498,252.91, that D.C. Medicaid paid Global for these 567 beneficiaries from January 2012 through February 2014.  *Id.* at 104.  After March 31, 2014, through December 31,

2014, D.C. Medicaid paid no other HCA any money for the listed 567 Medicaid beneficiaries. *Id.*

The defendants argue that the PCA Services Utilization Report should not have been admitted (1) under Federal Rule of Criminal Procedure 16, due to the government's untimely disclosure, Def. FB's R. 33 Mem. at 2, 6; Def. MB's R. 33 Mot. at 29–34; (2) under Federal Rule of Evidence 404(b), because the exhibit was used "for the improper purpose of demonstrating a pattern and propensity for this type of activity," Florence Bikundi's Reply Gov't Opp'n Def.'s R. 33 Mot. New Trial ("Def. FB's R. 33 Reply") at 2, ECF No. 418; and (3) under Federal Rule of Evidence 403, because the exhibit misleadingly suggested that "567 beneficiaries listed in Exhibit 439 . . . did not need services," *id.* at 3, and "was speculative at best and subject to numerous possible interpretations," *id.* at 4; *see* Def. MB's R. 33 Mot. at 36–38.  Each of these argument is addressed *seriatim* below.

> **(a)   *Timing Of Disclosure of Government Exhibit 439 Did Not Violate Federal Rule Of Criminal Procedure 16***

The defendants have a legitimate point about the timeliness of disclosure of the PCA Services Utilization Report only the day before the close of the government's case-in-chief.  *See* Tr. (Nov. 3, 2015 PM) at 14, ECF No. 342 (government counsel stating, "[t]hat report was apparently ready today"); Tr. (Nov. 4, 2015 AM) at 113 (Shearer), ECF No. 344 (Shearer testifying that report was generated "yesterday").  In response to the Court's query about the delay in production, the government explained that the report had been requested "before the trial started," but since "a lot of the information was commingled," the effort apparently took time.  Tr. (Nov. 3, 2015 PM) at 17, ECF No. 342.  Shearer subsequently confirmed during his testimony that, in September, before the trial started government counsel requested that Shearer's

department "try to quantify the amount that we . . . could determine was the amount of actual fraud." Tr. (Nov. 4, 2015 AM) at 113 (Shearer), ECF No. 344.[19]

The government agreed to the Court's suggestion to postpone the testimony of Shearer until the next day and make this witness available for an interview by defense counsel, Tr. (Nov. 3, 2015 PM) at 18, ECF No. 342, and this schedule was imposed, *id*. at 111 (Court noting that "the ability of defense counsel to talk to Mr. Shearer helps address some of the timeliness issues with production of this particular report"). At no time did either defendant request a longer continuance in order to respond to the information in the PCA Services Utilization Report. On the contrary, counsel for Michael Bikundi expressed the view that no continuance would "cure the problem," of being "ambushed." *Id*. at 19.

Under Rule 16(a)(1)(E), the government must disclose "documents, data . . . if the item is within the government's possession, custody, or control and . . . (ii) the government intends to use the item in its case-in-chief at trial . . . ." FED. R. CRIM. P. 16(a)(1)(E). The sanction for failure "to comply with this rule, may" include permitting discovery, subject to "just terms and conditions," a continuance, barring introduction of the undisclosed evidence or "any other order that is just under the circumstances." FED. R. CRIM. P. 16(d)(2). In this case, despite a timely request to the local government agency to prepare a report before trial, the government simply did not possess the PCA Services Utilization Report until the day the report was disclosed.

Based on the clear text of Rule 16, the D.C. Circuit has stressed that "the government cannot be required to disclose evidence that it neither possesses nor controls." *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998). Thus, in *Marshall*, the Court held "that the United

---

[19]    Shearer indicated that, after he figured out a method for responding to government's counsel's request, the task of compiling the information for, and then generating, the report, was completed in about two weeks. Tr. (Nov. 4, 2015 AM) at 114 (Shearer), ECF No. 344.

States did not violate Rule 16 when it failed to turn over evidence it neither possessed nor controlled," which evidence was held by a local law enforcement agency and only uncovered during a "new line of  investigation" initiated during trial.  *Id.*  While the Court cautioned that this holding "is not an invitation for the United States to engage in gamesmanship in discovery matters" and that "a prosecutor may not sandbag a defendant by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial," *id.* at 69 (internal quotation omitted), no suggestion has been made by the defendants in this case that any delay in production of the challenged report was the result of bad faith or "gamesmanship," and this Court perceives none.

In any event, the Court took appropriate steps to ensure that the defendants had an opportunity to conduct an interview of Shearer prior to his testimony at trial and, as discussed *infra* in Part III.A.4(c), they made good use of their cross-examination of this witness regarding Government Exhibit 439.  The complete prohibition on the government introducing this exhibit, as requested by the defendants as a sanction for a Rule 16 disclosure violation, was not warranted in these circumstances and certainly does not militate in favor of a new trial.[20]

**(b)     *Government Exhibit 439 Was Not Subject To Exclusion Under Rule 404(b)***

Although Florence Bikundi made no mention of Federal Rule of Evidence 404(b) in her moving papers, she asserts in reply that admission of Government Exhibit 439 amounted to an "improper use of 404(b) evidence, for which the Government did not give notice" and, therefore,

---

[20]     Florence Bikundi's relies on *United States v. McCrory*, 930 F.2d 63 (D.C. Cir. 1991), for the proposition that "[t]he appropriate remedy" in the instant case "would have been to preclude the government from introducing the evidence at trial as a violation of" Rule 16.  Def. FB's R. 33 Mem. at 6.  The Court disagrees.  In *McCrory*, the D.C. Circuit concluded that the trial court had properly excluded undisclosed evidence, which was known to the government before trial and rendered the defense theory at trial of misidentification "unavailable."  930 F.2d at 68.  By contrast, in this case, the PCA Services Utilization Report was *not* available before trial and the defendants have identified *no* defense theory rendered unavailable due to its admission.

this exhibit "should not have been admissible."  Def. FB's R. 33 Reply at 2.  The defendant

reasons that this exhibit supports the inference "that the 567 beneficiaries listed in the report . . .

did not need service," when evidence presented at trial was somewhat different, namely:  "that

there were certain beneficiaries who did not receive service" when, in fact, "*they did need* the

services."  *Id*. at 2–3 (emphasis in original).  This belated argument first made in reply is

considered waived.  *See United States v. Bell*, 795 F.3d 88, 100 n.14 (D.C. Cir. 2015) ("Because

his . . . Rule 403 argument is first made in his Reply, . . . the argument is waived."); *In re

Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006) (finding argument "waived because it was made

for the first time in his reply brief"); *Rollins Envtl. Servs. v. EPA,* 937 F.2d 649, 653 n.2 (D.C.

Cir. 1991) ("Issues may not be raised for the first time in a reply brief.").

   In any event, this argument is without merit.  The gravamen of the health care fraud

charges in Counts One and Two is that the defendants "submitted and caused to be submitted

false and fraudulent claims to D.C. Medicaid seeking payment for the costs of personal care

services that were not provided."  Superseding Indictment ¶¶ 70(f), 74 (f).  Whether these

services were or were not actually needed is beside the point.  Indeed, the government presented

testimony at trial both of D.C. Medicaid beneficiaries who actually needed personal care services

and those who did not.  For example, Sergio Zuniga, Tywonda Fenner, Carolyn Baldwin and

Mary Drayton all testified about their underlying health reasons for needing PCA services.  *See,

e.g.*, Tr. (Oct. 20, 2015 PM) at 8 (Zuniga), ECF No. 316 (Sergio Zuniga testifying that, due to his

spina bifida condition and being in a wheelchair, there are times when he "really need[s] help");

Tr. (Nov. 2, 2015 PM) at 43–44, 48 (Fenner), ECF No. 340 (Tywonda Fenner testifying, that due

to her diabetes and being "slow," she needs help at home to take her medications); Tr. (Nov. 3,

2015 AM) at 35, 39 (Baldwin), ECF No. 343 (Carolyn Baldwin, who is in a wheelchair,

testifying that PCAs assist in her home); Tr. (Oct. 28, 2015 AM) at 39, 43 (Drayton), ECF No. 329 (Mary Drayton testifying that, after a "knee operation," she needed an aide to help).

Another beneficiary testified about being recruited to become a Global patient even though she did not need PCA services. *See* Tr. (Nov. 2, 2015 PM) at 64-66 (McPherson), ECF No. 340 (Alma McPherson testifying about being paid $100, along with two other people, to visit doctor "play acting" need for a cane and "to say that I had some kind of disease"). Likewise, James Mbide testified that, based on his own observations, some Global patients did not need PCA services and should have been discharged from D.C. Medicaid, but he was told by Michael Bikundi to "put on his business hat," which Mbide understood as an instruction to continue billing D.C. Medicaid for the services when they were not needed. Tr. (Oct. 19, 2015 AM) at 22 (Mbide), ECF No. 314. Each of the beneficiary witnesses admitted to falsely certifying timesheets for personal care services, which were not *provided*, in return for regular cash payments. *See* Tr. (Oct. 20, 2015 PM) at 9-11 (Zuniga), ECF No. 316; Tr. (Oct. 28, 2015 AM) at 42-43 (Drayton), ECF No. 329; Tr. (Nov. 2, 2015 PM) at 49-50 (Fenner), ECF No. 340; Tr. (Nov. 2, 2015 PM) at 68-69 (McPherson), ECF No. 340; Tr. (Nov. 3, 2015 AM) at 32-33, 41 (Baldwin), ECF No. 343.

Thus, even if the PCA Services Utilization Report were construed to support the inference suggested by the defendants—that 567 Global patients did not need PCA services—this evidence would only bolster the same point already made by other evidence presented at trial. In other words, this exhibit would not be subject to Rule 404(b) and is instead plainly intrinsic to the charged health care fraud offenses. Rule 404(b) bars the admission of another "crime, wrong, or act" offered to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," FED. R. EVID. 404(b)(1), but permits

such evidence to be admitted for "another purpose" as long as the government provides notice of its intent to offer the evidence, FED. R. EVID. 404(b)(2), which gives the defense the opportunity to request limiting instructions.  These requirements do not apply, however, if the court determines that the acts are intrinsic to the charged crime.  As the D.C. Circuit recently explained, "[a] threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those for which the defendant is charged, or instead is intertwined with the commission of the charged crimes.  Acts 'extrinsic' to the crime charged are subject to Rule 404(b)'s limitations; acts 'intrinsic' to the crime are not."  *United States v. McGill*, No. 06-3190, 2016 U.S. App. LEXIS 3734, at *53 (D.C. Cir. Mar. 1, 2016); *see also United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) ("When evidence of such acts is 'intrinsic' to the charged crime, it is not evidence of 'other' acts and is thus wholly unregulated by Rule 404(b)."); *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000); FED. R. EVID. 404(b) advisory committee's note to 1991 amendment ("The amendment does not extend to evidence of acts which are 'intrinsic' to the charged offense." (citation omitted)).  "Generally intrinsic evidence includes 'act[s] that [are] part of the charged offense' or 'some uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'"  *Bell*, 795 F.3d at 100 (quoting *Bowie*, 232 F.3d at 929).

To the extent that the PCA Services Utilization Report reflects patients for whom Global received D.C. Medicaid reimbursements when the listed patients did not need PCA services, that evidence is an integral part of the health care fraud charges, rather than evidence of "other" acts subject to Rule 404(b).  Consequently, admission of Government Exhibit 439 did not violate Rule 404(b).

     **(c)**    ***Government Exhibit 439 Was Not Unduly Prejudicial Under Federal Rule Of Evidence 403***

The defendants contend that admission of the PCA Services Utilization Report was unduly prejudicial and erroneous under Federal Rule of Evidence 403.  Def. FB's R. 33 Mem. at 6; Def. MB's R. 33 Mot. at 36.  At the outset, the weakness in this argument is demonstrated by simple comparison of the numbers at issue.  To the extent that the challenged report suggests that the level of the fraud committed at Global amounted to $29,498,252.91, this amount was less than half the *full* amount of the fraud claimed by the government.  Specifically, the government argued at trial that, due to Florence Bikundi's exclusion from participation in any federal health care program, her status as an owner and manager of Global, and the fraudulent Medicaid provider agreement (Gov't Ex. 1), this company should never have been accepted as a Medicaid provider and was not entitled to receive *any* funds, let alone over $80,000,000, from D.C. Medicaid.  Tr. (Oct. 15, 2015 AM) at 36–37 (Gov't Opening Statement), ECF No. 347; Tr. (Nov. 9, 2015 AM) at 16 (Gov't Closing Statement), ECF No. 376.  The defendants ignore this obvious point, that Government Ex. 439 shows a lower amount of overall fraud than the amount claimed by the government, to argue nonetheless that this exhibit created undue prejudice.  The defendants' argument is predicated on two inter-related points, neither of which is persuasive.

  First, the defendants argue that Shearer could not and did not provide a definitive explanation for "why [the 567 listed beneficiaries] were no longer receiving services from Medicaid" leaving the jury "to speculate as to why the services were not provided."  Def. MB's R. 33 Mot. at 36.  As support, the defendants note that "[t]he D.C. Government attempted to reach all 3200 beneficiaries and place them with new agencies but they did not reach everyone," making Shearer's testimony "inconclusive and speculative."  Def. FB's R. 33 Mem. at 6.  Since no definitive explanation was given for why the beneficiaries listed on PCA Services Utilization

Report stopped receiving services between March 1 and December 31, 2014, the jury could have concluded "that the beneficiaries never needed the services to begin with," which the government argued "would establish the 'full extent of the fraud.'" *Id.* at 5 (quoting government counsel at Tr. (Nov. 3, 2015 PM) at 15, ECF No. 342).

The defendants' argument ignores important context.  Government Exhibit 439 was not the only evidence that raised the issue of the scope of the fraudulent and corrupt activity at Global and, in particular, the level of fraudulent billing to D.C. Medicaid and the defendants' knowledge of this fraudulent scheme.  Eight cooperating, former Global employees and five cooperating, former Global patients, all testified about falsified Global patient records and timesheets, which information was corroborated by the numerous record-keeping deficiencies cited by HRLA surveyors and administrators.  In addition to the testimony about Global patients not receiving or needing PCA services, summarized *supra* in Part III.A.4(b), this issue was highlighted in questions focused on the actual number of Global employees and/or patients involved in the falsifying of records to ensure continued billing to D.C. Medicaid.  For example, Melissa Williams testified that about thirty percent of patients wanted payments to certify timesheets, Tr. (Oct. 29, 2015 PM) at 121 (Williams), ECF No. 334, and that twenty-five PCAs did not provide services, *id*. at 123.  Nicola White testified that between 2009 and 2014, "about 50 percent of those" POCs in patient files were altered.  Tr. (Oct. 21, 2015 AM) at 85–86 (White), ECF No. 318.  Elke Johnson testified that when she made calls to patients' homes to check whether the PCA was present, she found about an eighty percent compliance on weekdays, but less, about fifty to sixty percent, on the weekends.  Tr. (Oct. 20, 2015 AM) at 37, 44, 77, 105 (Johnson), ECF No. 315.  Thus, as the government points out, Government Exhibit 439 could not be a "surprise" in light of the government's—and the defendants' on cross-examination—efforts

to quantify the extent of the fraud at Global.  Gov't Opp'n Def. Michael Bikundi's R. 33 Mot. New Trial ("Gov't Opp'n MB's R. 33 Mot.") at 9, ECF No. 407.

Moreover, the defendants effectively exploited the opportunity on cross-examination to detail the limits of any conclusions and inferences to be drawn from Government Exhibit 439. On direct examination, Shearer made clear that not all 3,200 beneficiaries, who were patients of the four HCAs shut down on execution of search warrants, were reached to determine if new HCA assignments were needed.  Tr. (Nov. 4, 2015 AM) at 100 (Shearer), ECF No. 344.  He also offered no opinion as why former Global patients "didn't continue to get services after the execution of the search warrants," *id*. at 102–03, after D.C. Medicaid had paid Global $29,498,252.91 for those 567 beneficiaries between January 1, 2012 and February 14, 2014, *id*. at 104.  On cross-examination, the defendants elicited testimony that Shearer did not know (1) how many former Global patients were contacted, *id*. at 106; (2) how many former Global patients were determined to need PCA services, *id*. at 108; (3) why the former Global patients were no longer receiving services, *id*. at 115; (4) how many former Global patients were excluded due to death, *id*.; and (5) how many former Global patients no longer received PCA services because they were no longer eligible, possibly due to an increase in income, re-location outside D.C., or the use of a family member to provide PCA services, *id*. at 115–16.  The defendants' criticism of the limits of any conclusions to be drawn from Government Exhibit 439 are clearly probative of the weight to be given to this evidence rather than its admissibility.

Second, the defendants contend that if they "had been given time and had the ability to investigate" why the listed beneficiaries were no longer receiving PCA services, the "jurors could have been properly educated about . . . the usefulness of the report."  Def. MB's R. 33 Mot. at 37; *see also id*. at 35 (asserting that defendant "was deprived of an ability to investigate

the substance of Exhibit 449 [sic]"); Def. FB's R. 33 Mem. at 6 (acknowledging that "the Court allowed Mrs. Bikundi overnight to speak with Mr. Shearer prior to his testimony the next morning" but nevertheless contending she "was not allowed the appropriate time to investigate and interview the beneficiaries listed in the report to determine whether they did in fact need the services"). Yet, the defendants made no request for any continuance to conduct such an investigation, choosing instead to ask only that the report be excluded. Moreover, as the government points out, "the defense had access to the same claims data as the government and could have interviewed any of the many Medicaid beneficiaries contained in that data." Gov't Opp'n Def. Florence Bikundi's R. 33 Mot. New Trial ("Gov't Opp'n FB's R. 33 Mot.") at 8, ECF No. 404; Gov't Opp'n MB's R. 33 Mot. at 9.

Accordingly, notwithstanding the defendants' vigorous and continuing objection to Government Exhibit 439, this document was properly admitted at trial and, thus, no new trial is warranted on this basis.

### 5.    *The Defendants Fail To Show Any Variance In Proof For Charged Health Care Fraud Conspiracy*

Count One of the Superseding Indictment charged Florence and Michael Bikundi with conspiring with six other Global employees (*i.e.*, Christian Asongcha, Melissa Williams, Elvis Atabe, Carlson Igwacho, Irene Igwacho and Berenice Igwacho), from August 2009 through February 2014 "to unlawfully enrich themselves by submitting false and fraudulent claims to D.C. Medicaid," Superseding Indictment ¶ 69, in violation of 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1035 (False Statements in Health Care matters) and 42 U.S.C. § 1320a-7b(b) (Illegal Payments in Connection with Federal Health Care Program). Having failed to make any request at trial for a multiple conspiracy instruction, Florence Bikundi now urges that her guilty verdict on this charge "be vacated and a new trial ordered in the interest of justice," Def. FB's R.

33 Mem. at 9, because the evidence "established multiple conspiracies rather than the single one

and this variance prejudiced Mrs. Bikundi," *id*. at 8; *see also* Def. FB's R. 29 Mem. at 3

(renewing acquittal motion because "evidence presented by the government demonstrates that

there were multiple conspiracies occurring that Mrs. Bikundi was neither aware of or a part

of").[21]

 Specifically, Florence Bikundi points to evidence regarding illegal "patient sharing

arrangements" that Melissa Williams had with other PCAs at Global and another company,

Vizion One, to pay beneficiaries to sign-off on timesheets verifying more hours than the PCAs

had actually worked.  Def. FB's R. 33 Mem. at 9.  In addition, Florence Bikundi complains of a

prejudicial "spillover effect" from other evidence that she claims revealed conspiracies in which

Chris Asongcha, who remains a fugitive in this case, Nicola White, Elvis Atabe and other Global

employees were involved and that were "distinct and varied from the conspiracy charged in the

superseding indictment" and had "nothing to do with Mrs. Bikundi."  *Id*.  Contrary to the

defendant's contention, "[f]rom the overwhelming evidence of the defendants' common goal,

interdependence, and overlapping core of participants, a reasonable jury could easily conclude

that the defendants were part of a single . . . conspiracy."  *Bostick*, 791 F.3d at 138.

 In evaluating a defendant's challenge to a conspiracy conviction on grounds of a variance

between the single conspiracy charged and the purported proof of multiple conspiracies, courts

must determine whether "the evidence was sufficient for the jury to conclude that the

[defendants] joined in a single conspiracy."  *United States v. Tarantino*, 846 F.2d 1384, 1394

---

[21] Florence Bikundi reiterates that insufficient evidence was submitted at trial that she participated "in any conspiracy with Melissa Williams or any of the individuals named in the indictment" or that she "entered into an unlawful agreement with any other individual to commit health care fraud." Def. FB's R. 33 Mem. at 8.  This challenge to the sufficiency of the evidence to support the defendants' convictions on Count One is addressed, *supra*, in Part III.A.2.

(D.C. Cir. 1988). The D.C. Circuit has identified "a variety of factors" to aid in this evaluation, the "most important of these is whether the conspirators share a common goal." *Id.* at 1393. Additional factors include "the degree of dependence inherent in the conspiracy," the conspirators' "link to other conspirators" and "the overlap of participants in the various operations claimed to comprise a single conspiracy." *Id.*; *see also Bostick,* 791 F.3d at 137–38 ("We consider three factors to determine whether the evidence supports a conclusion that the defendants belonged to a single conspiracy: whether the alleged participants had (1) a common goal, (2) interdependence, and (3) overlap, such as the presence of core participants linked to all the defendants." (internal quotation and citation omitted)); *United States v. Eiland*, 738 F.3d 338, 358 (D.C. Cir. 2013) ("In determining whether the evidence supports a finding of a single conspiracy or instead only demonstrates multiple conspiracies, we look at whether the defendants shared a common goal, any interdependence between the alleged participants, and any overlap among alleged participants, such as the presence of core participants linked to all the defendants." (quoting *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996)). When making a variance challenge, the defendant bears the burden of showing, first, a variance between the charged single conspiracy and the existence of multiple conspiracies and, second, that "because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *Eiland,* 738 F.3d at 358 (quoting *Tarantino*, 846 F.2d at 1391). The defendants simply cannot meet this burden here. [22]

---

[22]     Without any discussion, Florence Bikundi cites *United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988), and *Kotteakos v. United States*, 328 U.S. 750 (1946), as support for her variance challenge. Def. FB's R. 33 Mem. at 9. These cases are not helpful to her argument for different reasons. In *Tarantino*, the D.C. Circuit rejected the defendants' claim of a prejudicial variance of multiple conspiracies, finding instead that "even though they may not have known the precise identity of all the other conspirators" in the single charged narcotics distribution and money laundering conspiracy, each defendant—like the defendants in the instant case—"played a vital role in the conspiracy's success," and "shared the conspiracy's objects." 846 F.2d at 1293–94. In *Kotteakos,* the government

First, consideration of the *Tarantino* factors confirms that a single conspiracy, as charged in Count One, was established.  With respect to the first factor, the evidence showed that the conspirators shared a common goal of using Global to defraud D.C. Medicaid of funds through use of various means, including submitting and approving false timesheets for PCAs seeking reimbursement from D.C. Medicaid for work not performed, recruiting and paying kickbacks to Medicaid beneficiaries to incentivize them to sign-off on PCAs' false timesheets, and falsifying multiple documents required to maintain licensure as a D.C. Medicaid provider and obtain continuing reimbursement from D.C. Medicaid.  Even if each participant in this corrupt operation did not know precisely what other participants were doing to facilitate this fraud and spur the exponential growth of Global's reimbursements from D.C. Medicaid, the co-conspirators shared the common single goal of using Global to make as much money as possible from this federal health care program.  Moreover, even if certain co-conspirators made their own illegal arrangements with PCAs and beneficiaries to submit false timesheets, the defendants' attempt to characterize these arrangements as side-deals wholly separate from the charged conspiracy is incorrect.  Instead, those arrangements were building blocks for the entire criminal enterprise and had the effect of increasing the number of Medicaid beneficiaries and PCAs willing to engage in the falsification of timesheets and other records to continue bilking D.C. Medicaid for reimbursement to which the defendants and their co-conspirators were not entitled. As the government correctly notes, "[w]hile members of the conspiracy may have played different roles (Melissa Williams and Elvis Atabe, for example, primarily assisted in falsifying

---

*conceded* a serious variance between the indictment, which charged over ten defendants in a single conspiracy, and the proof showing at least eight separate conspiracies, 328 U.S. at 755–56, which were not "tied together as stages in the formation of a larger, all-inclusive combination, all directed to achieving a single unlawful end or result," *Blumenthal v. United States*, 332 U.S. 539, 558 (1947).  In this circumstance, the Supreme Court reversed the convictions, finding it "highly probable that the error had substantial and injurious effect."  *Kotteakos*, 328 U.S. at 776.  By contrast here, the government insists that the jury correctly concluded that the defendants were members of a single conspiracy, which is firmly established by the evidence.  *See supra* Part III.A.2.

documents, while Carlson Igwacho, Berenice Igwacho, and Irene Igwacho, as home health aides, submitted payments to beneficiaries and obtained signed timesheets falsely indicating that they had worked the full hours with the client), each had an overall goal of defrauding the Medicaid program." Gov't Opp'n FB's R. 33 Mot. at 11–12.

The Supreme Court's consideration of a variance challenge in *Blumenthal v. United States*, 332 U.S. 539 (1947), is illustrative of the weakness in the defendants' instant assertion that evidence of illegal arrangements engaged in by charged co-conspirators amounts to a variance of proof warranting a new trial.  In *Blumenthal*, five defendants were convicted of a single conspiracy of selling two carloads of whiskey in violation of the price cap set by statute. *Id.* at 542.  The defendants played different roles in the "channel for distributing the liquor and giving that unlawful process a legal façade," *id.* at 548, even though some of the defendants "did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of all," *id.* at 558.  Since "the several agreements were essential and integral steps" for the success of the overall conspiracy, however, the Court concluded that "[b]y their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal."  *Id.*  Consequently, the Court rejected the defendants' contention that "the proof, in variance from the indictment, shows that there was more than one conspiracy," *id*. at 542, and affirmed the convictions, *id*. at 559. Similarly here, even if the proof at trial showed that co-conspirators engaged in illegal deals to which Florence and Michael Bikundi were not made fully aware, these activities helped further the overall goal of the single, charged conspiracy and do not amount to a variance in proof.  *See also United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996) (holding that drug

distributing cliques that were in competition with one another were still part of a single conspiracy in part because they shared the common goal of selling one defendant's cocaine for profit).

With respect to the second factor, the evidence established interdependence among the charged conspirators to carry out the fraud scheme.  The D.C. Circuit has explained that this factor "requires that each defendant's actions 'facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole.'"  *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 900 (D.C. Cir. 2010) (quoting *United States v. Carnagie*, 533 F.3d 1231, 1238 (10th Cir. 2008) (internal quotation omitted)).  This factor is easily met here. Florence Bikundi obtained the D.C. Medicaid license for Global to operate and recruited at least some Medicaid beneficiaries to obtain their PCA services through Global.  Carolyn Baldwin, one of the beneficiaries who had received payoffs from Florence Bikundi in the past, became a patient of Global and continued to receive payoffs for signing off on false timesheets for Melissa Williams.  The co-conspirators who worked as PCAs, including Carlson, Berenice and Irene Igwacho, Melissa Williams and Frances James, operated similarly to Florence Bikundi and paid-off beneficiaries to sign false timesheets, which were then submitted for approval to both Florence and Michael Bikundi and ultimately to D.C. Medicaid for reimbursement.  In order to maintain Global's license as a Medicaid provider, Florence and Michael Bikundi facilitated the creation of false documentation by Elvis Atabe, Nicola White, Elvis Atabe, Irene Igwacho and others, including false background checks and POCs, to present to HRLA surveyors.  As Elvis Atabe testified, "the whole system was bad in Global."  Tr. (Oct. 21, 2015 PM) at 25 (Atabe), ECF No. 317.  This testimony was corroborated by Melissa Williams, who testified that it was understood that whatever documents needed to be forged would be forged.  Tr. (Oct. 29, 2015

PM) at 86–88 (Williams), ECF No. 334.  Each role played by the co-conspirators was integral to facilitating the larger fraud scheme.

The "final factor of lesser significance is the overlap of participants in the various operations claimed to comprise a single conspiracy." *Tarantino*, 846 F.2d at 1393.  The D.C. Circuit has explained that this factor requires "only that the main conspirators work with all the participants." *Bill Harbert Int'l Constr., Inc.*, 608 F.3d at 901 (quoting *United States v. Hemphill*, 514 F.3d 1350, 1363 (D.C. Cir. 2008)).  Here, all of the conspirators were Global employees so they all worked together under the supervision and management of Florence and Michael Bikundi.  This status gave the conspirators a strong incentive for Global to continue in business and flourish in order to keep their jobs.  Indeed, some of the conspirators were not legally entitled to work in this country, a vulnerable circumstance that made them even more willing to comply with instructions to engage in illegal activities to maintain their employment. Tr. (Oct. 19, 2015 PM) at 140–41 (Johnson), ECF No. 313; Tr. (Oct. 29, 2015 PM) at 31 (Williams), ECF No. 334.

Thus, the *Tarantino* factors all confirm that a single conspiracy was proven at trial and that there was no variance in proof, as Florence Bikundi now, belatedly claims.

Second, even if some variance in the evidence occurred, the defendants fail to show any substantial prejudice from the "spillover" evidence of the other illegal activity in which some of the co-conspirators engaged.  Indeed, "not every variance between the crime charged and the crime proven is fatal to the validity of the resulting conviction." *United States v. Cross*, 766 F.3d 1, 5 (D.C. Cir. 2013); *see also United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000) (finding "a variance between the indictment charging a single conspiracy and the trial evidence indicating more than one conspiracy," but nonetheless concluding "the variance did not substantially

prejudice the appellants").  Requiring a "material[]" variance that causes "substantial prejudice" to trigger the need for a new trial, *United States v. Emor*, 573 F.3d 778, 786 (D.C. Cir. 2009), comports with the well settled law that the guilty verdict will be upheld "if the evidence adequately supports the jury's finding that a single conspiracy existed," *Eiland,* 738 F.3d at 359, and "[w]hether the evidence proved a single conspiracy 'is primarily a question of fact for the jury,'" *Bostick*, 791 F.3d at 137 (quoting *United States v. Childress*, 58 F.3d 693, 709 (D.C. Cir. 1995)).  As summarized *supra* in Part III.A.2, the evidence regarding Florence and Michael Bikundi's involvement in the over-arching conspiracy was overwhelming.  In this circumstance, the defendants simply cannot show any substantial prejudice from the alleged variance based on "insufficient evidence for a reasonable jury to find [the defendant] guilty of the conspiracy charged in the indictment beyond a reasonable doubt."  *Cross*, 766 F.3d at 5.

Moreover, while spillover prejudice "may occur when a jury imputes evidence from one conspiracy to a defendant involved in another conspiracy," *United States v. Gaviria*, 116 F.3d 1498, 1533 (D.C. Cir. 1997), this risk is minimized when, as here, the co-conspirators themselves denied to the jury that the defendants were advised or even aware of the other illegal conspiracies cited by the defendants.  For example, Melissa Williams testified that, while both Florence and Michael Bikundi were fully aware of some of her illegal activities to facilitate the goals of the charged conspiracy, she did not tell them or otherwise make them aware of her illegal arrangements (1) with Atawan Mundu John to use a Medicaid patient of Vizion One to sign false timesheets for PCA services not actually provided, Tr. (Nov. 2, 2015 AM) at 40–41 (Williams), ECF No. 338; or (2) her patient sharing arrangements with certain Global PCAs, *id.* at 6–7, 100.[23]

---

[23]    To the extent that Florence Bikundi tries to attribute to Chris Asongcha some undefined "separate and distinct conspiracy from the conspiracy charged in the superseding indictment," Def. FB's R. 33 Mem. at 9, this is

In sum, the defendants fail to carry their burden of showing either a variance or prejudice and are, consequently, not entitled to a new trial on this basis.

### 6.   *The Jury Was Properly Instructed On The Health Care Fraud In Count Two*

Florence Bikundi contends that the jury was given erroneous instructions for Count Two, charging the defendants with health care fraud, in violation of 18 U.S.C. §§ 2 and 1347, by not instructing the jury "that it had to unanimously agree to each manner and means alleged by the government." Def. FB's R. 33 Mem. at 7. The defendant designates each "manner and means" charged in Count Two as "six different acts" and then posits that the government "must prove beyond a reasonable doubt at least one of the theories to the satisfaction of the entire jury." *Id*. Absent a unanimity instruction for Count Two, the defendant argues that "it is unclear on which set of facts form the guilty verdict," requiring "vacat[ur of] the judgment on Count 2 and . . . a new trial." *Id*. at 8. The defendant is incorrect as a matter a law.

Count Two charges that, from at least in or around August 2009, continuing until in or around February 2014, in the District of Columbia and elsewhere, the defendants Florence and Michael Bikundi, aiding and abetting each other, and others, known and unknown to the Grand Jury, "did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of, the D.C. Medicaid program, a health care benefit program, as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, namely

---

merely a revival of the defendants' unsuccessful effort at trial to put the blame for the illegal activities occurring at Global on an absent fugitive. *See, e.g.*, Tr (Nov. 9, 2015 PM) at 109, 113–14, ECF No. 376 (Florence Bikundi's Closing Statement); Tr. (Nov. 10, 2015 AM) at 29, ECF No. 377 (Michael Bikundi's Closing Statement). The jury plainly rejected this blame-shifting argument for sound reason based on the ample evidence of the defendants' own involvement in the charged conspiracy.

personal care services." Jury Instructions at 14–15. "The indictment alleges that it was a purpose of the scheme for the defendants Florence Bikundi and Michael Bikundi and others to unlawfully enrich themselves by, among other things, submitting and causing to be submitted false and fraudulent claims for payment to D.C. Medicaid for personal care services that were not provided as claimed." *Id.* at 15. The "manner and means by which defendants sought to accomplish the purpose of the fraud scheme," *id.*, were enumerated as follows:

    a.  Defendants and co-conspirators offered and caused to be offered cash payments to patient recruiters in return for referring D.C. Medicaid beneficiaries to serve as patients of Global.

    b.  Defendants and co-conspirators recruited and caused to be recruited D.C. Medicaid beneficiaries who were willing to receive cash payments in exchange for certifying that the personal care aides had provided services as prescribed when the services were not provided.

    c.  Defendants and co-conspirators falsified and caused to be falsified Global patient files to make it appear that D.C. Medicaid beneficiaries were qualified for and received personal care services that were not provided.

    d.  Defendants and co-conspirators falsified and caused to be falsified Global employee files to make it appear that Global employees were qualified to provide personal care services to D.C. Medicaid beneficiaries, when they were not qualified to provide those services.

    e.  Defendants and co-conspirators created and caused to be created false and fraudulent personal care aide timesheets which falsely certified that personal care services were provided to D.C. Medicaid beneficiaries when the services were not provided.

    f.  Defendants and co-conspirators submitted and caused to be submitted false and fraudulent claims to D.C. Medicaid seeking payment for the costs of personal care services that were not provided.

*Id.*; *see* Superseding Indictment ¶ 74(a)–(f).

      Neither the jury instructions nor the verdict form instructed the jury to reach unanimous agreement on the specific "manner and means" listed in (a) through (f), which each defendant

was charged with using to commit the health care fraud offense.  *Id.* at 14–18; Verdict Sheet at 2, ECF No. 361.  At the same time, as the government correctly points out, the defendants failed to request any specific unanimity instruction as to Count Two, even though they requested, and such an instruction was given, for Count One.  Gov't Opp'n FB's R. 33 Mot. at 9; *see* Parties' Joint Pretrial Statement, Ex. 2 (Joint Proposed Jury Instructions) at 80–82 (proposed instructions for Count Two), ECF No. 271.  This failure to request a unanimity instruction as to the "manner and means" in Count Two, and to object to the final instructions on this basis, would "preclude[] appellate review," FED. R. CRIM. P. 30(d), unless the absence of a unanimity instruction constitutes "[a] plain error that affects substantial rights," FED. R. CRIM. P. 52(b).  No error, let alone plain error, occurred here and, consequently, no new trial is required in the "interest of justice."  FED. R. CRIM. P. 33(a).

The Supreme Court explained in *Richardson v. United States*, 526 U.S. 813 (1999), that "[f]ederal crimes are made up of factual elements, which are ordinarily listed in the statute that defines the crime" and "[c]alling a particular kind of fact an 'element' carries . . . [t]he consequence that . . . a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element."  *Id.* at 817.  Not every fact that describes criminal activity amounts to an element, however.  The Court clarified that "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime."  *Id.*  By way of example, the Court observed that while "an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun.  But that disagreement—a disagreement about means—would not matter as long as all 12 jurors unanimously concluded

that the Government had proved the necessary related element, namely that the defendant had threatened force."  *Id.*; *see also Schad v. Arizona*, 501 U.S. 624, 631 (1991) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone.").  In *Richardson*, the Court held that each individual predicate violation making up the requisite "series of violations," under the continuing criminal enterprise statute, 21 U.S.C. § 848(a), was an element of that offense requiring juror unanimity to sustain the conviction.  526 U.S. at 815.

By contrast, when the indictment merely describes the means used to carry out a crime, those factual allegations—or "brute facts"—do not amount to "elements" requiring unanimity.  As the Seventh Circuit bluntly put it: "jurors don't have to agree on means."  *United States v. Schiro*, 679 F.3d 521, 533 (7th Cir. 2012).  The *Schiro* court gave its own example, explaining, "Suppose a defendant on trial for murder had first choked his victim and then shot him, and some jurors think the choking killed him and others that he was alive until he was shot.  It is enough that they are unanimous that the defendant killed him."  *Id*.

The defendant's challenge to the lack of a unanimity instruction raises the question of whether the "manner and means" used to execute the charged health care fraud are part of the elements of the charged crime requiring a specific unanimity instruction to ensure all jurors agreed to at least one enumerated "means," or, instead, are merely, as titled, the means of committing the offense.  If the latter, then the general unanimity instruction requiring the jury to unanimously find the defendants guilty beyond a reasonable doubt is sufficient, even if the jurors were less than unanimous regarding one or more of the enumerated means.  *See* Jury Instructions

82

at 30 ("[I]n order to return a verdict, each juror must agree on the verdict.  In other words, your verdict must be unanimous on each of the 15 charges.").

The D.C. Circuit has not addressed this precise question in the context of a health care fraud offense or more general fraud offense, but in analogous circumstances has found that the means used to commit an offense, as described in an indictment, are not subject to a specific unanimity instruction.  *See, e.g., United States v. Kayode*, 254 F.3d 204, 213–14 (D.C. Cir. 2001) (finding no error in district court's declining to give unanimity instruction requiring jury to agree on which five documents satisfied all elements of the offense of possession of false identification documents since "[t]he statute makes relevant only the number of false identification documents intended to be used, not the identity of each particular document"); *United States v. Harris*, 959 F.2d 246, 255 (D.C. Cir. 1992) (per curiam) (agreeing with government that jury did not have to agree on which five (or more) persons belonged to a continuing criminal enterprise but only that the defendant had acted in concert with "five or more persons"); *see also United States v. Adams*, No. 14-cr-44, 2015 U.S. Dist. LEXIS 167211, at *12–14 (D.D.C. Dec. 15, 2015) (concluding that defendant was "not entitled to unanimity instruction on the particular means he employed to obstruct or impede the internal-revenue laws").

Four other Circuits have considered the need for a unanimity instruction regarding the means used to execute a fraudulent scheme and concluded that "[a] jury, faced with divergent factual theories in support of the same ultimate issue, may decide unanimously . . . that the government has proven a scheme to defraud even if they may not be unanimous as to the precise manner in which it occurred."  *United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (ellipsis in original) (quoting *United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013)).  In *Daniel*, the Seventh Circuit held that the district court did not abuse its discretion in declining to

give an additional specific unanimity instruction on the specific fraudulent representations or omissions the defendant committed since these "were 'underlying brute facts' of the verdict against him" and "merely the means he used to commit an element of the crime" of wire fraud. *Id*. at 614; *see also LaPlante*, 714 F.3d at 647 ("The court was not required to give that unanimity instruction because the jury is not required to agree on the means—the specific false statement—[the defendant] used to carry out her fraudulent scheme."); *United States v. Rice,* 699 F.3d 1043, 1048 (8th Cir. 2012) (holding that jurors were properly instructed "that they needed to agree that one of the means had been used [to defraud victims], but that not all needed to agree on the same one"); *United States v. Lyons*, 472 F.3d 1055, 1068 (9th Cir. 2007) (holding that in a scheme to defraud, "the jury need not be unanimous on the particular false promise").

While these out-of-Circuit decisions are not binding, they are persuasive in their application of the Supreme Court's precedent in *Richardson* and *Schad* distinguishing "brute facts," which describe the means of committing a crime, from the factual elements required by the statute to be proven beyond a reasonable doubt to a unanimous jury. Indeed, more recently, the Supreme Court took pains to avoid any suggestion "that the Government adds an element to a crime for purposes of sufficiency review when the indictment charges different means of committing a crime in the conjunctive." *Musacchio*, 136 S.Ct. at 715 n.2.

Accordingly, the defendants were not entitled to a unanimity instruction for the "manner and means" allegedly used to commit the health care fraud offense, even had they timely requested such an instruction.

### B.    CHALLENGES TO EIGHT MONEY LAUNDERING CONVICTIONS

Both Florence and Michael Bikundi seek a judgment of acquittal and a new trial on their eight convictions for conspiring to commit and committing money laundering, in violation of 18

U.S.C. §§ 2, 1956(a)(1)(B)(i), and 1956(h), as charged in Counts Fifteen through Twenty-Two. The defendants challenge these money laundering convictions on three grounds: (1) the government presented insufficient evidence to support these convictions, Def. FB's R. 33 Mem. at 14; Def. FB's R. 29 Mem. at 19–22; Def. MB's R. 33 Mot. at 38–44; (2) "the underlying facts of money laundering were also used to support a conviction for health care fraud," Def. FB's R. 33 Mem. at 14; *see* Def. MB's R. 33 Mot. at 45–46; and (3) these convictions are inconsistent with the jury's acquittal of the defendants on Counts Twenty-Three through Twenty-Five, Def. FB's R. 29 Mem. at 17.[24] Each of these challenges is addressed *seriatim* below.

### 1. *Sufficient Evidence Was Presented To Sustain Money Laundering Convictions*

The defendants challenge the sufficiency of the evidence supporting their money laundering convictions, stating that "the government failed to prove any agreement to conspire to commit money laundering as alleged in Count 15, and further failed to prove any intent to conceal the source of the funds alleged in Counts 16-22." Def. FB's R. 33 Mem. at 14; *see* Def. MB's R. 33 Mot. at 44. Evidence supporting the money laundering charges was presented principally through the testimony of Agent Hinson, who traced the transfer by the defendants of the fraudulently obtained D.C. Medicaid funds from deposits in Global bank accounts to over one hundred non-Global accounts controlled by either or both defendants. Tr. (Nov. 3, 2015 AM) at 131, 134 (Hinson), ECF No. 343; Gov't Ex. 184. In considering the defendants' challenge, the Court first reviews the specific money laundering convictions, before assessing the sufficiency of the evidence supporting these convictions.

---

[24]     Florence Bikundi also complains that the jury found her "guilty without specifying which object of the conspiracy there was a unanimous agreement." Def. FB's R. 29 Mem. at 17. She is mistaken. The verdict form completed by the jury shows that, on Count Fifteen, the jury twice answered "YES" to unanimously finding that an object of the money laundering conspiracy was to violate 18 U.S.C. § 1956(a)(1)(B)(i) and to violate § 1957. Verdict Form at 2.

The defendants' conviction of the money laundering conspiracy charged in Count Fifteen required proof, first, that Florence and Michael Bikundi agreed to try to accomplish an unlawful plan to conceal and disguise the nature, location, source, ownership and control of the proceeds of health care fraud, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or to engage in monetary transactions in criminally derived property, which had a value greater than $10,000 and was derived from health care fraud, in violation of 18 U.S.C. §1957; and, second, that each defendant intentionally joined in that agreement. *See* Jury Instructions at 21–22, 24.

The remaining substantive money laundering convictions are based on seven separate transactions involving (1) three checks, dated November 7, 2012, March 18, 2013 and April 29, 2013, transferring a total of $1,300,000 from two Global bank accounts to two Tri-Continental bank accounts, in Counts Sixteen, Seventeen and Eighteen; and (2) three checks, dated June 7, 2013, June 21, 2013, and August 2, 2013, and a wire transaction on May 10, 2013, transferring a total of $1,370,000 from a Global bank account to a CFC bank account, in Counts Nineteen through Twenty-Two. *See id.* at 25–26.

Contrary to the defendants' contention, the requisite agreement between the defendants for their money laundering conspiracy conviction was supported by sufficient evidence. The proof at trial showed that both defendants were fully aware of fraudulent timesheets submitted by Global for reimbursement by D.C. Medicaid and that Global's patient and employee files were replete with falsified documents. In short, both defendants knew that the monies received by Global from D.C. Medicaid were obtained by fraud. The proof at trial further showed that in the handling of those fraudulently-obtained proceeds, these two defendants worked in lockstep to (1) manage the Global operations, including reviewing and approving timesheets, issuing checks, supervising employees, and other aspects of the business, *see supra* Parts I.C–E; (2) control

Global's bank accounts, for which both defendants were signatories over the lifespan of the accounts, Gov't Ex. 184; (3) control bank accounts for CFC and Tri-Continental over the lifespan of the accounts, *see supra* Part I.F; and (3) transfer funds from Global accounts to non-Global accounts that one or both of the defendants controlled, *see id*. This jointly undertaken activity provided sufficient evidence of the defendants' agreement to work together for the same illegal goals for a rational jury to conclude, beyond a reasonable doubt, that they had an agreement, satisfying this element for a conviction on Count Fifteen.

The crux of the defendants' challenge to the money laundering convictions, including for money laundering conspiracy, is that the "government clearly failed to prove . . . that Mrs. Bikundi attempted to 'conceal or disguise' the alleged fraudulently obtained funds." Def. FB's R. 29 Mem. at 18; Def. MB's R. 33 Mot. at 44 ("There was no evidence of concealment."). Indeed, to sustain a conviction under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove, beyond a reasonable doubt, that the defendant knew "that the transaction [was] designed in whole or in part — (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). The defendants criticize the proof on this "design to conceal or disguise" element because of the apparent ease with which the D.C. Medicaid funds were traced by law enforcement and the defendants' use of their own names on the accounts to which the funds were transferred.[25] On

---

[25] Specifically, the defendants point out that "Special Agent Hinson with no prior experience before this case as a money laundering investigator testified that the transactions were easily traceable to Mrs. Bikundi." Def. FB's R. 29 Mem. at 18; *see also* Def. MB's R. 33 Mot. at 41 (noting that although Hinson "was not a C.P.A., never performed services" or was trained as a "professional bookkeeper" and had only "worked on two money laundering cases during her career," she "had no difficulty finding the accounts and some of the accounts were opened prior to 2009"); *id*. at 44 (noting that "[t]here was no evidence of concealment" since the "United States had no difficulty either locating or seizing the funds"). The funds were easily traceable due to the fact that the "deposits and withdrawals to various financial accounts" were "all done openly" without the "use [of] false names, third parties, or any particularly complicated financial maneuvers, which are usual hallmarks of an intent to conceal." Def. FB's R. 29 Mem. at 19–20; *see* Def. MB's R. 33 Mot. at 44 ("All of the recovered funds were in accounts controlled either by Florence or Michael Bikundi, or both."). In particular, the checks transferring funds from Global to Tri-

this essential element for money laundering, the Court opined at the close of the government's

case-in-chief that the evidence regarding the defendants' use of "many different bank accounts to

conceal the source of the illegally obtained funds" was "slim."  Tr. (Nov. 4, 2015 PM) at 17,

ECF No. 345.[26]  Yet, upon close review of the applicable case law and the trial evidence the

Court "cannot say it is more likely than not that no reasonable juror would have found the

requisite concealment in transactions occurring after proceeds existed."  *United States v. Baxter*,

761 F.3d 17, 32 (D.C. Cir. 2014) (affirming money laundering conviction); *see also Pasha*, 797

F.3d at 1135 n.9 (affirming convictions over defendants' challenge to the sufficiency of evidence

since, even where "the evidence was not overwhelming," the "standard for such challenges is

very high").

      The government concedes, as it must, that sustaining the money laundering convictions

requires proof, beyond a reasonable doubt, that the defendants handled the fraud proceeds with

the purpose, in whole or in part, to conceal or disguise the proceeds' nature, location, source,

ownership, or control.  Gov't Opp'n FB's R. 29 Mot. at 42.  The Supreme Court made this point

plainly in *Cuellar v. United States*, 553 U.S. 550, 561–65 (2008), in construing a parallel

provision of the same money laundering statute under which the defendants were convicted and

focusing on the meaning of the language common to both provisions, namely:  "is designed in

whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or

the control of the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(2)(B)(i); *accord*

---

Continental and CFC that are at issue in the substantive money laundering counts Sixteen through Twenty-Two "do not disguise the source or the recipient" and, consequently, show no effort to conceal or disguise the funds.  Def. FB's R. 29 Mem. at 20; *see* Def. MB's R. 33 Mot. at 44 ("Funds deposited into accounts in the names of CFC Corporation and Tri-Continental were deposited without any attempt whatsoever to conceal the origin of the funds.").

[26]     As noted, *supra* at nn. 10–12, the Court reserved decision on the defendants' motions for acquittal on all of the money laundering charges, including those for which the defendants were ultimately acquitted by the jury.  *See* Tr. (Nov. 4, 2015 PM) at 18, ECF No. 345.

§ 1956(a)(1)(B)(i).  In that case, the Court reversed the money laundering conviction of a defendant, who was caught driving in the direction of the Mexican border in a Volkswagen Beetle with approximately $81,000 in cash that was secreted in a concealed compartment built into the car's rear floorboard, which was then covered in animal hair in an apparent "attempt to mask the smell of marijuana."  553 U.S. at 554.  "[G]uided by the words of the operative statutory provision," *id*. at 558, the Court concluded that "merely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money," *id*. at 563.  Showing that the defendant "engaged in extensive efforts to conceal the funds *en route* to Mexico," *id.* at 568, and to "*facilitate* the transportation," *id*. at 567 (emphasis in original), falls short of the requisite proof that the funds were moved in this manner with the design or purpose of concealing a listed attribute of the funds.  The Court stressed that "*how* one moves the money is distinct from *why* one moves the money.  Evidence of the former, standing alone, is not sufficient to prove the latter."  *Id*. at 566 (emphasis in original). Notably, in *Cuellar*, "the Government failed to introduce any evidence that the reason drug smugglers move money to Mexico is to conceal or disguise a listed attribute of the funds."  *Id*. at 567.

The year before the *Cuellar* decision, the D.C. Circuit had occasion in *United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007), to address the sufficiency of the evidence to prove the same "essential element of the money laundering charge" that the defendants "attempted to 'conceal or disguise' the fraudulently obtained funds."  510 F.3d at 321–22.  The defendants in *Adefehinti* had a bank fraud scheme to buy cheap properties using fake identities and then "flip" them by selling them to each other with artificially high prices, using fraudulently obtained bank loans to fund the purchase.  *Id*. at 321.  In one such transaction underlying their money

laundering conviction, one defendant deposited a settlement check payable to and endorsed by the "fictional seller" to his company's account, from which the funds were distributed among the defendants. *Id.* at 322. The D.C. Circuit observed that "the necessary intent to conceal requires 'something more' than the mere transfer of unlawfully obtained funds, though that 'something more' is hard to articulate." *Id.* (quoting *United States v. Esterman,* 324 F.3d 565, 572 (7th Cir. 2003)). The Court reversed the money laundering conviction, finding that the transaction "involve[d] nothing but the initial crime," with the fraud proceeds "either cashed" or deposited "directly into accounts in the name of defendants or their associates without passing through any other person's account" and without any evidence that the defendants "took steps to disguise or conceal the source or destination of the funds." *Id.* at 323 (internal quotations and citations omitted). Rather than engage in efforts to conceal the listed attributes of the funds, the Court noted that the "money trail" was easily followed, law enforcement had no difficulty "doing so" and "[a]ll the transactions conspicuously lack the 'convoluted' character associated with money laundering." *Id.* at 323–24.

Similarly, in *United States v. Law*, 528 F.3d 888 (D.C. Cir. 2008), the D.C. Circuit reversed the money laundering conviction of a defendant, who made monthly mortgage payments for, and collected the tenants' rents from, the building, where he resided and operated his illegal narcotics business, even though he was not the actual owner of the building and made the mortgage payments in the actual owner's name. *Id.* at 893. The Court explained that "the evidence was insufficient to show the mortgage payments were designed to conceal the source of the funds rather than to profit[] from the excess rental income or[ to] maintain[] the premises to further drug trafficking," discounting the fact that the defendant paid the mortgage in the owner's name rather than his own. *Id.* at 896–97 (internal quotations omitted; alterations in original).

The defendants cite to the reversal of the money laundering convictions in *Cuellar*, *Adefehinti* and *Law* to highlight that, as in those cases, the requisite "evidence of a design to conceal" is lacking when "an observer would easily discern the money trail . . . [and] all the transactions conspicuously lack the convoluted character associated with money laundering." Def. FB's R. 29 Mem. at 19–22; Def. MB's R. 33 Mot. at 42. Instead, the traced money trail shows only the "trivial motivation" of the defendants' "acquiring of assets," and this activity of merely spending or disposing of illicitly obtained funds does not constitute money laundering. Def. FB's R. 29 Mem. at 21–22 (citing *Adefehinti* and *Law*). Unlike the circumstances in *Cuellar*, however, where the government presented no evidence about the possible purpose to conceal a statutory listed attribute of funds hidden in a car's concealed compartment, *see* 553 U.S. at 567, the government in this case presented Agent Hinson's testimony, albeit limited, about funneling D.C. Medicaid funds through bank accounts of the "completely unrelated" business companies to conceal the source of the fraud proceeds, *see* Tr. (Nov. 4, 2015 AM) at 78–79 (Hinson), ECF No. 344.

Likewise, in *Adefehinti*, the financial transactions underlying the money laundering conviction were essentially the same transaction underlying the bank fraud and, thus, any efforts to conceal the defendants' involvement in the transaction was understood as designed to conceal the fraud itself, not necessarily any statutory listed attribute of the fraud proceeds. *See* 510 F. 3d at 324 ("Having carried out a fraud of which concealment was an integral part, defendants cannot be charged with the same concealment a second time, as if it were the sort of independent manipulation of the proceeds required for money laundering."). Moreover, in *Adefehinti*, the fraud proceeds were easily traced from the initial check deposited directly into a defendant's company account and then distributed directly to a co-defendant's personal account, leading the

D.C. Circuit to conclude that "[t]here is no evidence that Adefehinti or [co-defendant] took steps to disguise or conceal the source or destination of the funds." *Id.* at 323. By contrast, and as discussed more fully *infra* in Part III.B.2, evidence of the transactions supporting the money laundering convictions here are wholly separate from the health care fraud scheme evidence.

Moreover, the defendants' fund transfers effectively moved fraudulently obtained D.C. Medicaid money out of Global's accounts to shell companies that did no business, or otherwise had no relationship, with Global, except in terms of the defendants' common ownership and control of these corporate entities.[27] Although the defendants attempt to minimize the import of these transfers as merely the spending of fraud proceeds, *see* Def. FB's R. 29 Mem. at 21–22, a reasonable jury could conclude from review of the timing and amounts of the fund transfers from D.C. Medicaid to Global accounts and then to CFC and Tri-Continental accounts and the personal uses of the funds from the latter accounts that these transactions were designed, as Agent Hinson testified, to conceal the source of the fraud proceeds. *See* Tr. (Nov. 4, 2015 AM) at 78–79 (Hinson), ECF No. 344.

Indeed, the defendants' financial transactions reflect indicia of money laundering that the D.C. Circuit called "instructive," including "the existence of more than one transaction, coupled with either direct evidence of intent to conceal or sufficiently complex transactions that such an

---

[27]     Michael Bikundi tries to argue that CFC and Tri-Continental were not sham or shell companies but that CFC "was a legitimate business entity," Tri-Continental "was established as an import-export entity," and "[t]he fact that neither business was profitable is irrelevant." Def. MB's R. 33 Mot. at 44. Any factual dispute over whether these two companies were a sham used by the defendants to launder fraud proceeds was resolved by the jury against the defendants, and that conclusion was well supported by the evidence that (1) neither company appeared to generate any income, Tr. (Nov. 4, 2015 AM) at 78–79 (Hinson), ECF No. 344; (2) millions of dollars from Global were transferred into the bank accounts of these two companies, which were in completely different lines of business from Global and transacted no business with Global, *id.*; (3) Carlson Igwacho's name was forged as the registered agent on CFC's Articles of Incorporation, Tr. (Oct. 28, 2015 PM) at 68–70 (Carlson Igwacho), ECF No. 335; Gov't Ex. 249; (4) Michael Bikundi was not supposed to have a role in CFC, but was a co-signatory with Florence Bikundi on CFC's bank account, Tr. (Oct. 28, 2015 PM) at 71 (Carlson Igwacho), ECF No. 335; Tr. (Oct. 29, 2015 AM) at 5 (Carlson Igwacho), ECF No. 332; Gov't Ex. 250; and (5) CFC was supposed to be a real estate development company but only a miniscule number of checks and money were spent from CFC's accounts related to real estate, Tr. (Nov. 3, 2015 AM) at 143–44 (Hinson), ECF No. 343.

intent could be inferred;" "funneling illegal funds through various fictitious business accounts" and "highly unusual transactions involving cashier's checks, third party deposits, and trust accounts used to disguise source of funds." *Adefehinti*, 510 F.3d at 322–23 (internal quotations and citations omitted).  Certainly, the government presented evidence of "tens of thousands of transactions," Tr. (Nov. 3, 2015 AM) at 130 (Hinson), ECF No. 343, a number of which were funneled through multiple accounts of sham companies before reaching the defendants' personal accounts, along with the use of 84 cashier's checks totaling over $7,700,000 that were purchased with funds from some accounts controlled by the defendants and deposited into other account they controlled, which could reasonably be viewed as disguising the source of the funds, *see* Tr. (Nov. 3, 2015 PM) at 27 (Hinson), ECF No. 342; Tr. (Oct. 29, 2015 PM) at 27 (Levy), ECF No. 334; Gov't Ex. 154.  This cumulative evidence amounts to more than "the mere transfer of unlawfully obtained funds," *Adefehinti*, 510 F.3d at 322, and when viewed in the light most favorable to the government, *see United States v. Mellen*, 393 F.3d 175, 180 (D.C. Cir. 2004), suffices to support the money laundering convictions, *see Baxter,* 761 F.3d at 32 (affirming money laundering conviction where defendant transferred fraudulently obtained funds "to a front company . . . and to a frontman" before the proceeds were transferred to a co-conspirator's personal account for payment of personal expenses since "[a] reasonable juror could conclude that those transactions involved unlawful proceeds and that those transfers by the fronts were designed  to conceal the money's illicit origins"); *United States v. Baldwin*, 563 F.3d 490, 490–91 (D.C. Cir. 2009) (affirming defendant's convictions for, *inter alia*, health care fraud, 18 U.S.C. § 1347, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h), where defendant and co-conspirators created sham business entities to submit fraudulent invoices for

reimbursement of health care benefits that were never furnished and "then created numerous bank accounts to receive the payments and launder the money").

Accordingly, the defendants' motions for acquittal or for a new trial on their money laundering convictions due to insufficient evidence are denied.

### 2.     *Proof Of Health Care Fraud And Money Laundering Were Not Improperly Conflated*

The defendants also contend that proof of the health care fraud and money laundering charges "should not be conflated" but that such conflation occurred here because the activity underlying both sets of charges "occurred during the same time period and . . . was part of the same transaction or set of transactions." Def. FB's R. 33 Mem. at 14–15; *see* Def. MB's R. 33 Mot. at 46 ("The health care fraud and the money laundering conspiracies were not distinct from one another."). This contention is unavailing.

The D.C. Circuit has instructed, consistent with the consensus of other circuit courts, that the charged money laundering offense must be "distinct from the crimes that produced the funds that were laundered." *Baxter*, 761 F.3d at 30; *United States v. Hall*, 613 F.3d 249, 254–55 (D.C. Cir. 2010) ("[T]he offense of money laundering must be separate and distinct from the underlying offense that generated the money to be laundered."); *Adefehinti*, 510 F.3d at 324 ("[The] transaction or transactions that created the criminally-derived proceeds must be distinct from the money-laundering transaction." (quoting *United States v. Seward,* 272 F.3d 831, 836 (7th Cir. 2001))); s*ee also United States v. Castellini*, 392 F.3d 35, 47 (1st Cir. 2004) ("Money laundering requires there to be proceeds of illegal activity and cannot be the same as the illegal activity which produces the proceeds."); *United States v. Butler*, 211 F.3d 826, 830 (4th Cir. 2000) ("[T]he laundering of funds cannot occur in the same transaction through which those funds first become tainted by the crime."); *United States v. Mankarious*, 151 F.3d 694, 706

(7th Cir. 1998) ("[A] money laundering transaction . . . must be separate from any transaction necessary for the predicate offense to generate proceeds."); *United States v. Edgmon*, 952 F.2d 1206, 1213 (10th Cir. 1991) ("Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered."). While the defendants are on solid legal ground in stating this requirement for a valid money laundering conviction, they falter in their application of this legal principle to the trial evidence.

In support of their challenge, the defendants note, first, that "[t]he funds involved in the money laundering counts were the same funds that were received from D.C. Medicaid as a result of the health care fraud." Def. FB's R. 33 Mem. at 15; *see* Def. MB's R. 33 Mot. at 46. The fact that the health care fraud produced the illegal proceeds, which were then used in money laundering transactions, is unremarkable. Violation of the federal money laundering statute, 18 U.S.C. § 1956, requires "that the money being laundered must in some way be associated with 'unlawful activity.'" *Hourani v. Mirtchev*, 796 F.3d 1, 10 (D.C. Cir. 2015) (citing 18 U.S.C. § 1956(a)(1), which requires that a covered transaction "involves the proceeds of specified unlawful activity"). Thus, the defendants' focus on the fact that both the health care fraud and money laundering counts involved proof of the same fraudulently obtained money from D.C. Medicaid is too myopic and ignores the additional proof underlying the money laundering counts of how the defendants handled their ill-gotten gains.

The defendants next highlight that "the activities and transfers of money in and out of bank accounts occurred contemporaneously with each other and involved the same facts as alleged in the health care counts and money laundering counts." Def. FB's R. 33 Mem. at 15; *see* Def. MB's R. 33 Mot. at 46 ("[B]oth health care fraud and money laundering were taking

place contemporaneously. . . . They were the same event."). The government does not dispute that the defendants' health care fraud and money laundering activities occurred over the same time period and involved the same fraudulently obtained funds from D.C. Medicaid. Gov't Opp'n FB's R. 33 Mot. at 17. Yet, as the government succinctly and correctly puts it: this is "not a basis to vacate the defendant's conviction." *Id.* For money laundering, "it does not matter when all the acts constituting the predicate offense take place. It matters only that the predicate offense has produced proceeds in transactions distinct from those transactions allegedly constituting money laundering." *Mankarious*, 151 F.3d at 706.

The evidence underlying the money laundering convictions supplemented the documentary and testimonial evidence supporting the health care fraud charges by showing "the sort of independent manipulation of the proceeds required for money laundering." *Adefehinti*, 510 F.3d at 324. The health care fraud convictions rested on all of the evidence leading up to Global's receipt of over $80,000,000 from D.C. Medicaid from 2009 until February 2014. At the point of receipt of the D.C. Medicaid funds, the health care fraud scheme was successfully completed. By contrast, the money laundering convictions rested on the documentary evidence and testimony of Agent Hinson regarding what Florence and Michael Bikundi then did with the fraud proceeds after those funds were deposited into Global's Intake Accounts. The defendants' activity in fraudulently obtaining the money was not conflated with their conduct in "concealing it" by engaging in entirely different transactions that resulted in the distribution of the funds across over one hundred different accounts and financial instruments. These different actions constitute "two different activities which rarely are one and the same." *Adefehinti*, 510 F.3d at 324. Since the money laundering offenses were separate and distinct from the health care

offenses that generated the laundered proceeds, the defendants' contention otherwise fails and their money laundering convictions will not be disturbed on this ground.

### 3.   *Verdicts Are Not Inconsistent*

Finally, Florence Bikundi urges vacatur of her conviction on Count Fifteen because no reasonable juror would "be able to find beyond a reasonable doubt that Mrs. Bikundi is guilty of conspiracy to commit money laundering, including a violation of 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity), but then" find her "not guilty of the underlying offense as shown in Counts 23-25." Def. FB's R. 29 Mem. at 17. Even if the defendant correctly characterized the verdict on Count Fifteen as inconsistent with the acquittals on Counts Twenty-Three through Twenty-Five, "a factually inconsistent verdict," is not, "by itself, grounds for reversal," since that "may well be nothing more than 'a demonstration of the jury's leniency.'" *United States v. Brown*, 504 F. 3d 99, 102-103 (D.C. Cir. 2007) (*quoting United States v. Powell*, 469 U.S. 57, 61 (1984)); *see also Pitt v. District of Columbia*, 491 F.3d 494, 506 (D.C. Cir. 2007) ("In both the civil and criminal contexts, courts have held that inconsistency alone is not a sufficient basis for setting aside a jury verdict."); *United States v. Dykes*, 406 F.3d 717, 722–23 (D.C. Cir. 2005) (holding that a "criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count" (citations omitted)); *United States v. Lewis*, 716 F.2d 16, 21 (D.C. Cir. 1983) ("[C]ase law establishes that inconsistency in jury verdicts on multiple counts in a single indictment is not sufficient to overturn an otherwise valid conviction.").

The Supreme Court has explained that "[e]ach count in an indictment is regarded as if it was a separate indictment," *Powell*, 469 U.S. at 62, and is therefore evaluated separately.

Protection against "jury irrationality or error," which may be reflected in an inconsistent verdict is afforded "by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts" and no "further safeguards against jury irrationality are necessary." *Id*. at 67. Thus, the defendant's attack on her conviction in Count Fifteen may be readily disposed of on this basis alone, namely, the Court's finding, *supra* in Part III.B.1, that the money laundering convictions are supported by sufficient evidence.

In any event, the defendant's view of the verdicts as "inconsistent" is incorrect. The jury unanimously found, on Count Fifteen, that the defendants conspired to violate two different money laundering statutes, even though they also concluded that the defendants were not guilty of committing the substantive offense under one of those same statutes. The conspiracy charge required the jury to conclude, unanimously, only that the defendant intentionally joined an agreement to accomplish an unlawful purpose, and there was no necessity of finding that the defendant actually committed the separate and distinct unlawful act that was the goal of the illegal agreement.[28] Indeed, the law is well settled that a criminal defendant may not attack his conviction on a compound offense solely because of a perceived inconsistency with the jury's acquittal of the predicate offense. Over thirty years ago, in *Powell*, the Supreme Court refused to vacate a verdict convicting a defendant of using the telephone in "committing and in causing and facilitating" certain narcotics felonies, which the same jury had acquitted her of committing. 469 U.S. at 60, 69. Noting "the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity," the Court counseled "that the best course to take is simply to insulate jury verdicts from review on this ground." *Id*. at 68–69; *see also United States v. Laing*, 889

---

[28] The government suggests that "the jury may have acquitted the defendant on the substantive section 1957 counts because it found that the Government failed to establish one of the elements – such as that at least $10,000 of the property involved in the transaction was obtained or derived from a crime." Gov't Opp'n Def. FB's R. 29 Mot. at 35 (citing Jury Instructions at 29–30).

F.2d 281, 288–89 (D.C. Cir. 1989) (rejecting claim of inconsistent verdicts where defendant was convicted of offense of carrying a firearm in relation to a drug trafficking offense but acquitted of underlying drug trafficking offense).

For all of these reasons, no inconsistent verdict claim by the defendants warrants a new trial or vacatur of their convictions for money laundering conspiracy in Count Fifteen.

## C.   DEFENDANTS WERE PROPERLY JOINED FOR TRIAL

Defendant Michael Bikundi seeks a new and separate trial from Florence Bikundi because of what he characterizes as the "overwhelming" and "striking . . . enormity" of the "disparity of evidence between Mr. and Mrs. Bikundi" and "[t]he attendant prejudice to Michael Bikundi" from the "spillover effect."  Def. MB's R. 33 Mot. at 47, 49.[29]  As this Court has previously concluded both before and during trial, Michael Bikundi was properly joined for trial with his spouse and ample evidence of his guilt was presented.  Consequently, as explained in more detail below, Michael Bikundi is not entitled to any new and separate trial.

### 1.   *Legal Standard Applicable To Review Of Severance Motions*

Federal Rule of Criminal Procedure 8 permits joinder in the same indictment of two or more offenses that "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan," FED. R. CRIM. P. 8(a), as well as joinder of two or more defendants if they are alleged to have participated in the "same series of acts or transactions constituting an offense or offenses," whether the defendants are charged in the same counts "together or separately" or "not charged

---

[29]   Michael Bikundi made motions for a severance prior to and during the trial on the same grounds and these motions were denied.  *See* Michael Bikundi's First Mot. Sever, ECF No. 155; Tr. (Oct. 28, 2015 AM) at 89–92, ECF No. 329; Tr. (Nov. 3, 2015 AM) at 80–81, ECF No. 343; Tr. (Nov. 10, 2015 AM) at 75, ECF No. 377; Minute Order (July 31, 2015); Minute Entry (Nov. 10, 2015).

in each count," *id.* 8(b).  The D.C. Circuit has repeatedly instructed that "'Rule 8 has generally been construed liberally in favor of joinder,'" while at the same time joinder "cannot be stretched to cover offenses . . . which are discrete and dissimilar and which do not constitute parts of a common scheme or plan."  *Gooch*, 665 F.3d at 1326 (quoting *United States v. Richardson*, 161 F.3d 728, 733 (D.C. Cir. 1998)).  The Supreme Court has recognized that joint trials "play a vital role in the criminal justice system," noting the particular policy reasons underscoring the benefits of joinder to "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotations and citations omitted); *see also United States v. Long*, 905 F.2d 1572, 1580–81 (D.C. Cir. 1990) (stating that joinder promotes the judicial system's "strong and legitimate interest in efficient and expeditious proceedings"); *United States v. Robinson*, 432 F.2d 1348, 1351 (D.C. Cir. 1970) ( "[Joinder] expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.").  Indeed, there is a "presumption in favor of joinder," *McGill*, 2016 U.S. App. LEXIS 3734, at *176, that "is especially strong where the respective charges require presentation of much of the same evidence, testimony of the same witnesses and involve defendants who are charged, *inter alia*, with participating in the same illegal acts," *id.* (quoting *United States v. Richardson*, 167 F.3d 621, 624 (D.C. Cir. 1999)) (ellipsis omitted).

Nevertheless, Federal Rule of Criminal Procedure 14(a) permits a court to order "separate trials of counts" or to "sever the defendants' trials," "if joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government."  FED. R. CRIM. P. 14(a).

While the standard of "appears to prejudice a defendant" set out in Rule 14(a) for consideration of severance, does not, on its face, provide an onerous test, the discretion afforded to district courts must be exercised with appreciation of the policy reasons favoring joinder. Thus, the D.C. Circuit has made clear that even if prejudice is shown, this "does not result in an automatic grant of the motion." *Gooch*, 665 F.3d at 1326.

Instead, the D.C. Circuit has instructed that for severance to be proper "[t]here must be 'a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Bostick*, 791 F.3d at 152–53 (affirming a district court's denial of a defendant's motion for a severed trial) (quoting *Zafiro*, 506 U.S. at 539); *see also United States v. Glover*, 681 F.3d 411, 417 (D.C. Cir. 2012) (affirming district court's denial of defense motion to sever trial citing same standard).

## 2.    *Substantial And Independent Evidence Of Michael Bikundi's Guilt Was Presented At Trial*

As support for his motion for a new trial, Michael Bikundi points to the disparity of evidence against him in comparison to his wife due, first, to the separate charges, in Counts Thirteen and Fourteen, against Florence Bikundi for health care fraud and making false statements stemming from her nursing license revocations and resulting exclusion from the participation in all federal health care programs, Def. MB's R. 33 Mot. at 47; and, second, to other evidence presented at trial involving only his wife, *id*. at 47–49.

At the outset, a disparity in the volume of evidence presented at trial among co-defendants simply does not suffice to warrant a severance, even when one defendant assumes the role of "second prosecutor" and accuses another of committing the charged crime. *See Zafiro*, 506 U.S. at 544 (Stevens, J., concurring); *United States v. Glover,* 736 F.3d 509, 516 (D.C. Cir. 2013). On the contrary, "when there is 'substantial and independent evidence of each

[defendant's] significant involvement in the conspiracy,' severance is not required." *Moore*, 651 F.3d at 96 (quoting *Tarantino*, 846 F.2d at 1399); *see also United States v. Slade*, 627 F.2d 293, 310 (D.C. Cir. 1980) (finding severance not required despite disparity in evidence because evidence against defendant was "independent and substantial"). Thus, the defendant must point to "a serious risk" of such prejudice from certain evidence presented at trial only against Florence Bikundi that may have so colored the jury's view as to "prevent the jury from making a reliable judgment about [his] guilt." *Bostick*, 791 F.3d at 152–53.

First, to the extent that Michael Bikundi attributes "immense prejudice" to the evidence regarding his wife's exclusion from federal health care programs, Def. MB's R. 33 Mot. at 47, he is wrong.[30] His briefing describes the basis for his wife's exclusion as "related to the licensure fraud," *id.*, which is factually correct but those underlying facts were never presented to the jury nor was the term "licensure fraud" ever used before the jury. On the contrary, as summarized *supra* in Part I.B, three out of the total of 40 trial witnesses, testified about the exclusion process and communications with Florence Bikundi regarding her exclusion. These three witnesses from the Virginia Board of Nursing and the United States HHS-OIG did not provide any information

---

[30]     Neither defendant makes any argument in post-trial briefing that Counts Thirteen and Fourteen, which charge only Florence Bikundi with concealing her exclusion from participation in federal health care programs, failed to meet the requirement for joinder, under Rule 8(a), as "connected with or constitute[ing] parts of a common scheme or plan." FED. R. CRIM. P. 8(a). Indeed, these two counts are predicated on Florence Bikundi's knowledge of her exclusion, explain steps that she took to conceal this fact in obtaining licensing for and operating Global, and are relevant to showing how she facilitated the scheme to defraud the D.C. Medicaid program. In these circumstances, where offenses are of different types but connected to facilitate or contribute to another criminal act, the charges are properly tried together in a single trial. *See, e.g.*, *Blunt v. United States*, 404 F.2d 1283, 1288 (D.C. Cir. 1968) (concluding that severance of robbery charge was not required, even though of "a wholly different nature from the forgery and uttering charges," because "the theft of the checkbook used hours later to commit the fraud and forgeries is 'connected together' with these latter offenses"); *United States. v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (denying severance of different charges since "all of the events concerning the money laundering activity were admissible to demonstrate the defendant's intent to defraud."); *United States v. Adeosun*, 49 F. Supp. 2d 7, 13 (D.D.C. 1999) (denying defendant's motion to sever money laundering count from bank fraud and other counts of indictment since "it is clear on the face of the indictment that all of these offenses are 'of the same or similar character or are based on the same act or transactions . . . or constituting parts of a common scheme or plan'").

about the basis for that exclusion, let alone mention that Florence Bikundi had engaged in "licensure fraud." *See* Tr. (Oct. 26, 2015 PM) at 4–16 (Durrett), ECF No. 327; *id*. at 17–50 (Hoffman); Tr. (Nov. 4, 2015 AM) at 125–39 (Gillin), ECF No. 344. The masking of the underlying reasons for Florence Bikundi's exclusion reduced any risk of undue prejudice to Michael Bikundi from these two charges against his wife.

Moreover, the two charges in Counts Thirteen and Fourteen related to Florence Bikundi's exclusion are similar in nature and no more prejudicial than the serious felony charges of health care fraud and money laundering that the jury considered against Michael Bikundi. By contrast, where defendants have urged severance of their trials from co-defendants who are facing far more serious charges, including those punishable by death, the D.C. Circuit has affirmed the denial of severance. For example, in *Moore*, two defendants sought severance of their trials because co-defendants were charged with more numerous *and* serious death penalty eligible crimes. 651 F.3d at 94–95. The defendants argued that evidence of these more serious charges presented against their co-defendants "could have a 'spillover' effect, akin to guilt-by-association, that would prejudice the jury against them." *Id.* at 95. The D.C. Circuit concluded, however, that denial of the severance motion was no abuse of discretion. *Id.* at 96.

Finally, any prejudice that may have been generated by the exclusion evidence against Florence Bikundi was addressed in the instructions given to the jury before the presentation of evidence and, again, in final instructions that the jury must consider the evidence against each defendant separately. Tr. (Oct. 15, 2015 AM) at 24 (Preliminary Instructions), ECF No. 347; Jury Instructions at 7–8. Such instructions have been held by the D.C. Circuit to afford adequate protection against any prejudicial spillover effect from evidence and charges brought against only one defendant and not the co-defendants. *See McGill*, 2016 U.S. App. LEXIS, at *179

(affirming denial of severance where court gave instructions "directing the jury to undertake an individualized consideration of the guilt of each defendant"); *Gooch*, 665 F.3d at 1336–37 (citing *Zafiro*, 506 U.S. at 540–41); *Moore*, 651 F.3d at 95–96; *United States v. Carson*, 455 F.3d 336, 374–75 (D.C. Cir. 2006) (per curiam); *United States v. Spriggs*, 102 F.3d 1245, 1256 (D.C. Cir. 1996); *Slade*, 627 F.2d at 309–10.  Thus, the fact that certain evidence was admitted at trial solely against Florence Bikundi in connection with her exclusion from participation in federal health care programs does not warrant a new and separate trial for Michael Bikundi.

Second, Michael Bikundi contends that certain evidence warrants a new, severed trial, citing the 2009 Medicaid Provider Agreement for Global, which "Michael Bikundi was never alleged to have been involved in negotiating[,] . . . to have signed[,] . . . to have known anything about . . . [and] is not alleged to have forged anyone's signature on the agreement."  Def. MB's R. 33 Mot. at 48.[31]  According to Michael Bikundi, testimony regarding the forged signatures on this agreement "was powerfully prejudicial and incriminating."  *Id.*  This single, cherry-picked government exhibit out of a total of almost three hundred government exhibits introduced at trial falls far short of demonstrating the level of undue prejudice that would warrant a new trial.  Numerous other documents presented at trial were proved to be fraudulent due to forged signatures and/or fabricated or altered information, including POCs, timesheets, background checks for Global employees, as well as their health certificates and training certificates, and Global board of director meeting minutes.  *See supra* Part I.C–E.  No evidence may have been

---

[31]    Michael Bikundi also mentions other evidence, including that he "was not alleged to have any contact with Carolyn Baldwin," "merely drove Florence Bikundi to Ms. White's home and did not personally receive the plans of care," "did not issue blank CPR's, was not involved in the alteration of timesheets and was locked in his office when surveys were conducted."  Def. MB's R. 33 Mot. at 48.  While this abbreviated summary of evidence may be exculpatory, when viewed in the context of other evidence presented about Michael Bikundi's actions at Global, the jury determined that his guilt was established beyond a reasonable doubt, and the Court has concluded that this evidence is sufficient to sustain the jury verdict.  *See supra* Part III.A.2, B.

presented of Michael Bikundi's direct involvement in the creation or submission of Global's 2009 Medicaid Provider Agreement but ample evidence was submitted about his involvement in managing this company in a manner that facilitated the fraudulent payment of millions of dollars by the D.C. Medicaid program.

Accordingly, Michael Bikundi's motion for a new trial due to the "disparity and attendant prejudice" from certain charges and evidence against Florence Bikundi is denied.

### D.    SELECTIVE PROSECUTION

In a last gasp effort to obtain a new trial and judgmental of acquittal, Michael Bikundi accuses the government, for the first time in this criminal proceeding, of selective prosecution. *See* Def. MB's R. 33 Mot. at 50–54.  Citing testimony of Donald Shearer, from DHCA, that three health care agencies other than Global were shut down upon execution of search warrants of those companies' premises, but that those other companies were not prosecuted, Tr. (Nov. 4, 2015 AM) at 104–05, 116–17 (Shearer), ECF No. 344, Michael Bikundi claims that he was "singl[ed] out," Def. MB's R. 33 Mot. at 50, since "other agents of other home health agencies who were also shut down for violations were not prosecuted," *id.* at 53.  This claim is not only untimely but also utterly fails to meet the requisite standard to undo the jury verdict and bar further process against him.

 At the outset, any defense or objection raising "a defect in instituting the prosecution, including . . . selective or vindictive prosecution," "must be raised by pretrial motion if the basis for the motion is then reasonably available . . . ."  FED. R. CRIM. P. 12(b)(3)(A)(iv).  The defendants did not raise this claim at any time before or during trial, despite extensive pretrial motion practice.  *See supra* n.3.  Although the government does not raise a timeliness objection to the defendant's claim of selective prosecution, *see* Gov't Opp'n MB's R. 33 Mot. at 14, Rule

12 is explicit that consideration of this type of challenge to a prosecution must be made before

trial and, if not timely made, the court may consider the defense or objection only "if the party

shows good cause." FED. R. CRIM. P. 12(c)(3). Michael Bikundi has made no effort to show any

reason, let alone good cause, for his belated selective prosecution claim. For this reason alone,

his selective prosecution claim may be rejected. *See United States v. Choi*, 818 F. Supp. 2d 79,

89–90 (D.D.C. 2011) (holding that "[b]ecause respondent did not submit a pre-trial motion to

dismiss on the basis of these [selective prosecution] claims, he generally could not raise them

following the commencement of trial"); *accord Jarkesy v. SEC*, 803 F.3d 9, 26 (D.C. Cir. 2015)

(noting that a selective prosecution claim is usually raised and addressed "pretrial").

Even if the merits were considered, this selective prosecution claim is insufficiently

supported. A selective prosecution claim "that the prosecutor has brought the charge for reasons

forbidden by the Constitution" "is not a defense on the merits to the criminal charge itself,"

*Jarkesy*, 803 F.3d at 26 (quoting *United States v. Armstrong*, 517 U.S. 456, 463, (1996)), or a

"refutation of the government's case in chief," but rather operates as "an independent

constitutional bar to the prosecution," *United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir.

2000). To prevail on such a claim, the defendant must prove that he is "part of a protected class

under the Equal Protection Clause, U.S. CONST. amend. XIV, § 1, and show not only that

prosecutors acted with bad intent, but also that 'similarly situated individuals [outside the

protected category] were not prosecuted.'" *Fog Cutter Capital Grp. v. SEC*, 474 F.3d 822, 826–

27 (D.C. Cir. 2007) (quoting *Armstrong*, 517 U.S. at 465); *see also Branch Ministries v. Rossotti*,

211 F.3d 137, 144 (D.C. Cir. 2000) ("To establish selective prosecution, the Church must 'prove

that (1) [it] was singled out for prosecution from among others similarly situated and (2) that

[the] prosecution was improperly motivated, *i.e.*, based on race, religion or another arbitrary

classification.'" (alterations in original) (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983))).

These requirements reflect the limits of judicial review of the exercise of prosecutorial discretion, which is "at the very core of the executive function [and] has long been held presumptively unreviewable." *In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997). Thus, while prosecutorial decisions are "subject to constitutional limitations that district courts can enforce," *United States v. White*, 71 F.3d 920, 923–24 (D.C. Cir. 1995), "[b]ecause such [selective prosecution] claims invade a special province of the Executive—its prosecutorial discretion—we have emphasized that the standard for proving them is particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully," *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489–90 (1999) (quoting *Armstrong*, 517 U.S. at 463–65).

In this case, Michael Bikundi has made no effort either to specify the protected class of which he is a member that was the purported motivation for his prosecution or to identify similarly situated individuals outside such protected category who were not prosecuted. Rather, he merely points out limited trial testimony that three health care companies were shut down along with Global but no individuals at those other companies appear to have been prosecuted. Clearly, all four of these companies were criminally investigated and subjected to court-authorized warrants for searches and seizures.

Merely because individuals at Global, including the Florence and Michael Bikundi, who owned and operated Global, were prosecuted along with many of their employees, for serious criminal conduct, does not demonstrate improper motive by the government. To the contrary, the Supreme Court has made clear that "the conscious exercise of some selectivity in

enforcement is not in itself a federal constitutional violation so long as the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Bordenkircher v. Hayes*, 434 U.S. 357, 364–65 (1978) (internal quotations, alteration and citation omitted). The defendant Michael Bikundi has fallen far short of making even a threshold showing of any improper motive. Accordingly, his motions for a judgment of acquittal or a new trial based on his claim of selective prosecution are denied.

## IV.     CONCLUSION

The defendants Florence and Michael Bikundi operated Global Healthcare, Inc. for over four years, reaping millions of dollars in reimbursement for the provision of home personal care services to D.C. Medicaid beneficiaries in the District of Columbia. The overwhelming evidence at trial demonstrated that Global's receipt and maintenance of a license to operate as a health care agency and its billing were predicated on forged and fraudulent records, and amply supports the jury findings that these two defendants are guilty of conspiracy to commit and committing health care fraud. In addition, evidence at trial is sufficient to support their convictions of conspiracy to commit and committing money laundering. Moreover, none of the defendants' other challenges to their convictions merit disturbing the jury verdict.

Accordingly, for the foregoing reasons, the defendants' motions for a new trial or judgment of acquittal on their convictions are DENIED.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED**.

**DATED:**  March 7, 2016

_____
BERYL A. HOWELL
United States District Judge